**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

BRUCE PERRONE,
ROSANNA LONG, and
SIERRA CLUB,

        *Plaintiffs,*

v.                            CIVIL ACTION No.  2:24-cv-00434

CHAIRMAN CHARLOTTE R. LANE,
*in her official capacity,* COMMISSIONER
RENEE A. LARRICK, *in her official capacity*,
and COMMISSIONER WILLIAM B. RANEY,
*in his official capacity,*

        *Defendants.*

## <u>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>

Defendants Chairman and Commissioners of the Public Service Commission of West Virginia ("PSC") (collectively "PSC Commissioners" or "Defendants") by and through their undersigned counsel, and, in conjunction with the Motion to Dismiss ("Motion") filed contemporaneously herewith, move this Court to dismiss this Complaint for lack of subject-matter jurisdiction, and under Fed. R. Civ. P. 12(b)(6) and 12(b)(1).

## BACKGROUND

This case concerns Orders issued by the PSC in annual Expanded Net Energy Cost ("ENEC") rate cases [1] filed by Appalachian Power Company and Wheeling Power Company (collectively the "Companies").[2]  The crux of this Complaint asserts that the PSC

---

[1] Case Nos. 21-0339-E-ENEC ("2021 ENEC"), 22-0393-E-ENEC ("2022 ENEC"), and 23-0377-E-ENEC ("2023 ENEC"). Plaintiff Sierra Club has intervened in past Commission proceedings, but none of the Plaintiffs were parties to the 2021, 2022, or 2023, ENEC cases, nor did any of the Plaintiffs petition to intervene in those cases.
[2] The PSC regulates the Companies jointly for ratemaking purposes.

unlawfully issued a series of orders directing the Companies to fire their coal-fired power plants at a 69% capacity factor. (Compl. at ¶ 1.)[3]

In ENEC cases the PSC establishes just and reasonable rates by allowing electric utilities to recoup energy and demand-related power supply costs, net of profits they make on net wholesale electricity and transmission transactions. Each annual ENEC proceeding involves PSC review of ENEC costs and revenues from a past year, and projections of ENEC costs and revenues for a future year.

In the Companies' 2021 ENEC case, the PSC observed in an Order[4] that the Companies' projected ENEC costs were heavily weighted to include purchased power from the PJM Interconnection, LLC ("PJM") competitive wholesale market. The PSC further observed that projected variable costs of generation from the Companies' power plants were considerably lower than projected purchased power cost.[5] The PSC expressed concern that the Companies planned to serve customers with expensive energy from the wholesale market instead of maximizing generation from their own plants to serve customers at a lower cost. The Commission was also concerned that low

---

[3] While the Court must accept the factual allegations contained in the Complaint as true for the purposes of the Motion to Dismiss, Defendants reserve their rights to contest each of the factual allegations at issue and do not concede their veracity.  Moreover, Plaintiffs refer, as a basis of the so-called "69% directive" in the Complaint, to various orders of the PSC. Plaintiffs failed to attach those orders to the Complaint. As a general rule, if the Court considers "matters outside the complaint," it must convert a motion to dismiss into a motion for summary judgement. A Court is permitted to consider matters on the public record in connection with a motion to dismiss without converting the motion to one for summary judgment. Booker v. Dominion Va. Power, No. 3:09cv759, 2010 U.S. Dist. LEXIS 44960, at *12 (E.D. Va. May 7, 2010), citing Papasan v. Allain, 478 U.S. at 265, 268 n.1 (1986). Additionally, "when a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment." Booker, U.S. Dist. LEXIS 44960, at *12, citing Gasner v. County of Dinwiddie, 162 F.R.D. 280, 282 (E.D. Va. 1995). "Such documents include 'official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed.'" Id. Thus, the orders at issue are attached to the Defendants' Motion to Dismiss infra.
[4] WV PSC Order September 2, 2021 (2021 ENEC), attached to Motion as Exhibit A.
[5] Id. at 5.

utilization of economical generation from the Companies' power plants limited the Companies' ability to sell excess generation on the wholesale market at a profit that the Companies could pass back to ratepayers to reduce the net power supply costs customers pay for in ENEC rates.[6] Based on projections of wholesale power prices compared to the costs to self-generate, the PSC assumed increased self-generation (also referred to self-scheduling) by the Companies when the PSC set the 2021 ENEC rates and suggested plant operation at a 69% capacity factor as a minimum goal or target that the Companies should achieve.[7]

In the 2022 ENEC, the PSC ordered the Companies to maximize self-generation when doing so would be more economical than purchasing power, and reminded the Companies that they have the burden to prove the necessity and prudence of purchased power costs before the PSC will allow rate recovery.[8]

The Complaint suggests, misleadingly, that the PSC Commissioners issued an unconditional directive to the Companies to operate their coal-fired electric generation plants at an average 69% capacity factor and that negative rate impacts will result. (Compl. at ¶¶ 82, 83.) The Complaint also asserts that the alleged production directive will interfere with the FERC-regulated wholesale price of power in the PJM energy market, and result in higher rates for the Companies' retail customers. (*See, e.g.*, Compl. at ¶¶ 115, 116.)

The entirety of Plaintiff's Complaint, however, is based on a false premise – the 69% directive. In fact, none of the ENEC Orders mandated that the Companies maintain

---

[6] *Id.* at 5-6.
[7] *See generally*, Exhibit A, WV PSC Order September 2, 2021 (2021 ENEC); WV PSC Order January 9, 2024 (2021, 2022, and 2023 ENEC), at 4, attached to Motion as Exhibit B.
[8] WV PSC Order February 3, 2023, (2022 ENEC) at 4, attached to Motion as Exhibit C.

plant operations at a 69% capacity factor indefinitely or when dispatch was projected to be uneconomical.[9] To the contrary, the PSC orders consistently tied the 69% capacity factor target to economic dispatch and encouraged the Companies to maximize operation of their coal-fired generation stations to take advantage of market conditions to benefit their ratepayers.[10]

The Plaintiffs assert one cause of action. Plaintiffs seek a declaratory judgment under 28 U.S.C. §§ 2201(a) and 2202 that the 69% directive is preempted by the Federal Power Act, 16 U.S.C. §791a – 825r (1940) ("FPA"). As stated below, Plaintiffs' Complaint fails as a matter of law under Fed. R. Civ. P. Rules12(b)(1) and 12(b)(6), and must be dismissed.

## ARGUMENT

## I.    PLAINTIFFS LACK STANDING

The individual Plaintiffs, Mr. Perrone and Ms. Long, assert that they have standing because they are residential customers of APCo, and they have "experienced rising electricity rates over the past few years and [do] not want [their] rates to continue to increase, particularly in order to subsidize the uneconomic dispatch of APCo's and WPCo's power plants." (Compl. at ¶¶ 22 and 23.) The Sierra Club asserted that it has standing because it has at least one office space located in West Virginia, and it is a retail customer of the Companies. (Compl. at ¶ 24.)

---

[9] In consideration of the standards for adjudging a Rule 12(b)((6) motion to dismiss, Defendants understand that this honorable Court must take the Plaintiffs' incorrect characterizations of the 69% capacity target as true in evaluating the Defendants' motion.

[10] Exhibit A, September 2, 2021 PSC Order (2021 ENEC) (first introduced a 69% capacity factor for use in that ENEC case based on evidence that the Companies and ratepayers would benefit economically); March 2, 2022, PSC Order (2021 ENEC), attached to Motion as Exhibit D (stating intention that Companies maximize use of fossil-fuel generation that is cheaper than purchased power); Exhibit B, January 9, 2024 PSC Order (2021, 2022 and 2023 ENEC) (encouraging self-generation when self-generation is the most economical choice).

The Sierra Club also asserted that it has associational[11] standing because certain of its members are residential customers of the Companies, and, like the individual Plaintiffs, "they have all noticed that their electricity bills have been increasing, and they do not want to pay higher rates in order to prop up West Virginia coal plants' uneconomic dispatch in compliance with the Commissioners' 69% Directive." (Compl. at ¶ 25.) Furthermore, the Sierra Club asserted that its members' alleged injuries are "germane [its] mission to replace fossil fuel generation with cleaner energy sources" and its "promotion of energy conservation through appropriately designed electrical utility rate structures which, in conjunction with additional regulatory activity minimize the emission of environmental pollutants." (Compl. at ¶ 26) (internal citations and quotations omitted). Plaintiffs have failed to allege sufficient facts to establish standing under Article III of the U.S. Constitution, or prudential standing.

The Fourth Circuit has distinguished Article III constitutional standing from prudential standing. *See, e.g.*, <u>CGM, LLC v. BellSouth Telecommunications, Inc.</u>, 664 F.3d 46, 52 (4th Cir. 2011). To possess constitutional standing, a plaintiff must be injured by the defendant, and a federal court must be able to redress the injury. <u>CGM</u>, <u>LLC</u>, 664 F.3d at 52 (internal citations and quotations omitted). Prudential standing encompasses several judicially-created limits on federal jurisdiction, "such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches,

---

[11] An association cannot establish standing to sue on behalf of its members unless "at least one of [its] members possesses standing to sue in his or her own right." *See, e.g.*, <u>United States v. AVX Corp.</u>, 962 F.2d 108, 116 (1st Cir. 1992).

and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.*, (citing Allen v. Wright, 468 U.S. 737, 751, 104 S. Ct. 3315 (1984)).

"To satisfy the standing requirement of the case-or-controversy limitation on judicial authority found in Article III, Section 2 of the Constitution, the party invoking federal court jurisdiction must show that (1) it has suffered an injury in fact, (2) the injury is fairly traceable to the defendants' actions, and (3) it is likely, and not merely speculative, that the injury will be redressed by a favorable decision." Long Term Care Partners, LLC v. United States, 516 F.3d 225, 230-31 (4th Cir. 2008) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130 (1992) (internal quotations omitted)).

Standing is not a "mere pleading requirement but rather an indispensable part of the plaintiff's case." Defs. Of Wildlife, 504 U.S. at 561. As the party invoking the Court's jurisdiction, Plaintiffs bear the burden of establishing these elements. Spokeo v. Robins, 578 U.S. 330, 338, 136 S. Ct. 1540 (2016).

Plaintiffs' allegations in support of standing, whether individual or associational, is premised on the assertion that the alleged 69% directive "has contributed to higher electricity prices, and threatens to raise consumer rates even more in the future." (Compl. at ¶ 27.) This is insufficient to show injury in fact, causation, or redressability.

Plaintiffs have failed to show an injury in fact. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 578 U.S. at 339 (citing Defs. of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992)). A concrete injury is one that is "real, and not abstract." Spokeo, 578 U.S. at 340 (internal quotation marks omitted). Plaintiffs' alleged injury – a threat of higher

electricity rates – is based upon nothing but guesswork and conjecture. They allege no facts to show an actual injury for the purposes of Article III standing in this case. Plaintiffs' conclusory statements are insufficient to meet the pleading standards required to assert an actual, concrete, and real injury. (*See* Mot. To Dismiss at 3, citing <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Plaintiffs' assertions are hypothetical at best, and as such, Plaintiffs do not have standing.

Standing also requires causation and redressability, which "overlap as two sides of a causation coin." <u>Carpenters Indus. Council v. Zinke</u>, 854 F.3d 1, 6 n.1, 428 U.S. App. D.C. 243 (D.C. Cir. 2017) (internal citations and quotations omitted). To be fairly traceable to the challenged conduct, "there must be a causal connection between the injury and the conduct complained of." <u>Defs. of Wildlife</u>, 504 U.S. at 560. The connection "must not be too speculative or attenuated." <u>All. for Hippocratic Med</u>., 602 U.S. at 383. To be redressable, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Defs. of Wildlife</u>, 504 U.S. at 561. (internal quotation marks omitted). Plaintiffs have failed to allege facts sufficient to establish either causation or redressability, nor could they.

Simply put, the Complaint does not and cannot identify any past rate increase that has resulted from the alleged 69% production directive. Moreover, the claim that the alleged directive will result in future rate increases is hypothetical and speculative because West Virginia retail electric utility rates are calculated based on multiple categories of cost of service - not only the variable costs of operating generation facilities or the cost of fuel for generation facilities. Rates are also based on the cost of administrative expense, the cost of capital, debt service for investment in public utility

facilities, return on rate base, operation and maintenance, vegetation control, depreciation, income and property tax, to name a few.

Thus, it is a factual impossibility that the alleged 69% directive could be traceable to any past or future rate increases. Furthermore, an order from this Court enjoining[12] the PSC from enforcing such a directive would not and cannot assure redressability of the Plaintiffs' alleged injury – future electricity rate increases. Plaintiffs have done nothing more than recite the threadbare elements of Article III standing. As such, the Complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

For similar reasons, Plaintiffs also lack prudential standing. Prudential standing encompasses several judicially-created limits on federal jurisdiction, CGM, LLC, 664 F.3d at 52. This includes "the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches." *Id.*, (citing Allen v. Wright, 468 U.S. 737, 751, 104 S. Ct. 3315 (1984)). Here, Plaintiffs seek a decision from this Court regarding the generalized grievance of rising utility rates.

Furthermore, "to establish prudential standing, plaintiffs must show that the statutory cause of action encompasses the plaintiffs claim." Vill. of Old Mill Creek v. Star, No. 17 CV 1163, 2017 U.S. Dist. LEXIS 109368, at *15-16 (N.D. Ill. July 14, 2017) (citing Bank of Am. Corp. v. City of Miami, Fla., 137 S. Ct. 1296, 1302 (2017)). "The presumption is that a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Old Mill Creek, 2017 U.S.

---

[12] Plaintiffs seek a declaratory judgment under the Declaratory Judgments Act, 28 U.S.C. §§ 2201(a) and 2202 (the "Act"). The Act, however, "is remedial only and neither extends federal courts jurisdiction nor creates any substantive rights." CGM, LLC, 664 F.3d at 55-56. "As such, an action for declaratory judgment does not escape the constitutional mandate that its proponent has standing and that it does not seek an advisory opinion." *Id.* MST, LLC v. N. Am. Land Tr., No. 2:22-cv-00874-DCN, 2022 U.S. Dist. LEXIS 204171, at *7-8 (D.S.C. Nov. 8, 2022) (citing Trustgard Ins. Co. v. Collins, 942 F.3d 195, 199 (4th Cir. 2019)).

Dist. LEXIS 109368, at 15016. (citing <u>Lexmark Int'l, Inc. v. Static Control Components,</u> <u>Inc.</u>, 134 S. Ct. 1377, 1388 (2014)).  Here, similar to <u>Old Mill Creek</u>, Plaintiffs, as retail ratepayers, do not have prudential standing to file preemption claims under the FPA because their interests do not fall within the zone of interest protected by section 824d of the FPA. That section, relied upon by Plaintiffs (Compl. at ¶ 128), deals with FERC jurisdiction over wholesale rates. Plaintiffs only alleged injury is paying higher rates as retail and residential ratepayers. As such, Plaintiffs lack prudential standing, and the Complaint must be dismissed.

## II.    PLAINTIFFS LACK A PREEMPTION CAUSE OF ACTION AND CANNOT INVOKE EQUITABLE JURISDICTION IN LIEU OF ONE.

The Complaint should be dismissed because Plaintiffs lack a cause of action to bring FPA-based preemption claims in federal district court. There is no constitutional, statutory, or equitable basis for private parties to seek equitable relief under the FPA. The three federal district courts that have addressed this issue have held that there is no private right of action under the FPA.[13]

The Complaint asserts that the Defendants violated the Supremacy Clause but the Supreme Court has held that "[t]he Supremacy Clause is not the source of any federal

---

[13] <u>Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils.</u>, 410 F. Supp. 3d 943 (S.D.Ind. 2019). U.S. Dist. LEXIS 170132, 2019 WL 4749968 (dismissing FPA preemption complaint filed by generator against municipal water and sewer utility to prevent utility from terminating water and sewer service); <u>Coalition for</u> <u>Competitive Elec. v. Zibelman</u>, 272 F. Supp. 3d 554 (S.D.N.Y. 2017) (dismissing FPA preemption complaint that alleged a New York program to award Renewable Energy and Zero-Emmission Credits to nuclear generators enabled the generators to bid low into the wholesale market but receive a higher than market price for their energy and thereby distort the wholesale market price), *aff'd on other grounds*, 906 F.3d 41 (2d Cir. 2018), *cert. denied,* <u>Elec. Power Supply Ass'n v. Rhodes</u>, 2019 U.S. LEXIS 2652, 139 S. Ct. 1547, 203 L. Ed. 2d 712, 87 U.S.L.W. 3406, 2019 WL 145344; <u>Village of Old Mill Creek v. Star</u>, 2017 U.S. Dist. LEXIS 109368, 2017 WL 3008289 (N.D. Ill. July 14, 2017) (dismissing FPA preemption complaint filed by ratepayers that alleged an Illinois Zero Emission Credit program would enable nuclear plants to bid into the wholesale market at artificially low prices and suppress wholesale market prices), *aff'd on other grounds sub nom.*, <u>Elec. Power Supply Ass'n v. Star</u>, 904 F.3d 518, 2018 U.S. App. LEXIS 25980, *reh'g denied,* <u>Elec. Power Supply Ass'n v. Star</u>, 2018 U.S. App. LEXIS 28509, *cert. denied,* <u>Elec. Power Supply Ass'n v.</u> <u>Star</u>, 2019 U.S. LEXIS 2575, 139 S. Ct. 1547, 203 L. Ed. 2d 712, 87 U.S.L.W. 3406, 2019 WL 133642.

rights and certainly does not create a cause of action." Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320 (U.S. 2015). Therefore, a plaintiff cannot invoke a court's equitable powers to enforce a law if Congress intended to exclude private enforcement of the law. *Id.* at 325. Relying on Armstrong, the Lawrenceburg court concluded that the FPA does not create a private right of action. 410 F. Supp. at 956. The FPA, instead, sets "standard[s] for [FERC] to apply and, independently of [FERC] action, creates no right which courts may enforce." Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 251 (1951). FERC alone has the power and discretion to go to court to enforce the FPA when necessary.

The Lawrenceburg, Zibelman, and Old Mill Creek rulings are based on two Supreme Court decisions. In Armstrong, the Supreme Court held that the Supremacy Clause "does not create a cause of action" under the federal Medicaid Act, 575 U.S. at 324-25, and instead "instructs courts what to do when state and federal law clash." *Id.* at 325. Raising preemption claims in federal court requires: (i) an express or implied private right of action under the allegedly preemptive federal statute; or (ii) a showing that the court can act pursuant to its equitable power to enjoin the alleged unlawful action. Each of these inquiries is a question of Congressional intent. *See*, Alexander v. Sandoval, 532 U.S. 275, 286 (2001). Armstrong thus mandates an evaluation of the federal statutory claim at issue in order to determine whether it is properly before a court. Here, Plaintiffs cannot assert a private right of action under the FPA. They instead ask this Court to invoke its equitable jurisdiction to address their preemption claim. Whether equitable jurisdiction may be invoked depends on whether Congress expressly or implicitly "inten[ded] to foreclose equitable relief" to private parties under the statute. Armstrong, 575 U.S. at 328

10

(citation omitted).

A Supreme Court decision first touched on the <u>Armstrong</u> equitable relief question in connection with an FPA preemption case in <u>Hughes</u>, but the Court did not rule on the question. The Court instead assumed, without deciding, that plaintiffs alleging FPA violations could seek relief in federal court. 578 U.S. 150, 161 n.6 (2016).[14] During the argument, however, Justice Breyer questioned the case posture because "there isn't" a "Supremacy Clause private right of action" and the Court did not have the benefit of "FERC's opinion" except "through the [Solicitor General]."[15] Justice Breyer's question is answered by the district court decisions in <u>Lawrenceburg</u>, <u>Zibelman</u>, and <u>Old Mill Creek</u>. "Plaintiff cannot bring a private cause of action for an FPA preemption claim." <u>Lawrenceburg</u>, 410 F. Supp 3d. at 956. Plaintiffs' recourse is to FERC, and not to this Court.

## A. There is no express or implied FPA private right of action.

"The concept of a 'cause of action' is employed specifically to determine who may judicially enforce . . . statutory rights or obligations." <u>Davis v. Passman</u>, 442 U.S. 228, 239 (1979). The Complaint nowhere alleges a private right of action to enforce the FPA.[16] Nor could it properly do so because there is none. The Supreme Court has acknowledged that the FPA provides no private right of action. The statute sets "standard[s] for [FERC]

---

[14] The Court decided <u>Armstrong</u> after the lower court proceedings in <u>Hughes</u> were complete, and the <u>Hughes</u> defendants did not preserve the defense that plaintiffs lacked a cause of action.

[15] Oral Arg. Tr. 24:3-11 (U.S. S. Ct. Feb. 24, 2016) (Breyer, J.), https://www.supremecourt.gov/oral_ arguments/argument_transcripts/2015/14-614_g2hk.pdf.

[16] Plaintiffs' allegation of federal subject matter jurisdiction (Complaint, ¶ 15) has no bearing on the separate and essential inquiry whether Plaintiff has a cause of action. "[J]urisdiction is a question of whether a federal court has the power, under the Constitution or laws of the United States, to hear a case, [whereas] cause of action is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." *Davis*, 442 U.S. at 239 n.18.

to apply and, independently of [FERC] action, *creates no right which courts may enforce*." Mont.-Dakota Utils. Co. v. Nw. Pub. Serv. Co., 341 U.S. 246, 251 (1951) (emphasis added).

The Lawrenceburg and Zibelman Courts concluded that Congress' inclusion of a private right of action in a single, circumscribed section of the FPA known as The Public Utility Regulatory Policies Act ("PURPA")[17], enacted decades after Mont.-Dakota, indicates that Congress purposefully did not include a private right of action in the FPA generally.[18] With the exception of PURPA, "the Federal Power Act does not authorize a private cause of action." Old Mill Creek, 2017 WL 3008289, at *26.

**B. The FPA Forecloses Private Actions for Equitable Relief.**

An administrative relief process set forth in a federal statute is implicit evidence of Congress' intent to foreclose equitable relief. Armstrong, 575 U.S. at 328. "[Where] a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 147 (1985) (citations omitted). The federal statute at issue in Armstrong - a rate regulation provision of the Medicaid Act - provided an administrative relief process based upon a "judgment-laden standard" entrusted to the Secretary of Health and Human Services. *Id.* Like the Medicaid Act, the FPA provides for administrative enforcement and relief. The "express provision of one method of enforcing a substantive rule suggests that Congress intended

---

[17] Pub. L. No. 95-617, 92 Stat. 3117 (1978); 16 U.S.C. § 824a-3(h)(2)(B).

[18] "Congress's allowance for a private right of action in the very narrow and specific circumstances under PURPA within the FPA further supports the conclusion that a general private right of action under the FPA was not intended to be provided by Congress." Lawrenceburg, 410 F. Supp. 3d at 957. "The limited private right of action provided by PURPA is by itself sufficient to establish that Congress intended to foreclose equitable relief." Zibelman, 272 F. Supp. 3d at 566.

to preclude others." *Id.* (quoting <u>Alexander v. Sandoval</u>, 532 U.S. 275, 290 (2001).[19] The presence of an express statutory enforcement scheme can by itself demonstrate Congress's intent to preclude the exercise of a court's equitable jurisdiction. That is the case here. "The FPA tacitly forecloses private parties from invoking equity jurisdiction to challenge state laws enacted in alleged violation of the FPA because Congress implicitly provided a "sole remedy" in the FPA - specifically, enforcement by FERC." <u>Zibelman</u>, 272 F. Supp. 3d at 565.

The FPA contains a comprehensive administrative enforcement scheme. <u>Zibelman</u>, at 565-66; <u>Old Mill Creek</u>, 2017 U.S. Dist. LEXIS 109368 at *25.

- All rates for sales or transmission subject to FERC's jurisdiction are to be filed with FERC. 16 U.S.C. § 824d(c).

- FERC may suspend and examine rate filings to ensure they are just and reasonable and not unduly preferential or discriminatory. *Id.* 16 U.S.C. § 824d(d), (e).

- Interested parties can intervene and oppose rate filings. 18 C.F.R. § 385.214.

- Any person may file a complaint seeking changes to any existing rate, rule, practice on contract affecting a rate that a complainant believes to be "unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a).

- Further, "[a]ny person" may file a complaint regarding "anything done or omitted to be done by any [regulated entity] in contravention of" the statute (16 U.S.C.S § 825e), or may file a petition asking FERC to issue a declaratory order. 18 C.F.R. §§ 385.206 and 385.207.

---

[19] *See,* <u>Seminole Tribe v. Florida</u>, 517 U.S. 44, 73-74 (1996) ("refus[ing] to supplement" the Indian Gaming Regulatory Act's "carefully crafted and intricate remedial scheme" with equitable cause of action).

- FERC also can, subject to federal court review, declare whether state laws are preempted. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC, 964 F.3d 1177 (D.C. Cir. 2020); Orangeburg v. FERC, 862 F.3d 1071, 1081 (D.C. Cir. 2017); E.g., New Eng. Ratepayers Ass'n, 168 F.E.R.C. P61,169 (2019) (concluding that a state statute was preempted by the FPA); Cal. Pub. Utils. Comm'n, 132 FERC ¶ 61,047, *granting clarification and dismissing reh'g*, 133 FERC ¶ 61,059 (2010), *reh'g denied*, 134 FERC ¶ 61,044 (2011).

FERC also has ample tools to remedy violations.

- FERC may "perform any and all acts" it finds "necessary or appropriate to carry out" the FPA's provisions. 16 U.S.C. § 825h.

- The FPA specifically empowers FERC - "in its discretion" - to bring an action in federal district court against "any person" to enforce compliance with the FPA and enjoin any acts that violate it or obtain a writ of mandamus compelling compliance. *Id.* 16 U.S.C. § 825m(a)&(b).

Congress afforded these explicit rights to FERC, committed exercise of them to FERC's discretion, said nothing about suits by private plaintiffs, and instead provided for such entities to seek relief from and through the agency. Armstrong, 575 U.S. 328. Plaintiffs should not be able to end run the scheme Congress created by invoking this Court's equitable powers.

## III.    PLAINTIFF'S PREEMPTION CLAIMS FAIL AS A MATTER OF LAW

Federal preemption can occur where: (i) Congress has expressly preempted the state action at issue; (ii) Congress has so occupied the field that federal law precludes enforcement on the same subject; or (iii) state law conflicts with and stands as an obstacle

to the accomplishment of the purpose of the federal statute. <u>Nw. Cent. Pipeline Corp. v. State Corp. Comm'n</u>, 489 U.S. 493, 509 (1989). Plaintiffs do not assert express preemption. Neither field nor conflict preemption applies.

> **A. The FPA Explicitly Contemplates State Regulation Within the State Domain and Does Not Field Preempt a State Requirement that a Utility Use its Own Generation to Serve Intrastate Retail Load.**

Field preemption applies when "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." <u>Nw. Cent. Pipeline</u>, 489 U.S. 493, 509; <u>PPL EnergyPlus, LLC v. Nazarian</u>, 753 F.3d 467, 474 (4th Cir. 2014).

There is no field preemption of the alleged production directive because the FPA "places beyond FERC's power, and leaves to the states alone, the regulation of any [non-wholesale] sale, most notably, any retail sale, of electricity (citation omitted)[;] and [t]he states' reserved authority includes control over in-state facilities used for the generation of electric energy." (citations omitted) <u>Hughes</u>, 578 U.S. at 154. The PSC may regulate within the domain Congress assigned to the state even when that regulation incidentally affects areas within FERC's domain. <u>Id.</u> at 164 (citing, <u>Oneok, Inc. v. Learjet, Inc.</u> 575 U.S. 373, 385 (2015) (whether Natural Gas Act preempts a particular state law turns on the "target at which the state law aims")).[20] Congress has distinguished between those matters that belong exclusively to the federal government, such as regulation of interstate sales and transmissions of energy, and those matters that remain within the regulatory authority of the states, such as the regulation of energy generators. <u>PPL EnergyPlus, LLC v. Solomon</u>,

---

[20] The <u>Hughes</u> Court noted that although <u>Oneok</u> involved the Natural Gas Act rather than the Federal Power Act, the relevant provisions of the two statutes are analogous, and the Supreme Court routinely relies on Natural Gas Act cases in determining the scope of the FPA. 578 U.S. 150, 164 n. 10.

766 F.3d 241, 250 (3d Cir. N.J., 2014), *cert. denied* <u>CPV Power Holdings, LP v. Talen Energy Mktg.</u>, *LLC*, 578 U.S. 944 (2016). "FERC's authority over interstate rates does not carry with it exclusive control over any and every force that influences interstate rates." *Id.* 766 F.3d at 255.

Even if the PSC had issued a directive for the Companies to achieve a 69% capacity factor at their own generation plants, it would have acted within the State's domain under the FPA because the alleged production directive (1) arose in a retail rate case from concern about the impact of skyrocketing energy prices on retail ratepayers, and (2) regulated in-state generation facilities for the benefit of in-state retail ratepayers. 16 U.S.C. § 824(b)(1). *See*, <u>Coalition for Competitive Elec. v. Zibelman</u>, 906 F.3d 41, 50 (2nd Cir. 2018). A capacity factor requirement is a requirement on production, which the Supreme Court has found to be firmly on the state side of the jurisdictional dividing line. <u>Nw Cent.</u>, 489 U.S. 493, 514.[21] Production requirements do not intrude into FERC's sphere.

### B.    A Capacity Factor Requirement is not Conflict Preempted by the FPA.

Conflict preemption applies "where under the circumstances of [a] particular case, [state action] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." <u>Hughes</u>, 578 U.S. at 151 (citation omitted).

Under the FPA, "conflict-pre-emption analysis must be applied sensitively . . . so as to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role. <u>Nw Cent.</u>, 489 U.S. 493, 515. Hence, when the state "regulate[s] production or other subjects of state jurisdiction," "and the means chosen [are]

---

[21] While <u>Nw Cent.</u> is a Natural Gas Act case, the Supreme Court routinely relies on Natural Gas Act cases in determining the scope of the FPA because relevant provisions of the two statutes are analogous. <u>Hughes</u>, 578 U.S. 150, 164 n. 10.

at least plausibly … related to matters of legitimate state concern," there is no conflict between the state rule and the federal regulatory scheme, unless "clear damage to federal goals would result." *Id.* at 518, 522.

Even assuming the PSC issued an unconditional production requirement, which it did not, the directive would have been related to a legitimate state concern (reasonable retail rates). Petitioners fail to acknowledge, and perhaps fail to understand, that load-serving generator decisions on the amount of internally generated energy to make available to meet hourly load are FERC-approved elements of the PJM Operating Agreement.[22] The Operating Agreement Manual 11 governing Energy & Ancillary Services Market Operations makes it clear that any resource wishing to deliver a certain quantity of power into the market can do so by simply telling PJM that it intends to "self-schedule". A production directive would not frustrate Congress' purpose or objectives in the FPA because the FERC-approved PJM Operating Agreement and rules allow generators to self-schedule into the PJM Day-ahead energy market.[23] Accordingly, a PSC directive to the Companies to produce energy at a 69% capacity level would not impermissibly infringe on wholesale markets because any such directive would be consistent with the Companies' right to self-schedule and offer that energy into the PJM market.

## IV.    THE COURT SHOULD DISMISS OR STAY THE COMPLAINT UNDER THE DOCTRINE OF PRIMARY JURISDICTION.

As discussed above, if anywhere, this case should have been filed at FERC. Even if the Court disagrees, the PSC Commissioners encourage the Court to refer the

---

[22] PJM FERC-approved Operating Agreement, https://pjm.com/directory/merged-tariffs/oa.pdf
[23] *Id.*; PJM Operating Agreement, Schedule 1 Section 1 Market Operations Sec. 1.10.3., FERC docket ER23-1138-000.

preemption issue to FERC under the doctrine of primary jurisdiction which "is 'designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise.'" Norfolk S. Ry. Co. v. Balt. & Annapolis R.R., 715 Fed. Appx. 244, 249 (4th Cir. 2017) (citing Envtl. Tech. Council v. Sierra Club, 98 F.3d 774, 789 (4th Cir. 1996). The wholesale market regulator, FERC, should analyze whether the capacity directive in the PSC Orders is preempted by the FPA.

## V.   THE PLAINTIFFS HAVE NOT PLAUSIBLY PLEAD FACTS THAT WOULD ENTITLE THEM TO RELIEF.

Here, the Plaintiffs fail to accurately recount to this Court the content of PSC orders. The PSC orders discussed a 69% capacity factor as an appropriate target for the Companies to have achieved *during a timeframe* when self-production would have been extremely advantageous for ratepayers of the Companies. The Plaintiffs mischaracterize the 69% capacity factor as an absolute requirement – which it was not and is not.

The PSC speaks only through its orders and can only issue a directive through an Order. In quoting or paraphrasing orders of the PSC, the Plaintiffs disregard or ignore that the orders consistently tied the 69% capacity target to the timeframe encompassed by the 2021 ENEC case and economic dispatch. The PSC applied the capacity factor requirement to a period of time when the Companies' projections indicated they should take advantage of their ability to generate economically by operating plants at a 69% capacity factor.

Even the order language quoted by the Plaintiffs in their Complaint (Compl. at ¶ 84a) states that the 69% applied to the 2021 ENEC was based on cost projections. The same order acknowledged that power purchases in lieu of self-scheduling could be prudent if cost projections did not come true:

APCo's projected ENEC costs include significant amounts of purchased power which could be prudent if it is clear that purchased power costs will be less expensive when compared to generation at the West Virginia power plants.[24]

In response to the Companies' petition for reconsideration and request for clarification, the PSC clarified that the capacity target applied when self-generation was the economical choice:

> . . . the [PSC's] intent, when setting a utilization target for the Companies' fossil-fuel fired plants, is to require the Companies to follow a power supply policy to maximize their use of fossil-fuel generation *that is cheaper* than purchased power . . .[25]

Company owned generation was the cheaper option in September 2021 when that Order issued. The PSC did not direct the Companies to use their generation when purchasing power was the cheaper option.

The January 9, 2024 PSC Order explained the 69% capacity factor as:

> . . . a target to strive for, based on evidence before us in the 2021 ENEC that self-generation was more economical than relying on non-self-generated power. There should be no misunderstanding about maximizing self-generation and striving for a minimum target capacity utilization level *when self-generation was the most economical power supply choice*. If the projections regarding the economic benefit of self-generation had been incorrect, the Companies could have planned their daily generation accordingly and explained why that resulted in not meeting the target capacity utilization level. As it turned out, there was no question that *self-generation would have been economic for most of the period March, 2021 through February 28, 2023* . . . The issue in this case is not whether the Companies achieved a 69 percent capacity factor, or any specific capacity factor, it is that they did not maintain adequate coal stockpiles and incoming coal supplies to maximize generation when it was prudent to do so.[26]

---

[24] Exhibit A, September 2, 2021 PSC Order (2021 ENEC) at 5.
[25] Exhibit D, March 2, 2022 PSC Order (2021 ENEC) at 7 (emphasis added).
[26] Exhibit B, January 9, 2024, PSC Order (2021, 2022, and 2023 ENEC) fn 10 at 8-9 (emphasis added).

In addition to cherry-picking language from Orders and using it out of context, the Plaintiffs support their mischaracterization of the 69% capacity factor by quoting questions posed by Chairman Lane at hearings - but Chairman Lane alone does not speak for the PSC. As triers of fact, the PSC Commissioners may ask questions to clarify the answers and positions taken by expert witnesses. Such questions cannot be conflated into a directive from the Commission, which speaks only through its orders.  The Plaintiffs also quote testimony of witnesses for the Companies and members of PSC staff - who also do not speak for the PSC. The PSC speaks only through its orders, and the facts asserted by the Complaint are inconsistent with the content of the PSC orders.

The Complaint does not contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570 (2007).

**CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

CHAIRMAN CHARLOTTE R. LANE, COMMISSIONER RENEE A. LARRICK, and COMMISSIONER WILLIAM B. RANEY,

By counsel,

*/s/ Jessica M. Lane, Esq.*
Jessica M. Lane (W.Va. Bar No. 7040)
Jeffrey A. Foster (W. Va. Bar No. 9410)
Public Service Commission of West Virginia
201 Brooks Street
Charleston, West Virginia 25301
304-340-0300 phone
304-340-3758 fax
jlane@psc.state.wv.us
jfoster@psc.state.wv.us

CERTIFICATE OF SERVICE


The undersigned here certifies that on November 4, 2024, a copy of the foregoing was served via CM/ECF with electronic service going to counsel of record who have entered an appearance in the lawsuit.


*/s/ Jessica M. Lane, Esq.*
Jessica M. Lane (W.Va. Bar No. 7040)
Jeffrey A. Foster (W. Va. Bar No. 9410)
Public Service Commission of West Virginia
201 Brooks Street
Charleston, West Virginia 25301
304-340-0300 phone
304-340-3758 fax
jlane@psc.state.wv.us
jfoster@psc.state.wv.us