# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

BRUCE PERRONE, ROSANNA LONG,
and SIERRA CLUB,

       Plaintiffs,

v.                                                                    CIVIL ACTION No. 2:24-cv-00434

CHAIRMAN CHARLOTTE R. LANE,
COMMISSIONER RENEE A. LARRICK,
and COMMISSIONER WILLIAM B. RANEY,
*in their official capacities*,

       Defendants.

## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO THE COMMISSIONERS' MOTION TO DISMISS

Dated:       November 18, 2024

Respectfully submitted,

/s Amanda Demmerle
Amanda Demmerle (WVSB No. 13930)
APPALACHIAN MOUNTAIN ADVOCATES
J. Michael Becher (WVSB No. 10588)
APPALACHIAN MOUNTAIN
ADVOCATES
PO Box 11571
Charleston, WV 25339
(757) 650-2774
ademmerle@appalmad.org
(304) 382-4798
mbecher@appalmad.org

Evan Johns (WVSB No. 12590)
6101 Penn Avenue
Suite No. 402
Pittsburgh, PA 15206
(304) 439-0303
ejohns@appalmad.org

Plaintiffs filed this lawsuit in order to seek relief from the "69% Directive," which compels APCo and WPCo to uneconomically dispatch their power into the wholesale market at the expense of West Virginia ratepayers. The Commissioners offer a grab bag of reasons to dismiss the Complaint, but they fail to consider well pled factual allegations, misconstrue Plaintiffs' burden at this point of the litigation, and pursue legal arguments that fail as a matter of law under binding precedent. Because Plaintiffs have pled facts to show that the Commissioners' 69% Directive intrudes into FERC's exclusive jurisdiction and is thus preempted, the Court should deny the Commissioners' Motion to Dismiss.

## REGULATORY BACKGROUND

This case involves two regulatory bodies—the Federal Energy Regulatory Commission ("FERC") and West Virginia's Public Service Commission (the "Commission" or "PSC")—and their scope of authority. Pursuant to the Federal Power Act ("FPA"), FERC exclusively regulates interstate transmission of electricity and the sale of electricity at wholesale in interstate commerce, while States retain jurisdiction over the retail sale of electricity, generation, and the transmission and distribution of electricity in intrastate commerce, *see* 16 U.S.C. § 824(b)(1).

The PJM Interconnection ("PJM") is a wholesale electricity market that falls under FERC's exclusive jurisdiction. ECF No. 1 ¶ 30. As relevant here, PJM operates an Energy Market, which requires PJM to forecast the next day's anticipated electricity demands and secure enough bids to fulfill that demand (known as the "Day-Ahead Market"). *Id.* ¶¶ 32, 40. Through an auction process, the cheapest resource will "clear" the market first, followed by the next cheapest option, and so forth until demand is met. *Id.* ¶ 42. When supply matches demand, the market is "cleared," and the price of the last resource to offer in is the market-clearing price and becomes the wholesale price of power for all the generators whose bids were accepted in the auction. *Id.* ¶¶ 42–44. If an operator

does not receive a market-clearing price greater than or equal its costs to produce and sell electricity, its dispatch will be uneconomic—it will lose money on the sale—but because the Market-Clearing Price is based on the last offer that clears the market, uneconomic dispatch will occur only if a unit clears the market with an artificially low bid. *Id.* ¶ 48.

Appalachian Power Company ("APCo") and Wheeling Power Company ("WPCo") are public utilities that supply electricity for West Virginia consumers. *Id.* ¶ 59. To do so, they rely upon their portfolio of owned generation (which they must sell into the PJM Energy Market) and power purchase agreements from the PJM Energy Market. *Id.* ¶¶ 38, 50–52. Because APCo and WPCo operate in West Virginia, they are regulated by the Commission. *Id.* ¶ 61. Among other things, the Commission sets the retail rate that they can charge retail customers for electricity. *Id.* One component of retail rates is the cost of fuel (and related expenses) and purchased power used to serve customers, which is collectively known as the Expanded Net Energy Cost ("ENEC"). *Id.* ¶ 63. The purpose of an ENEC proceeding is for the Commissioners to determine whether APCo and WPCo's costs for the fuel, purchased power, and other costs were prudently incurred in any given year. *Id.* ¶ 67. The Commissioners must find that costs were prudently incurred in order for the Companies to pass their costs on to consumers in retail rates. *Id.* ¶¶ 86–87.

Plaintiffs' challenge arises out of the Commissioners' actions in ENEC proceedings over the past four years that have compelled APCo and WPCo to operate their coal-fired power plants at a 69% threshold (hereinafter, the "69% Directive"), rather than making operational decisions based on the market-clearing price in PJM. Plaintiffs seek declaratory relief from this Directive under *Ex parte Young* and federal preemption principles, arguing that the Commissioners intruded on FERC's exclusive jurisdiction of wholesale markets. Plaintiffs believe they—and all other ratepayers in West Virginia—have been and will continue to subsidize APCo and WPCo's

compliance with the 69% Directive until it is enjoined.

**ARGUMENT**

I.  **Accepting Plaintiffs' Well Pled Facts As True, Plaintiffs Have Standing and Are Entitled to the Relief They Seek.**

The Commissioners' attack on Plaintiffs' claim and their standing to bring it is a factual challenge inappropriate for a 12(b)(6) motion to dismiss. It is well established that "[w]hen ruling on a motion to dismiss, courts must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017); *see also Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 505 (4th Cir. 1998) (explaining that federal "pleading standards require the complaint be read liberally in favor of the plaintiff").

A.  **The Commissioners repeatedly emphasized and used the 69% Directive over a four-year period.**

The Commissioners' argument that Plaintiffs failed to plausibly plead facts entitling them to relief is really an argument that Plaintiffs' factual allegations are not true—that the 69% Directive does not require APCo and WPCo to dispatch their power plants 69% of the time regardless of economics. *See* ECF No. 18 at 18 ("The Plaintiffs mischaracterize the 69% capacity factor as an absolute requirement – which it was not and is not."). This argument is belied by a review of the Orders themselves, some of which the Commissioners have attached to their Motion. It is also inconsistent with the recent findings of the West Virginia Supreme Court in *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, No. 24-75, slip op. at 20 (W. Va. Nov. 13, 2024)

Beginning in 2021, in APCo and WPCo's 2021 ENEC proceeding, the Commissioners questioned whether APCo and WPCo were firing their coal-fired power plants enough. Specifically, the Commissioners were dissatisfied with APCo and WPCo's "capacity factor

3

projections"—which is the percentage of energy produced by a generating unit for one year compared to the energy that theoretically could have been produced at continuous full power operation during the same period—and found that they were "too low." ECF No. 1 ¶ 84a. The Commissioners determined that petitioners should be using a capacity factor of 69% "at a minimum," adjusted projected costs to reflect less purchased power and more self-generation, and approved ENEC rates based upon a capacity factor of 69%. ECF No. 1 ¶ 84a; ECF No. 17-1 at 50; *see also App. Power Co.*, slip op. at 7.

Since 2021, the Commissioners have used the 69% Directive to evaluate the utilities' cost recovery requests. In 2022, the Commission decided to reopen the 2021 ENEC docket, at least in part, because "capacity factors have not approached [the 69%] level in September, October, and November 2021" and set the matter for a hearing to determine why the companies were "severely curtailing their own generation." *App. Power Co.*, slip op. at 7; *see also* ECF No. 17-1 at 66; ECF No. 1 ¶ 84(b). In a May 13, 2022 order, the Commissioners directed its Staff to conduct a prudency review for expenses incurred from 2020 to 2022 because of "the large under-recovery balance and the Commission's direction . . . to run their coal-fired generation plants at 69 percent capacity, which has not yet been achieved." ECF No. 1 ¶ 84(d); *see also App. Power Co.*, slip op. at 9–10.

 In February 2023, the Commissioners reiterated its order that the utilities power plants "should be capable of operating at a minimum 69% capacity factor" and established a rebuttable presumption based on that threshold. *Id.* at 11–12; *see also* ECF No. 17-1 at 50; ECF No. 1 ¶ 86. Specifically, the Commissioners described evaluation upon the 69% threshold as the "first step" in determining whether costs were prudently incurred. ECF No. 17-1 at 53. They explained that "it would be easier for the Companies to meet their burden of proof regarding reasonableness of costs and prudence of their management of ENEC costs if they achieve the 69 percent annual

capacity factor. *Id.* If that threshold was not met, the Companies' submissions would be evaluated on a detailed four-factor test to determine reasonableness and prudence. *Id.* The Commissioners deferred ruling on the under-recovery balance until such "prudency review" was completed. *Id.* at 67. That prudency review was submitted on April 28, 2023. ECF No. 1 ¶ 75.

Despite a footnote positing that the 69% Directive was never meant to be binding, the Commissioners continued to rely on that threshold in its January 2024 Order. *See* ECF No. 17-1 at 18–19 & n.10. That Order did nothing to replace the previously established rebuttable presumption; instead, it based its finding on an assumption that "there was no question that self-generation would have been economic for most of the period March, 2021 through February 28, 2023 if the Companies had adequate coal supplied." *Id.* at 19 n.10. Indeed, in that same Order, the Commissioners noted the report's finding that "the Companies did not appear to take seriously the Commission decision in the 2021 and 2022 ENEC [dockets] and did not tell the employee responsible for coal procurement "of the 69 percent capacity factor target set forth in the September 2021 Commission Order." *Id.* at 18–19; *App. Power Co.*, slip op. at 14–15. The cost recovery denied in that Order was similar to the amount that the CTC Report recommended, which was directly tied to the Companies' failure to achieve 69% capacity factor and was founded on the failure to procure enough coal to meet that factor. ECF No. 1 ¶¶ 88–89, 96; *see also App. Power Co.*, slip op. at 15 ("[T]he Commission determined that the evidence showed that [the utilities] failed to procure enough coal to generate at a 69% annual capacity factor.").

While the Court can take judicial notice of the Orders,[1] it cannot take judicial notice of the truth of the factual matters within those documents and must make all inferences in favor of

---

[1] Taking judicial notice of these Orders does not convert this motion into one for summary judgment. *Zak*, 780 F.3d at 607 ("[C]ourts are permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment.").

Plaintiffs. *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 558 (4th Cir. 2013) (finding that "the district court improperly considered contents of a public record as an established fact and as evidence contradicting the complaint"). Thus, those Orders should be considered in light of other uncontroverted facts not challenged by the Commissioners that must be taken as true at this stage of the proceedings:

- Multiple lines of questioning from Chairman Lane regarding why APCo had not complied with the 69% Directive and statements explicitly stating or implying that the Commissioners "really mean 69 percent," *id.* ¶¶ 84c, 84e, 84f;[2]
- Beginning in March 2022 through September 2023, various APCo representatives raised their concerns that the 69% Directive was not economic but those concerns were ignored by the Commissioners, *id.* ¶¶ 102a–h;
- Capacity factors nationwide, in PJM, and for APCo and WPCo historically have been much lower than 69%, *id.* ¶¶ 2, 98-101 ("APCo and WPCo's 7-year average capacity factors for each of its coal-fired units is 55% or below, and the 10-year average capacity factor for all coal-fired units in PJM is only 41.9%.");
- APCo and WPCo began dispatching uneconomically in 2023 and 2024 after multiple orders relating to the 69% Directive were issued and multiple hearings where their questions regarding whether the Directive applied even if it was uneconomic were ignored, *id.* ¶¶ 117–25.

Therefore, at best, the Orders introduce a factual ambiguity that cannot be resolved against the Plaintiffs at this stage in the litigation. *See St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002) ("While there may be a dispute as to whether the alleged facts are the actual facts, in reviewing the grant of a motion to dismiss, we are required to accept the allegations in the complaint as true.").

### B.  Plaintiffs have and will pay higher rates as a result of the 69% Directive.

The Commissioners ignore Plaintiffs' well-pled facts when arguing that Plaintiffs have failed to prove standing. To establish constitutional standing, "a plaintiff must show (i) that he

---

[2] The Commissioners offer a bare assertion that Chairman Lane's statements should be ignored because the PSC only speaks through its orders. ECF No. 18 at 20. However, it is unreasonable to assume—particularly at this stage in the litigation—that statements from the Chair of the PSC during a hearing relating to APCo and WPCo's cost recovery would not inform APCo and WPCo whether the Commissioners, who are the final arbiters of cost recovery, would actually enforce the 69% Directive.

suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992)). As explained below, the Complaint sufficiently alleges all three aspects of constitutional standing.

### 1. Injury

The Commissioners argue that Plaintiffs lack standing because their only alleged injury is "a threat of higher electricity rates," which is "guesswork" and "conjecture." ECF No. 18 at 6–7. This is simply not true. As alleged in the Complaint, Plaintiffs are ratepayers in West Virginia, ECF No. 1 ¶ 5, have experienced rising electricity rates, *id.* ¶¶ 22–25, and these rates will only continue to increase under the 69% Directive, *id.* ¶¶ 7, 27. Thus, Plaintiffs have not alleged *a hypothetical threat* of higher bills, but alleged that their bills have *actually* increased and will continue to increase, both of which serve as concrete injury-in-fact. *TransUnion*, 594 U.S. at 425 ("[C]ertain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as . . . monetary harms. If a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.").

The question of whether rates have and will increase under the 69% Directive is intrinsic to the merits of Plaintiffs' claims—specifically whether it causes the PSC to reimburse APCo and WPCo for uneconomic dispatch through PJM in contravention of the Supremacy Clause. In evaluating standing, the court must not "put the merits cart before the standing horse." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2021). In other words, "the court must be careful not to decide the questions on the merits against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Id.* (quotation omitted).

### 2. Causation and Redressability

Next the Commissioners argue that the Complaint "does not and cannot identify any past rate increase that has resulted from the" 69% Directive. ECF No. 18 at 7. The Commissioners also argue that rate increases are calculated based on multiple categories such that Plaintiffs' injuries in the form of rate increases could not be traced to the Directive and similarly could not be redressed even if the Directive was enjoined. *Id.* at 7–8.

However, that is not the test—"[t]o establish standing, . . . the challenged action by the defendant must be 'at least in part responsible'" for the Plaintiffs' injuries "'notwithstanding the presence of another proximate cause.'" *Stinnie v. Holcomb*, 734 F. App'x 858, 871 (4th Cir. 2018) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013)). Plaintiffs have more than satisfied that standard.

Plaintiffs not only alleged that their electricity bills have increased, ECF No. 1 ¶¶ 22–25, but they also specifically alleged that the 69% Directive is uneconomic, *id.* ¶ 97, that cheaper electricity is available for purchase in PJM in lieu of operating APCo and WPCo's power plants, *id.* ¶ 110, that APCo and WPCo would not dispatch uneconomically but for the 69% Directive, *id.* ¶ 95, that APCo and WPCo have been dispatching uneconomically in 2023 and 2024 to comply with the Directive, *id.* ¶¶ 117–25, and that the Commissioners will reimburse costs incurred in uneconomic dispatch through ENEC proceedings, *id.* ¶ 86. Put simply, if not for the 69% Directive, the utilities would purchase cheaper electricity from the market during certain periods, instead of relying on uneconomic generation—resulting in a lower cost of service and lower bills for ratepayers. *See, e.g.*, *id.* ¶ 118. That is enough to meet the causation element. *See Hutton v. Nat. Bd. of Law Exam'rs*, 892 F.3d 613, 623 (4th Cir. 2018) ("[T]he Complaints contained sufficient allegations that the NBEO was a plausible source of the Plaintiffs' personal information.

8

Accordingly, the Complaints contain sufficient factual matter to render the Plaintiffs' allegations plausible on their face with respect to traceability."). Further, the fact that electricity rates may have risen or will rise in the future, in part, for other reasons is unavailing. *Stinnie*, 734 F. App'x at 871 (explaining that "causation may be established even when there are multiple contributory or independent causes of injury").

Plaintiffs' injuries are also clearly redressable—an injunction against the 69% Directive will allow APCo and WPCo to choose between generation and purchases based on PJM market signals, thus reducing the total cost (of generation and purchases) to meet load, their resulting cost of service, and ultimately Plaintiffs' electricity bills.

### 3. Zone of Interest

Finally, the Commissioners argue that Plaintiffs must also meet the prudential zone of interest test and fail to do so because their interests are not those contemplated or protected by the FPA. ECF No. 18 at 8–9. This is simply not true. As both the D.C. Circuit and Supreme Court have held, "'the power given to the [FERC]'" through the FPA "'is the protection of the public interest, as distinguished from the private interests of the utilities.'" *Citadel FNGE Ltd. v. FERC*, 77 F.4th 842, 846 (D.C. Cir. 2023) (quoting *Metropolitan Life v. FERC*, 595 F.2d 851, 844 (D.C. Cir. 1979)); *see also FERC v. Sierra Pac. Power Co.*, 350 U.S. 348, 355 (1956). Moreover, Plaintiffs' only claim is a Supremacy Clause preemption challenge brought under *Ex Parte Young*. Pursuant to Fourth Circuit precedent, Plaintiffs do "not have to meet the additional standing requirement involving the zone of interests test with respect to . . . Supremacy Clause claim[s]." *Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 481 (4th Cir. 2003) (Supremacy Clause preemption challenge under two federal statutes).

Thus, Plaintiffs have more than met their burden of proving Article III standing.

## II.    Plaintiffs' Cause of Action is Not Precluded By the FPA.

The Commissioners also argue that Plaintiffs' case is precluded by the Supreme Court's ruling in *Armstrong v. Exceptional Child Center Inc.*, 575 U.S. 320 (2015). ECF No. 18 at 9–14. That conclusion misinterprets *Armstrong*'s holding. As Justice Scalia, writing for the majority, explained: "The dissent agrees with us that the Supremacy Clause does not provide an implied right of action, and that Congress may displace the equitable relief that is traditionally available to enforce federal law. It disagrees only with our conclusion that such displacement has occurred here." *Id.* at 329. The Court, thus, recognized that it had jurisdiction and a cause of action in equity to entertain a supremacy clause challenge except where Congress had decided that such traditional actions were displaced. The majority determined that such displacement had occurred through the establishment of § 30(A) of the Medicaid Act because of an "intent to foreclose equitable relief" implied by a remedial scheme and a "judicially unadministrable standard." *Id.* at 328–29. Because equitable relief had been precluded, the Court concluded there was no cause of action. *Id.* at 330–31. In short, the Court held that actions based on the courts' equitable power were not available when a statute implicitly or explicitly displaced traditional equitable relief by the federal courts. *See, e.g.*, *CareFirst, Inc. v. Taylor*, 235 F. Supp. 3d 724, 741–42 (D. Md. 2017) ("In *Armstrong*, the Supreme Court held that plaintiffs could not proceed . . . because the Medicaid Act implicitly precluded private enforcement.").

Post-*Armstrong*, courts have coalesced around holdings that the *Ex parte Young* doctrine is the equitable cause of action that allows plaintiffs to bring suits for a violation of the Supremacy Clause. *See, e.g.*, *T.W. v. N.Y. State Bd. of Law Exam'rs*, 110 F.4th 71, 93–94 (2d Cir. 2024) ("*Ex parte Young* gives life to the Supremacy Clause because remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of

that law." (citations omitted)); *Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515 (5th Cir. 2017) (rejecting assertion that *Armstrong* modified prior Supreme Court cases authorizing preemption claims); *Silva v. Farrish,* 47 F.4th 78, 84–86 (2d Cir. 2022) (reversing lower court holding that plaintiff's supremacy clause claims could not proceed under *Ex parte Young*). Notably*,* the Supreme Court's challenge in *Hughes v. Talen Energy Mktg., LLC,* the precedent for which Plaintiffs rely on the merits of their claims, was rendered in the term subsequent to *Armstrong* and relied upon a private right of action challenged under the Supremacy Clause and the FPA. *See generally* 578 U.S. 150 (2016).

This approach is also exemplified in the *Carefirst* decision, when it applied the law of this Circuit to find a cause of action existed in a supremacy clause challenge to the Medical Insurance Empowerment Amendment Act of 2008. 235 F. Supp. 3d at 738–42. The court applied the *Ex parte Young* doctrine and explained,

> [b]ecause the resolution of plaintiffs' case 'depends on the resolution of a federal question sufficiently substantial to arise under federal law within the meaning of 28 U.S.C. § 1331,' it is not necessary to determine whether "[GMHSI's charter] . . . explicitly or implicitly provide[s] for a cause of action."

*Id.* at 740 (quoting *Verizon Md., Inc. v. Glob. NAPS, Inc.*, 377 F.3d 355, 368 (4th Cir. 2004)). In reaching its holding, the *Carefirst* court explicitly rejected an argument by the defendant that even in a case for relief under *Ex parte Young*, the courts must determine that Congress had created a cause of action by statute. *Id.* at 741 ("The Commissioner turns this principle on its head, suggesting that plaintiffs may proceed under *Ex parte Young* only where they can show that Congress created an implied private right of action.").

Thus, the Commissioners' argument can only succeed if the FPA, explicitly or implicitly, *precludes* private enforcement. It does not. Instead of foreclosing the availability of equitable relief in federal courts, Congress specifically endorsed it through the enactment of 16 U.S.C. § 825p.

That statutory section provides that "[t]he District Courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules, regulations, and orders thereunder, *and of all suits in equity* and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder." 16 U.S.C. § 825p (emphasis added). The Commissioners point to three out-of-circuit district court decisions that found there was no cause of action in FPA preemption cases in light of *Armstrong*, ECF No. 18 at 9 n.3, two of which address § 825p's language and ultimately conclude there is no cause of action. However, both of those courts incorrectly analyzed whether § 825p *created* a cause of action, rather than precluded it. *See Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utilities*, 410 F. Supp. 3d 943, 955 (S.D. Ind. 2019) ("Plaintiff's reliance on 16 U.S.C. § 825p is unavailing because that section of the FPA addresses the Court's jurisdiction; it does not provide a private cause of action to Plaintiff.");[3] *Vill. of Old Mill Creek v. Star*, No. 17-CV-1163, 2017 WL 3008289, at *8 (N.D. Ill. July 14, 2017) ("Section 825p of the Federal Power Act gives district courts jurisdiction over suits that FERC is authorized to bring under § 825m(a), but such vesting jurisdiction in the district courts does not create a *private* cause of action."). While § 825p may not create a cause of action, its language is direct evidence that the drafters of the FPA envisioned equitable challenges—like this one and *Hughes*—in federal court.

Nor does the FPA implicitly preclude Plaintiffs' action against the Commissioners. Two out-of-circuit district courts found that the FPA implicitly precludes an action under *Ex parte Young*. *See Coal. for Competitive Elec., Dynegy Inc. v. Zibelman*, 272 F. Supp. 3d 554, 565 (S.D.N.Y. 2017); *Star*, 2017 WL 3008289, at *8. But those decisions are not persuasive. For

---

[3] The court in *Lawrenceburg Power* also failed to even analyze whether the claim could proceed under *Ex parte Young*.

example, they both reason that because one section of the FPA creates a limited private cause of action, it should be inferred that the Congress wanted to preclude all other federal actions. *E.g.*, *Zibelman*, 272 F. Supp. 3d at 565 (citing *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001); *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985)). However, *Sandoval* and *Russell* did not evaluate *Ex parte Young* and only considered the statutory creation of rights. *See Sandoval*, 473 U.S. at 147 (holding when one section of a statute creates a cause of action explicitly, it may "preclude[] a finding of congressional intent *to create a private right of action*" in another section of the statute (emphasis added)); *Russell*, 473 U.S. at 147. Because *Armstrong* does not require that the FPA create a cause of action, these cases are inapposite. Further, courts have long recognized that the equitable powers of the Court are necessary to give meaning to the Supremacy Clause when a state commission's retail ratemaking impinges upon FERC's authority to set wholesale rates. *See, e.g.*, *Nantahala Power & Light Co. v. Thornbug*, 476 U.S. 953 (1986); *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354 (1988) ("The reasoning that led to our decision in *Nantahala* applies with equal force here and compels the same conclusion—States may not alter FERC-ordered allocations of power by substituting their own determinations of what would be just and fair.").

Thus, the only real argument for implied preclusion under *Armstrong* is if there is a comprehensive scheme under the FPA that shows an intent to foreclose equitable relief. But, even assuming FERC's administrative remedies were available to Plaintiffs,[4] they are substantively too

---

[4] It is not clear that there is a remedy at FERC here—because the 69% Directive arose out of retail rate proceedings, a challenge of it may not be within FERC's jurisdiction, nor is it within FERC's expertise to decide whether it has jurisdiction to decide the preemption issue. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) ("And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it. But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."). Rather, it is up to the courts to police the intersection of jurisdictions, as they have done numerous times in the past. *E.g.*, *Hughes*, 578 U.S. 150.

limited to preclude an *Ex parte Young* action. In *Verizon Md, Inc. v. Public Serv Com'n of Md.*, the Supreme Court found that Congress had not implicitly precluded a private right of action when a remedial scheme "is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young*." 535 U.S. 635, 647–48 (2002). Under the FPA, the available procedural mechanisms severely proscribe the liability that Plaintiffs could impose upon the Commissioners and is in no way comparable to what is allowed under a suit in federal court. While Plaintiffs are permitted to file a complaint regarding "unjust" or "unreasonable rates," there is no requirement for FERC to hold a hearing or other adjudication in which we may be heard, or to issue an order explaining its findings. 16 § U.S.C. 824(e) ("If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated."); *see also* Brief for the Respondent at 36, *City of Orangeburg v. FERC*, No. 15-1274 (D.C. Cir. June 21, 2016) (FERC taking the position that, although it has discretion to decide preemption questions, it "may also exercise its discretion not to do so," in part because an "entity that believes it is harmed by a state's action that conflicts with the Federal Power Act may pursue its claim in state or federal court"). Similarly, while a party may file a complaint against a state commission or utility for acts done in contravention of the statute, there is no duty to hold a hearing or issue an order, only to investigate if FERC determines the complaint is not satisfied or on its own initiative. *Id.* § 825(e). There is no right conferred upon the complainant to be party to the investigation or hearing. *Id.* §§ 825(f)–(g). Moreover, there is no requirement for FERC to issue an order. *Id.* §§ 825(e)–(g). Because action on a complaint is purely within the discretion of FERC and only its orders are subject to judicial review, the FPA does not create a remedial scheme sufficient to supplant the liability and relief available under *Ex parte Young.*

14

Because the FPA does not preclude private enforcement, the only other pertinent question is whether Plaintiffs meet the standards for proceeding under *Ex parte Young.* As this Court has recognized, "[t]he Supreme Court has repeatedly emphasized that *Ex parte Young* requires only a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Air Evac EMS, Inc. v. Cheatham*, 260 F. Supp. 3d 628, 639 (S.D. W. Va. 2017) (Johnston, J.) (quoting *Verizon Md.*, 535 U.S. at 645). Plaintiffs' Complaint meets both requirements. First, Plaintiffs plainly allege that the violation of federal law is ongoing. The Complaint contains numerous allegations that since 2021, the Commissioners have reinforced and reiterated the 69% Directive by evaluating the reasonableness and prudency of APCo's and WPCo's cost recovery submissions with an assumption that operations at or above a 69% capacity factor are reasonable. *See supra* Section I.A. Second, Plaintiffs seek only prospective relief. While the Complaint cites actions of the Commissioners going back to 2021, the substantive relief requested is (1) a declaration that "the 69% Directive violates the Supremacy Clause of the United States Constitution;" and, (2) an injunction against "Defendants from executing or otherwise putting into effect the 69% Directive." ECF No. 1 at 36. Such purely prospective relief is within the scope of *Ex parte Young.*

### III.    There Is No Justification for Dismissing this Action Pursuant to the Primary Jurisdiction Doctrine.

First and foremost, the Commissioners are wrong to claim that the Court may dismiss with prejudice under the primary jurisdiction doctrine. The primary jurisdiction doctrine is not a finding that the Court does not possess jurisdiction. Rather, in its application, a court retains only the discretion to stay a case or dismiss without prejudice. *Reiter v. Cooper*, 507 U.S. 258, 268 (1993); *see also Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 431 (4th Cir. 2021). In any event, the doctrine is inapplicable to the present proceedings.

Courts have been cautioned to employ the primary jurisdiction doctrine sparingly. *Chapman v. Portfolio Recovery Assoc.*, No. 2:18-cv-426, 2018 WL 11317096, at *2 (E.D. Va. Dec. 14, 2018). Within the Fourth Circuit, courts rely on four factors. *In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*, No. 1:21-cv-269, 2022 WL 10197651, at *11 (E.D. Va. Oct. 17, 2022). Those four factors include: (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application has been made to the agency. *Id.* Here, none of the four factors are met.

As to the first factor, the primary questions involved in this action are those of statutory preemption and constitutional questions. As the Supreme Court noted in its recent decision of *Loper Bright*, legal questions of that nature are historically and squarely within the experience of the courts, not administrative agencies. 144 S. Ct. 2244. As the precedents of *Hughes* and *Star* demonstrate, federal courts are well equipped to answer the questions presented in this case. *See also Nantahala Power & Light*, 476 U.S. 953; *Miss. Power & Light Co.*, 487 U.S. 354. Second, the issue is not within the discretion of FERC. As an administrative agency, FERC does not have discretion to simply allow an unconstitutional directive by a state administrative agency to stand or allow states to infringe on its authority as specifically delegated to it by the FPA. Any such action would be overturned on appeal of such an order. Third, there is little risk of inconsistent rulings. No party has brought to the Court's attention, and Plaintiffs are unaware of any other challenge to the 69% Directive. Finally, and relatedly, there is no petition or application to FERC upon which the agency might ground a different decision. For these reasons, the Court should decline the Commissioners' invitation to rely on the primary jurisdiction doctrine to refer this issue

to FERC. *See, e.g., Entergy Nuclear Fitzpatrick, LLC v. Zibelman*, No. 5:15-CV-230, 2016 WL 958605, at *9 (N.D.N.Y. Mar. 7, 2016) (rejecting primary jurisdiction argument in FPA preemption case).

### IV. The 69% Directive Is Field Preempted.

Finally, the Commissioners' argument that Plaintiffs' field preemption claim is wrong as a matter of law and unsupported by binding case law.[5]

"A state law is preempted where 'Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law' . . . ." *Hughes*, 578 U.S. at 163 (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989)). FERC has exclusive jurisdiction over the wholesale market, while States have exclusive authority over the retail market. *Id.* at 154. The Commissioners, however, incorrectly argue that there is no field preemption because the 69% Directive "(1) arose in a retail rate case from concern about the impact of skyrocketing energy prices on retail ratepayers, and (2) regulated in-state generation facilities for the benefit of in-state retail ratepayers." ECF No. 18 at 16. But "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates," and "States interfere with FERC's authority by disregarding interstate wholesale rates FERC has deemed just and reasonable, *even when States exercise their traditional authority over retail rates or, as here, in-state generation*." *Hughes*, 578 U.S. at 165 (emphasis added). Thus, the fact that the 69% Directive came out of a retail rate proceeding or affects Plaintiffs' retail rates is immaterial to a field preemption analysis.

Further, the 69% Directive is analogous to a Maryland regulatory program that the Supreme Court found was field preempted by the FPA. *Id.* at 166. *Hughes* involved Maryland's

---

[5] Plaintiffs are not pursuing a conflict preemption argument and thus will only address the Commissioners' arguments as to field preemption.

regulatory program to "provide[] subsidies, through state-mandated contracts to a new generator" which "condition[ed] receipt of those subsidies on the new generator selling capacity into a FERC-regulated wholesale auction." *Id.* at 153. Maryland's program required a power generator to "sell[] its capacity on the PJM market" and then "guarantee[d] . . . the contract price rather than the auction clearing price." *Id.* at 158–59. If the power generator's "capacity clears the PJM capacity auction and the clearing price falls below the price guaranteed in the contract for differences," Maryland load serving entities ("LSEs") paid the generator "the difference between the contract price and the clearing price. The LSEs then pass the costs of these required payments along to Maryland consumers in the form of higher retail prices." *Id.* at 159. Under the Maryland scheme, because the power generator "sells its capacity exclusively in the PJM auction market, [the generator] receives no payment from Maryland LSEs or PJM if its capacity fails to clear the auction." *Id.* The 69% Directive is similar, but even simpler—APCo and WPCo are required to reach a 69% capacity factor, which they can only do by selling into the PJM Energy Market, and their cost recovery is dependent on selling into PJM at or above the 69% capacity factor. ECF No. 1 ¶ 50–51. Further, because Plaintiffs have alleged that it is not economic for APCo and WPCo to reach a 69% capacity factor, the Directive also operates like the Maryland scheme in allowing cost recovery between the clearing price APCo and WPCo received from PJM and their actual costs, which are passed on to consumers in the form of higher retail rates. *Id.* ¶¶ 117–25.

In finding that Maryland's scheme was field preempted, the Supreme Court characterized Maryland's program as "[d]oubting FERC's judgment" by requiring power generators "to participate in the PJM capacity auction, but guarantees [the generator] a rate distinct from the clearing price for its interstate sales of capacity to PJM." *Id.* at 163. "[B]ecause the payments are conditioned on [the generator's] capacity clearing the auction—and, accordingly, on [the

generator] selling that capacity to PJM," "the payments are certainly 'received . . . in connection with' interstate wholesale sales to PJM." *Id.* at 163 n.9 (quoting 16 U.S.C. § 824d(a)). As the Court explained, it was this "tether" to the wholesale market that would determine whether a State interfered with the wholesale market. *Id.* at 166. In other words, *Hughes* "draws a line between state laws whose effect depends on a utility's participation in an interstate auction (forbidden) and state laws that do not so depend but that may affect auctions (allowed)." *Elec. Power Supply Ass'n v. Star*, 904 F.3d 518, 523 (7th Cir. 2018). The 69% Directive, which can only be met if APCo and WPCo participate in the PJM (wholesale) market, unmistakably falls on the forbidden side of the line.[6] Further, like in *Hughes*, because Plaintiffs have alleged the 69% Directive is not economic, ECF No. 1 ¶ 97, and that the Commissioners have given APCo and WPCo a rebuttal presumption[7] in favor of cost recovery if the 69% Directive is met, *id.* ¶ 86, the Directive guarantees APCo and WPCo a rate distinct from the clearing price in PJM.

The Commissioners made no attempt to distinguish *Hughes*. Rather, they cite *Coalition for Competitive Electricity v. Zibelman*, 906 F.3d 41 (2d Cir. 2018), in support of their argument that the Directive falls within the Commissioners' exclusive jurisdiction over retail rates, but that case is inapposite. *Zibelman* involved zero emission credits ("ZECs"), which were set at a specific price and awarded to nuclear generators when they sold their power into the wholesale market. *Id.* at 45–48. The plaintiffs challenged the ZEC program under the Supremacy Clause and *Hughes*, but

---

[6] The Commissioners also argue that "a capacity factor requirement is a requirement on production, which the Supreme Court has found to be firmly on the state side of the jurisdictional dividing line. ECF No. 18 at 16 (citing *Nw. Cent. Pipeline*, 489 U.S. at 514). As explained, however, it is not production that gives rise to preemption in this matter, but the reimbursement of costs tethered to sales through the FERC regulated interstate market. Further, "States interfere with FERC's authority . . . , even when States exercise their traditional authority over . . . in-state generation." *Hughes*, 578 U.S. at 165.

[7] Even the rebuttable presumption forces wholesale market participation—to get cost recovery, either APCo and WPCo can achieve a 69% capacity factor by successfully dispatching into PJM, whereby their costs are presumed reasonable or, if they fail to do so, they must demonstrate, among other things, that they "effectively bid[] to clear the PJM energy market." ECF No. 1 ¶ 86.

the court determined the ZEC program was not preempted because the credits were not tethered to wholesale market participation. *Id.* at 46. Specifically, the court found that "the only transactions New York compels are ZEC sales, and ZECs are sold separately from wholesale sales" and reasoned that "[b]ecause there is no wholesale sale when ZECs change hands, FERC lacks jurisdiction to decide whether the ZEC transactions are just and reasonable." *Id.* at 52. Thus, unlike in *Zibelman*, where no specific amount of ZECs were required to be sold and no specific wholesale market participation was being required, APCo and WPCo must reach a 69% capacity factor and the only way for APCo and WPCo to do so is by selling into the wholesale market.

In fact, the *Zibelman* court explicitly clarified that the "tether in *Hughes* is tied to 'wholesale market *participation*,' not prices . . . ; [thus] the Maryland program was unlawful because it conditioned payment on auction sales." *Id.* at 51. The same tether is present here—the 69% Directive *requires* wholesale market participation, ECF No. 1 ¶¶ 50–51, 86, 134, and *conditions* cost recovery on that participation, *id.* ¶ 86. Further, the court explained that the question is "whether ZECs compel generators to make wholesale sales" or "whether the retail rate adjustment, which factored in expected wholesale revenues, intruded on FERC's jurisdictional turf by compelling wholesale market participation." *Zibelman*, 906 F.3d at 52 (citation omitted). While the court found that the ZEC program did not compel wholesale sales, but rather only incentivized them, the 69% Directive does—the only way to meet the 69% Directive is by selling into PJM. Thus, this is a classic case of compulsion that is preempted by the FPA.

**CONCLUSION**

For the foregoing reasons, the Court should deny the Commissioners' Motion to Dismiss in its entirety.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

BRUCE PERRONE, ROSANNA LONG,
and SIERRA CLUB,

       Plaintiffs,

v.                                      CIVIL ACTION No. 2:24-cv-00434

CHAIRMAN CHARLOTTE R. LANE,
COMMISSIONER RENEE A. LARRICK,
and COMMISSIONER WILLIAM B. RANEY,
*in their official capacities*,

       Defendants.

## <u>CERTIFICATE OF SERVICE</u>

       I, Amanda Demmerle, certify that on November 18, 2024, **PLAINTIFFS' RESPONSE**

**IN OPPOSITION TO THE COMMISSIONERS' MOTION TO DISMISS** was filed with the

Clerk of Court using the CM/ECF System.


Dated:       November 18, 2024           Respectfully submitted,

                                            <u>/s Amanda Demmerle</u>

                                            Amanda Demmerle (WVSB No. 13930)