**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

BRUCE PERRONE,
ROSANNA LONG, and
SIERRA CLUB,

*Plaintiffs,*

v. CIVIL ACTION No. 2:24-cv-00434

CHAIRMAN CHARLOTTE R. LANE,
*in her official capacity,* COMMISSIONER
RENEE A. LARRICK, *in her official capacity*,
and COMMISSIONER WILLIAM B. RANEY,
*in his official capacity,*

*Defendants.*

**REPLY IN SUPPORT OF MOTION TO DISMISS**

Defendants Chairman and Commissioners of the Public Service Commission of West Virginia ("PSC") (collectively "PSC Commissioners" or "Defendants") by and through their undersigned counsel, submit the following Reply in Support of their Motion to Dismiss. Succinctly, Defendants assert that this Court should dismiss Plaintiffs' Complaint under Fed. R. Civ. P. 12(b)(6) and 12(b)(1). First, Plaintiffs' sole cause of action is based upon a fallacy – the alleged "69% Directive." The Commission has not, as a matter of law, required the Companies to run their plants at a 69% capacity factor. Next,

## I. PLAINTIFFS' CANNOT SHOW INJURY IN FACT.

"To satisfy the standing requirement of the case-or-controversy limitation on judicial authority found in Article III, Section 2 of the Constitution, the party invoking federal court jurisdiction must show that (1) it has suffered an injury in fact, (2) the injury is fairly traceable to the defendants' actions, and (3) it is likely, and not merely speculative, that

the injury will be redressed by a favorable decision." Long Term Care Partners, LLC v. United States, 516 F.3d 225, 230-31 (4th Cir. 2008) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130 (1992) (internal quotations omitted)).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 578 U.S. at 339 (citing Defs. of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992)). A concrete injury is one that is "real, and not abstract." Spokeo, 578 U.S. at 340 (internal quotation marks omitted).

Plaintiffs assert that they "have and will pay higher rates as a result of the 69% Directive." (Plaintiffs' Response at 6.) The Commission, however, has not, as a matter of law, required the Companies to run their plants at a 69% capacity factor. The language denoted in the Complaint and the Response fail to support the existence of a direct mandate from the Commission to run at a 69% capacity factor. (*See*, *e.g.*, Response at 6.) Specifically, Plaintiffs' point to random exchanges and stray comments made during the hearings held in the Companies' ENEC cases. This cannot, as a matter of law, establish the existence of a 69% capacity factor mandate from the Commission.[1] The Commission speaks only through its orders.

And the Order at issue that resolved the 2021, 2022, and 2023 ENEC cases – the January 9, 2024, Order (the "January 2024 Order") – specifically belies the existence of a 69% capacity factor mandate. Indeed, the Commission explained that it "arrived at the

[1] Plaintiffs also attempt to rely on the report prepared by Critical Technologies Consulting ("CTC Report"), which suggested what disallowance might be appropriate by comparison to a 69 % capacity factor by stating the disallowance was "similar" to that noted in the report. (Pls' Response at p. 5.) The Commission, however, did not adopt this methodology in its calculation of costs disallowed for the purposes of the ENEC proceedings. (*See*, *e.g.*, January 2024 Order at p. 22-28.)

69% capacity factor as a minimum target to strive for, based on the evidence before [it] in the 2021 ENEC." (January 2024 Order at p. 9, n.10, attached to Motion to Dismiss as Exhibit E.) Moreover, the Commission stated that "[t]he issue in this case is not whether the Companies achieved a 69 percent capacity factor, or any capacity factor, is that they did not maintain adequate coal stockpiles and incoming coal supplies to maximize generation when it was prudent to do so." (Id.) The Commission, here, encouraged self-generation when self-generation was the most economical choice. (Id.)

In their Response, Plaintiffs' recognize, but attempt to ignore, the aforementioned statement of the Commission. (Pls.' Response at p. 5.) The Plaintiffs' attempt to ignore the Commission's own denial of a 69% capacity factor mandate cannot support a cause of action.

Furthermore, the Commission's prior orders in these cases do not establish a 69% capacity factor mandate. For example, the Commission's Order on September 9, 2021 ("September 2021 Order," attached to Defendants' Motion as Exhibit A) first introduced a 69% capacity factor for use in that ENEC case based on evidence that the Companies and ratepayers would benefit economically. The 69% capacity factor was used for purposes of projecting ENEC costs subject to true-up. (September 2021 Order at p. 6.) The Commission further stated that "[t]he Companies will continue to report actual generation and purchased ed power costs and actual recoveries in future ENEC cases." (Id.) Furthermore, the Companies maintained the burden of proof "to demonstrate that its actual costs are reasonable, prudently incurred and not contrary to the public interest in West Virginia." (Id.)

In the February 3, 2023 Order in the 2022 ENEC case ("February 2023 Order,"

Attached to Defendants' Motion to Dismiss as Exhibit D) the Commission ordered the Companies to maximize self-generation when doing so would be more economical than purchasing power, and reminded the Companies that they have the burden to prove the necessity and prudence of purchased power costs before the PSC will allow rate recovery. (February 2023 Order at p. 4.)

For purposes of a motion to dismiss pursuant to Rule 12(b)(1) of the Rules of Federal Procedure, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Kerns v. United States, 585 F.3d 187, 192 (4th Circuit 2009). (internal quotations and citations omitted). This standard requires "more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Although a court will accept factual allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Plaintiffs' basis for its injury in fact, that the alleged 69% Directive will lead to increased rates, is not only implausible, it is impossible because the 69% Directive does not exist.

Moreover, Cooksey v. Futrell, 721 F.3d 226 (4th Cir. 2013), is inapposite to the case at bar. Cooksey involved First Amendment standing principles. There, the Fourth Circuit Court of Appeals noted that the requirements of standing are relaxed in First Amendment cases. Cooksey, 721 F.3d at 235. The relaxed standard "manifests itself most commonly in the doctrine's first element: injury-in-fact." Id. This distinction notwithstanding, the Plaintiffs cannot "rest on mere conjecture about possible governmental actions." *See*, *e.g.*, Ali v. Hogan, 496 F. Supp. 3d 917, 929 (D. Md. 2020) (*citing* Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013)). Plaintiffs' assertion that

they have experienced and will experience rate increases because of the alleged 69% Directive is conjecture, at best. Again, no such mandate was made. Plaintiffs assertions as such are not “well-pled” when specifically disavowed by the Commission in its January 2024 Order. As such, Plaintiffs have failed to show injury in fact.

## II. PLAINTIFFS HAVE FAILED TO SHOW CAUSATION AND REDRESSABILITY.

Similarly, Plaintiffs’ cannot show causation and redressability. “To satisfy the standing requirement of the case-or-controversy limitation on judicial authority found in Article III, Section 2 of the Constitution, the party invoking federal court jurisdiction must show that (1) it has suffered an injury in fact, (2) the injury is fairly traceable to the defendants' actions, and (3) it is likely, and not merely speculative, that the injury will be redressed by a favorable decision." Long Term Care Partners, LLC v. United States, 516 F.3d 225, 230-31 (4th Cir. 2008) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130 (1992) (internal quotations omitted)).

Here, the injury of which Plaintiffs complained cannot be fairly traceable to the Defendants’ conduct. Plaintiffs point to past rate increases and the threat of future rate increases as their injury, and that 69% Directive is a plausible source of their alleged rate increases. (Pls.’ Response at 9-9.) Plaintiffs cite Hutton v. Nat’l Bd. of Exam'rs in Optometry, Inc., 892 F.3d 613 (4th Cir. 2018), to support their causation argument. However, there is one distinct difference between Hutton and the case at bar.

Hutton was a putative class action related to a breach of personal information maintained by the defendant, the National Board of Examiners in Optometry, Inc. (“NABO”). Hutton, 892 F.3d at 616. The district court dismissed the case for lack of Article III standing. Id. With respect to traceability, the Fourth Circuit Court of Appeals held that

the plaintiffs in Hutton made specific allegations that tied the NBEO as the only common source that collected and continued to store information necessary to for an individual to open a fraudulent credit card. Id. at 623. Indeed, the only source that stored all of the information of the plaintiff-optometrists was the NBEO. We do not have that here.

In this case, Plaintiffs' rely on random statements made during the hearings and other filings in the ENEC cases to support the existence of the 69% Directive. As stated, however, the Commission speaks only through its orders. And the order that is the last word on it this issue is the January 2024 Order, which specifically denounces a 69% capacity factor directive (*see*, *supra*). There is no 69% Directive. Thus, it is a factual impossibility that the alleged injury could be plausibly connected to the higher rates.

The allegations in the Complaint have failed to push the threat of future rate increases due to the alleged 69% Directive from speculative to imminent. At best, the 69% capacity factor is part of a prudency analysis, recognized by the West Virginia Supreme Court of Appeals discussed the three ENEC cases at issue here in Appalachian Power Company and Wheeling Power Company v. Public Service Commission of West Virginia, No. 24-75, (Slip Op. November 13, 2024) (hereinafter APCo and WPCo").

In APCo and WPCo, the Court of Appeals upheld the Commission on its prudency analysis related to the APCo and WPCo ENEC cases.[2] That Court recognized the 69% capacity factor as a tool to use during a prudency analysis (not as a mandate or directive). Specifically, the Court noted that in the Commission's "February 3, 2023, order, the Commission stated that petitioners could most easily satisfy their burden of proving that they acted prudently and reasonably if they achieve the 69% annual capacity factor …

[2] The Court of Appeals remanded the matter to the Commission related to the manner it calculated the disallowance of $231.8 million of under recovery, unrelated to the 69% capacity factor and the prudency review.

the Commission cautioned that, if petitioners fail to achieve that minimum, then to demonstrate prudence, they would need to show that they (1) "maintain[ed] adequate economical fuel supplies, (2) ke[pt] plants available for generat[ing] the maximum amount of time, (3) maxim[ed] reduction . . . of outage times, . . . . and (4) effectively bid[] to clear the PJM energy market . . . ." APCo and WPCo, Slip Op. at 11. There was no directive that the Companies hit a 69% capacity factor or the companies would be disallowed costs. It was described, in the February 2023 order, as one factor to be used to determine prudency. At best, the Plaintiffs' threatened injuries are speculative and tenuous.

Again, Plaintiffs cannot show redressability. A favorable order from this court enjoining the Commission from enforcing a 69% Directive would have no effect. There is no 69% Directive. At best, there is an element of a prudency review that the Commission used as part of its analysis of the Companies' Conduct, that the West Virginia Supreme Court of Appeals recognized and refused to reverse in APCo and WPCo. The Plaintiffs' claims are that the Commission ordered APCo and WPCo to meet a 69% capacity factor "or else." That, as shown by the January 2024 Order, is not the case. Thus, the Plaintiffs lack Article III standing.

## III. THE SIERRA CLUB LACKS ASSOCIATIONAL STANDING.

While not addressed in the Response, it is clear that the Sierra Club lacks associational standing. An association has standing when at least one of its members "would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See*, *e.g.*, Lane v. Holder, 703 F.3d 668, 674 n.6 (4th Cir. 2012). The question is "whether an association's

lawsuit would, if successful, reasonably tend to further the general interests that individual members sought to vindicate in joining the association and whether the lawsuit bears a reasonable connection to the association's knowledge and experience." W. Va. Coalition Against Domestic Violence, Inc. v. Morrisey, No. 19-cv-00434, 2020 WL 6948093, at *7 (S.D. W. Va. Nov. 25, 2020) (*quoting* Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc., 448 F.3d 138, 149 (2d Cir. 2006)) First, for the same reasons noted above, the Sierra Club cannot meet the injury-in-fact, causation, or redressability requirements of Article III standing.

Next, the Sierra Club has failed to allege sufficient facts to establish that the interest at stake here, lower retail power rates, is germane to the Sierra Club's alleged "mission to replace fossil fuel generation with cleaner energy sources" and its "promotion of energy conservation through appropriately designed electrical utility rate structures which, in conjunction with additional regulatory activity minimize the emission of environmental pollutants." (Compl. at ¶ 26) (internal citations and quotations omitted). Thus, the Sierra Club lacks Article III associational standing, and should be dismissed from this case.

## IV. PLAINTIFFS' ALLEGED INJURIES FALL OUTSIDE OF THE ZONE OF INTERESTS.

The Fourth Circuit has distinguished Article III constitutional standing from prudential standing. *See, e.g.*, CGM, LLC v. BellSouth Telecommunications, Inc., 664 F.3d 46, 52 (4th Cir. 2011). To possess constitutional standing, a plaintiff must be injured by the defendant, and a federal court must be able to redress the injury. CGM, LLC, 664 F.3d at 52 (internal citations and quotations omitted). Prudential standing encompasses several judicially-created limits on federal jurisdiction, "such as the general prohibition on

a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.*, (*citing* Allen v. Wright, 468 U.S. 737, 751, 104 S. Ct. 3315 (1984)).

Plaintiffs' argue that they meet the prudential zone of interest test because the power given to the Federal Energy Commission ("FERC") through the Federal Power Act ("FPA") "is the protection of the public interest, as distinguished from the private interest of the utilities." (Pls.' Response at 9, internal citations and quotations omitted). In addition, Plaintiffs argue that their only claim is a Supremacy Clause preemption challenge brought under *Ex Parte* Young. Thus, they argued they do "not have to meet the additional standing requirement involving the zone of interests test." (Id., internal citations and quotations omitted.)

Plaintiffs, however, cannot rely on such generalized statements of policy to support the assertion that they fall within the zone of interests of the FPA. "Courts look to the provision upon which the plaintiff relies, not the overall purpose of the legislation in question, to determine if the plaintiffs' interest is within the statute's zone of interests. Vill. of Old Mill Creek v. Star, No. 17 CV 1163, 2017 U.S. Dist. LEXIS 109368, at *19 (N.D. Ill. July 14, 2017) (*citing* Bennett v. Spear, 520 U.S. 154, 175-76, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997) (internal quotations omitted). Moreover, the zone of interests test embraces interests "arguably to be protected by the statutory provision at issue. Grand Council of the Crees v. FERC, 339 U.S. App. D.C. 203, 198 F.3d 950, 957 (2000) (internal citations and quotations omitted.

Here, the Plaintiffs lay their claim on 16 U.S.C. §§ 824 and 824d. The Old Mill Creek Court specifically held that putative consumer plaintiffs' alleging injury due to charges on their bills that were traceable to an Illinois state law were "expressly excluded from § 824's interests because the states have the power to regulate retail sales of electricity and impose retail charges that are subject to state regulation. Vill. of Old Mill Creek, No. 17 CV 1163, 2017 U.S. Dist. LEXIS 109368, at *20. Like in Old Mill Creek, the Plaintiffs' claim for declaratory and injunctive relief are not within the zone of interests of the provisions of the FPA upon which they rely. Thus, Plaintiffs' claim fails as a matter of law. *See also* Nw. Requirements Utils. v. FERC, 798 F.3d 796, 809 (9th Cir. 2015) (where plaintiffs sought to "reduce [their utility's] costs, which are passed on to them," their claim fell outside the FPA's zone of interests).

## V. PLAINTIFFS LACK A PREEMPTION CAUSE OF ACTION AND CANNOT INVOKE EQUITABLE JURISDICTION IN LIEU OF ONE.

The Complaint asserts that the Defendants violated the Supremacy Clause but the Supreme Court has held that "[t]he Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action." Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320 (U.S. 2015). Therefore, a plaintiff cannot invoke a court's equitable powers to enforce a law if Congress intended to exclude private enforcement of the law. *Id.* at 325. Relying on Armstrong, the Lawrenceburg court concluded that the FPA does not create a private right of action. 410 F. Supp. at 956. The FPA, instead, sets "standard[s] for [FERC] to apply and, independently of [FERC] action, creates no right which courts may enforce." Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.,

341 U.S. 246, 251 (1951). FERC alone has the power and discretion to go to court to enforce the FPA when necessary. Plaintiffs arguments to the contrary are unavailing.

First, Plaintiffs'[3] overstate the claims allowed under 16 U.S.C. §825p. Such claims must still fall within the types of claims the FPA intends to regulate. For example, in La. Power & Light Co. v. Ackel, 616 F. Supp. 445 (M.D. La. 1985), the district court held that 16 U.S.C. § 825p did not confer jurisdiction over a public utility lawsuit against the Louisiana Public Service Commission after it declined to grant the utility an increase in intrastate electric rates. La. Power & Light Co., 616 F. Supp. At 445. To that end, the district court held: "Jurisdiction under the Federal Power Act, 16 U.S.C. § 825p is lacking because this is not an action "brought to enforce any liability or duty created by, or to enjoin any violation" of any order of the Federal Energy Regulatory Commission. Id. at 447. Thus, Plaintiffs' reliance on section 825p of the FPA is misplaced.

The clear weight of authority here indicates that Plaintiffs lack a preemption cause of action here. *See* Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils., 410 F. Supp. 3d 943 (S.D.Ind. 2019). U.S. Dist. LEXIS 170132, 2019 WL 4749968 (dismissing FPA preemption complaint filed by generator against municipal water and sewer utility to prevent utility from terminating water and sewer service); Coalition for Competitive Elec. v. Zibelman, 272 F. Supp. 3d 554 (S.D.N.Y. 2017) (dismissing FPA preemption complaint that alleged a New York program to award Renewable Energy and Zero-Emmission Credits to nuclear generators enabled the generators to bid low into the wholesale market

[3] Plaintiffs' reliance on Hughes v. Talen Energy Mktg., LLC, 578 U.S. 150 (2016), is inapposite to the analysis at hand. In Hughes, the Supreme Court was not faced with challenges to Article III standing, prudential standing, or a claim under *Ex parte Young*. *See*, *generally*, Hughes, 578 U.S. 150. Hughes dealt with a challenge to a Maryland regulatory program that provided subsidies through state-mandated contracts, to a new generator. Hughes, 578 U.S. 153. The suit challenging the Maryland regulatory scheme was brought by direct competitors of Maryland's new electricity generator, not downstream customers. Id.

but receive a higher than market price for their energy and thereby distort the wholesale market price), *aff'd on other grounds*, 906 F.3d 41 (2d Cir. 2018), *cert. denied,* Elec. Power Supply Ass'n v. Rhodes, 2019 U.S. LEXIS 2652, 139 S. Ct. 1547, 203 L. Ed. 2d 712, 87 U.S.L.W. 3406, 2019 WL 145344; Village of Old Mill Creek, 2017 U.S. Dist. LEXIS 109368, 2017 WL 3008289 (dismissing FPA preemption complaint filed by ratepayers that alleged an Illinois Zero Emission Credit program would enable nuclear plants to bid into the wholesale market at artificially low prices and suppress wholesale market prices), *aff'd on other grounds sub nom*., Elec. Power Supply Ass'n v. Star, 904 F.3d 518, 2018 U.S. App. LEXIS 25980, *reh'g denied,* Elec. Power Supply Ass'n v. Star, 2018 U.S. App. LEXIS 28509, *cert. denied,* Elec. Power Supply Ass'n v. Star, 2019 U.S. LEXIS 2575, 139 S. Ct. 1547, 203 L. Ed. 2d 712, 87 U.S.L.W. 3406, 2019 WL 133642.

Moreover, Plaintiffs' reliance on Hughes v. Talen Energy Mktg., LLC, 578 U.S. 150 (2016), is likewise misplaced. In Hughes*,* the Court touched on the equitable relief question from Armstrong, but did not rule on the question. The Court instead assumed, without deciding, that plaintiffs alleging FPA violations could seek relief in federal court. 578 U.S. 150, 161 n.6 (2016).[4] During the argument, however, Justice Breyer questioned the case posture because "there isn't" a "Supremacy Clause private right of action" and the Court did not have the benefit of "FERC's opinion" except "through the [Solicitor General]."[5] Justice Breyer's question is answered by the district court decisions in Lawrenceburg, Zibelman, and Old Mill Creek. "Plaintiff cannot bring a private cause of action for an FPA

---

[4] The Court decided Armstrong after the lower court proceedings in Hughes were complete, and the Hughes defendants did not preserve the defense that plaintiffs lacked a cause of action.

[5] Oral Arg. Tr. 24:3-11 (U.S. S. Ct. Feb. 24, 2016) (Breyer, J.), https://www.supremecourt.gov/oral_ arguments/argument_transcripts/2015/14-614_g2hk.pdf.

preemption claim." Lawrenceburg, 410 F. Supp 3d. at 956. Plaintiffs' recourse is to FERC, and not to this Court.

Plaintiff also argues that the remedial scheme provided under the FPA is substantively too limited to preclude and *Ex parte Young* action. The case relied upon by Plaintiffs, Verizon Md, Inc. v. Public Serv Com'n of Md.,535 U.S. 635, 647-48, interprets the remedial scheme provided under the Federal Telecommunications Act of 1996, 47 U.S.C. §252, *et seq.*, is inapposite. *See*, *e.g.*, Verizon Md., Inc., 535 U.S. at 638. It does not answer nor is it instructive on whether the FPA provides a comprehensive remedial scheme.

Congress has afforded the following specific rights to FERC:

- All rates for sales or transmission subject to FERC's jurisdiction are to be filed with FERC. 16 U.S.C. § 824d(c).
- FERC may suspend and examine rate filings to ensure they are just and reasonable and not unduly preferential or discriminatory. *Id.* 16 U.S.C. § 824d(d), (e).
- Interested parties can intervene and oppose rate filings. 18 C.F.R. § 385.214.
- Any person may file a complaint seeking changes to any existing rate, rule, practice on contract affecting a rate that a complainant believes to be "unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a).
- Further, "[a]ny person" may file a complaint regarding "anything done or omitted to be done by any [regulated entity] in contravention of" the statute (16 U.S.C.S § 825e), or may file a petition asking FERC to issue a declaratory order. 18 C.F.R. §§ 385.206 and 385.207.

- FERC also can, subject to federal court review, declare whether state laws are preempted. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC, 964 F.3d 1177 (D.C. Cir. 2020); Orangeburg v. FERC, 862 F.3d 1071, 1081 (D.C. Cir. 2017); E.g., New Eng. Ratepayers Ass'n, 168 F.E.R.C. P61,169 (2019) (concluding that a state statute was preempted by the FPA); Cal. Pub. Utils. Comm'n, 132 FERC ¶ 61,047, *granting clarification and dismissing reh'g*, 133 FERC ¶ 61,059 (2010), *reh'g denied*, 134 FERC ¶ 61,044 (2011).

FERC also has ample tools to remedy violations.

- FERC may "perform any and all acts" it finds "necessary or appropriate to carry out" the FPA's provisions. 16 U.S.C. § 825h.
- The FPA specifically empowers FERC - "in its discretion" - to bring an action in federal district court against "any person" to enforce compliance with the FPA and enjoin any acts that violate it or obtain a writ of mandamus compelling compliance. *Id.* 16 U.S.C. § 825m(a)&(b).

Indeed, Congress committed exercise of them to FERC's discretion, said nothing about suits by private plaintiffs, and instead provided for such entities to seek relief from and through the agency. Armstrong, 575 U.S. 328.

Plaintiffs' argument that the remedial scheme under the FPA is not sufficient simply because FERC has discretion to act on a complaint is unavailing. Discretion to act is found in many, if not all, legislative mandates to agencies. The remedial scheme found within the FPA grants FERC the ability to, *inter alia*, receive complaints (16 U.S.C. § 825e); investigate "any facts, conditions, practices, or matters which it may find necessary or proper in order to determine whether any person, electric utility, transmitting utility, or other

entity has violated or is about to violate any provision" of the FPA (16 U.S.C. § 825f); subpoena witnesses (16 U.S.C. § 825f(c)); take testimony by deposition (16 U.S.C. § 825f(d); and hold hearings (16 U.S.C. § 825g. Discretion is exercised by any tribunal when considering complaints filed within its jurisdiction. Thus, discretion does not make the remedial scheme less comprehensive.

Lastly, Plaintiffs do not have an equitable cause of action against the Defendants under *Ex parte* Young. *Ex parte* Young establishes a cause of action only for the subjects of potential state enforcement proceedings. *Ex parte* Young "allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute." Antrican v. Odom, 290 F.3d 178, 184 (4th Cir. 2002) (emphasis added). "The Supreme Court has strictly limited the application of the *Ex parte Young* doctrine to circumstances in which injunctive relief is necessary to give life to the Supremacy Clause." Bragg v. W. Va. Coal Ass'n, 248 F.3d 275, 292 (4th Cir. 2001) (internal citations and quotations omitted). "Just because a private citizen's federal suit seeks declaratory injunctive relief against State officials does not mean that it must automatically be allowed to proceed under an exception to the Eleventh Amendment protection." Bragg, 248 F.3d 275, 293 (4th Cir. 2001) (internal citations and quotations omitted).

Under *Ex parte* Young, a cause of action is available only for plaintiffs who "pre-emptively assert in equity … a defense that would otherwise have been available in the State's enforcement proceedings at law." Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health, 699 F.3d 962, 983 (7th Cir. 2012) (internal citations and quotation marks omitted). The plaintiff must be subject of the state enforcement action or otherwise

have its behavior regulated through an action at law. Id.; Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 144 (2d Cir. 2016) (noting that a proper plaintiff under *Ex parte* Young "generally invokes equity preemptively to assert a defense that would be available to it in a state or local enforcement action").

Here, the Plaintiffs' claims under *Ex parte* Young fail because they are not themselves at risk of enforcement of the 69% Directive. Moreover, the Ex *parte* Young exception does not apply here because the Plaintiffs' cannot show that the Defendants violated any federal law or constitutional violation simply because they cannot prove, as a matter of law, the existence of a 69% Directive. *Accord*, Smith v. W. Va. Univ. Bd. of Governors, No. 2:11-cv-00430, 2012 U.S. Dist. LEXIS 45216, at *12-14 (S.D. W. Va. Mar. 30, 2012) (motion to dismiss suit against state official under *Ex parte* Young granted because plaintiff failed to allege a factual predicate to show that the official violated federal law or constitution).

## VI. THE COURT SHOULD DISMISS OR STAY THE CASE BECAUSE FERC HAS PRIMARY JURISDITION OVER CLAIMS THAT WEST VIRGINIA HAS INTERFERED WITH JUST AND REASONABLE WHOLESALE RATES.

Even assuming, *arguendo*, that the Plaintiffs have standing and/or a claim under *Ex parte* Young, the Complaint should nevertheless be dismissed without prejudice or stayed under the primary jurisdiction doctrine. "Under the doctrine of primary jurisdiction a court can refer a technical or factual issue to an administrative agency for expert determination." Stevens v. Bos. Sci. Corp., 152 F. Supp. 3d 527, 531 (S.D. W. Va. 2016). "The development of the primary jurisdiction doctrine is a function of the judiciary's recognition that the adjudicatory authority of regulatory agencies will inevitably overlap

with the jurisdiction of traditional judicial courts." Stevens, 152 F. Supp. 3d at 531 (internal citations and quotations omitted). The doctrine of primary jurisdiction, "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." Id.

"If the issue is one 'that Congress has assigned to a specific agency,' the doctrine of primary jurisdiction allows the court to stay the judicial proceedings and direct the parties to seek a decision before the appropriate administrative agency." Id. at 533 (internal citations and quotations omitted). There is no mechanical formula for applying the doctrine of primary jurisdiction, however, the United States Supreme Court has focused on the expert and specialized knowledge of the agencies involved. Id. (*citing* Western Pacific Railroad Co., 352 U.S. 59, 64 (1956)).

Here, the doctrine of primary jurisdiction applies. Plaintiffs' Complaint specifically states that the alleged 69% Directive effects wholesale rates. Wholesale rates are the sole jurisdiction of FERC. FERC has the specific regulatory acumen to handle the issues incident to Plaintiffs' assertions. Moreover, FERC could address Plaintiffs' preemption claim. *See*, *e.g.*, Cal. Pub. Utils. Comm'n, 132 FERC ¶ 61,047, at PP 1-2 (2010) (finding that "CPUC's decision is not preempted by the FPA"). As such, Plaintiffs' argument that FERC does not have the regulatory authority to address its sole claim is misplaced. Thus, the court should refer this matter to FERC, and either stay or dismiss the Complaint without prejudice.

## VII. THE ACTIONS OF THE COMMISSION ARE NOT PREEMPTED

Plaintiffs argue in their Response that the alleged 69% Directive is field preempted. This is simply wrong. In support of their argument, Plaintiffs cite to Hughes v. Talen Energy

Marketing, LLC, 578 U.S. 150 (2016). Again, Plaintiffs' reliance on Hughes is misplaced. In Hughes, the United States Supreme Court dealt with a challenge to a Maryland regulatory program that provided subsidies through state-mandated contracts, to a new generator. Hughes, 578 U.S. 153. Receipt of those subsidies was conditioned on the new generator selling capacity into a FERC-regulated wholesale auction. Id. at 153. The Court held that Maryland's program was preempted because, by conditioning payment on completion of a wholesale sale, it "sets an interstate wholesale rate" that is different than the rate FERC approved. Id. at 163.

The Hughes Court stated that Maryland's program "requires [the generator] to participate in the PJM capacity auction, but guarantees [the generator] a rate distinct from the clearing price for its interstate sales of capacity to PJM" established by the auction. Id. "By adjusting an interstate wholesale rate, Maryland's program invades FERC's regulatory turf." Id. Here, the alleged 69% Directive required the Companies to operate their plants at a certain capacity. It did not require the Companies to sell their output in the FERC-regulated wholesale market, as the Maryland program in Hughes required.

In addition, even if the PSC had issued a directive for the Companies to achieve a 69% capacity factor at their own generation plants, it would have acted within the State's domain under the FPA because the alleged production directive (1) arose in a retail rate case from concern about the impact of skyrocketing energy prices on retail ratepayers, and (2) regulated in-state generation facilities for the benefit of in-state retail ratepayers. 16 U.S.C. § 824(b)(1). *See*, Coalition for Competitive Elec. v. Zibelman, 906 F.3d 41, 50 (2nd Cir. 2018). Again, as stated in Defendants' Memorandum in Support of its Motion to Dismiss, a capacity factor requirement is a requirement on production, which the Supreme

Court has found to be firmly on the state side of the jurisdictional dividing line. Nw Cent., 489 U.S. 493, 514.[6] Production requirements do not intrude into FERC's sphere.

Moreover, such a directive would have been related to a legitimate state concern (reasonable retail rates). Petitioners fail to acknowledge, and perhaps fail to understand, that load-serving generator decisions on the amount of internally generated energy to make available to meet hourly load are FERC-approved elements of the PJM Operating Agreement.[7] The Operating Agreement Manual 11 governing Energy & Ancillary Services Market Operations makes it clear that any resource wishing to deliver a certain quantity of power into the market can do so by simply telling PJM that it intends to "self-schedule". A production directive would not frustrate Congress' purpose or objectives in the FPA because the FERC-approved PJM Operating Agreement and rules allow generators to self-schedule into the PJM Day-ahead energy market.[8] Accordingly, a PSC directive to the Companies to produce energy at a 69% capacity level would not impermissibly infringe on wholesale markets because any such directive would be consistent with the Companies' right to self-schedule and offer that energy into the PJM market. Thus, the alleged 69% Directive is not field[9] preempted.

## VIII. CONCLUSION

Thus, for the foregoing reasons, for those stated in the Motion to Dismiss and Memorandum in Support, the Complaint should be dismissed with prejudice. Should the

---

[6] While Nw Cent. is a Natural Gas Act case, the Supreme Court routinely relies on Natural Gas Act cases in determining the scope of the FPA because relevant provisions of the two statutes are analogous. Hughes, 578 U.S. 150, 164 n. 10.

[7] PJM FERC-approved Operating Agreement, https://pjm.com/directory/merged-tariffs/oa.pdf

[8] *Id.*; PJM Operating Agreement, Schedule 1 Section 1 Market Operations Sec. 1.10.3., FERC docket ER23-1138-000.

[9] Plaintiffs state they are not pursuing a conflict preemption claim. (Pls.' Response at p. 17, n.5.)

Court find that the primary jurisdiction doctrine applies here, the court should stay this action pending resolution of the issues within FERC, or dismiss without prejudice.[10]

CHAIRMAN CHARLOTTE R. LANE,
COMMISSIONER RENEE A. LARRICK,
and COMMISSIONER WILLIAM B.
RANEY,

By counsel,

*/s/ Jeffrey A. Foster, Esq.*

Jessica M. Lane (W.Va. Bar No. 7040)
Jeffrey A. Foster (W. Va. Bar No. 9410)
Public Service Commission of West Virginia
201 Brooks Street
Charleston, West Virginia 25301
304-340-0300 phone
304-340-3758 fax
jlane@psc.state.wv.us
jfoster@psc.state.wv.us

[10] Defendants assert that dismissal without prejudice is appropriate because dismissal will not unfairly disadvantage the parties. Stevens, 152 F. Supp. 3d at 534.

CERTIFICATE OF SERVICE

The undersigned here certifies that on November 25, 2024, a copy of the foregoing was served via CM/ECF with electronic service going to counsel of record who have entered an appearance in the lawsuit.

*/s/ Jeffrey A. Foster, Esq.*
Jessica M. Lane (W.Va. Bar No. 7040)
Jeffrey A. Foster (W. Va. Bar No. 9410)
Public Service Commission of West Virginia
201 Brooks Street
Charleston, West Virginia 25301
304-340-0300 phone
304-340-3758 fax
jlane@psc.state.wv.us
jfoster@psc.state.wv.us