# EXHIBIT A

## JANUARY 2024 ORDER

**PUBLIC SERVICE COMMISSION**
**OF WEST VIRGINIA**
**CHARLESTON**

At a session of the PUBLIC SERVICE COMMISSION OF WEST VIRGINIA in the City of Charleston on the 9th day of January 2024.

CASE NO. 23-0377-E-ENEC

APPALACHIAN POWER COMPANY AND
WHEELING POWER COMPANY
Petition to Initiate the Annual Review and to Update the ENEC Rates Currently in Effect.

and

CASE NO. 22-0393-E-ENEC

APPALACHIAN POWER COMPANY AND
WHEELING POWER COMPANY
Petition to Initiate the Annual Review and to Update the ENEC Rates Currently in Effect.

and

CASE NO. 21-0339-E-ENEC

APPALACHIAN POWER COMPANY AND
WHEELING POWER COMPANY
Petition to Initiate the Annual Review and to Update the ENEC Rates Currently in Effect.

**COMMISSION ORDER**

The Commission rules on the reasonableness of Appalachian Power Company's (APCo) and Wheeling Power Company's (WPCo or Wheeling) (collectively the Companies) net Expanded Net Energy Cost (ENEC) costs and under-recoveries. The Commission disallows $231.8 million of requested ENEC under-recoveries. The remaining balance of the requested under-recoveries, which is currently $321.1 million, will not be allowed in rates until September 1, 2024, at which time it will be recoverable over a ten-year period at a rate of approximately $32.1 million per year plus a carrying cost allowance of four percent per year.

## BACKGROUND[1]

On April 28, 2023, the Companies filed their 2023 petition to initiate the annual review and update of ENEC rates. The Companies submitted pre-filed direct and rebuttal testimony of nine witnesses providing details of the proposed ENEC rates.

The Companies sought to recover deferred and projected ENEC costs of $641.7 million, which is comprised of an accumulated under-recovery balance of $552,875,658, rounded to $552.9 million[2], as of February 28, 2023, and increased projected costs of $88.8 million for the forecast period of September 1, 2023, through August 31, 2024[3]. Under-recoveries are calculated by the Companies by comparing the actual net ENEC costs incurred on a month-by-month basis and the actual recoveries of ENEC costs at rates then in effect. If net costs in a month are greater than the ENEC revenues billed to customers, the Companies book an under-recovery. If net costs in a month are less than the ENEC revenues billed to customers, the Companies book an over-recovery. Both over- and under-recoveries are deferred and accumulated balances (net over-recoveries or under-recoveries) are considered by the Commission for deduction or addition to projected future ENEC revenue requirements for the purpose of setting prospective ENEC rates.

In this filing, the accumulated $552.9 million under-recovery balance reflects accumulated monthly net under-recoveries from March 1, 2021, through February 28, 2023. Normally, the Commission reviews over- or under-recovery balances and builds them into rates annually so that a fixed accumulated balance is amortized (built into rates) over one or more future ENEC rate periods rather than being carried forward from year to year without a recovery increment in rates. Beginning with Case No. 21-0339-E-ENEC (2021 ENEC), however, issues arose relating to whether the Companies were maximizing generation from their own plants in lieu of serving load with more expensive energy from the PJM Interconnection, LLC (PJM).[4]

---

[1] For a complete procedural history, please see the case information for Case Nos. 21-0339-E-ENEC, 22-0393-E-ENEC, and 23-0377-E-ENEC at www.psc.state.wv.us.

[2] We will round the net ENEC numbers to the nearest $100,000 throughout this Order.

[3] On September 13, 2023, the Commission granted the Companies an increase in ENEC rates for the forecasted $88.8 million increased costs.

[4] PJM operates a competitive wholesale electricity market and manages the reliability of its transmission grid. PJM provides open access to transmission and performs long-term planning. In managing the grid, PJM centrally dispatches generation and coordinates the movement of wholesale electricity in all or part of

It is important to note that throughout ENEC proceedings there are references to sales to and purchases from PJM. For a load-serving utility that has no other sources of power supply, a reference to power from PJM would be clearly understood to mean a purchase of power to serve load. However, for vertically integrated load serving utilities with their own power supply, the term "sale" refers to self-generated power that is delivered from the power plants into the transmission system and is accounted-for as a "sale" into PJM. The term "purchase" refers to the load of the utility which is taken from the transmission system and is accounted-for as a "purchase." In effect, the total net transaction of a load serving vertically integrated utility, which APCo and Wheeling are, is self-generation to serve load with an accounting performed by PJM. For example, If the load is 10 million Megawatt Hour (MWh) and the self-generation is 10 million MWh during a period when the PJM locational marginal price (LMP) is $40 per MWh, although the accounting may be referred to as a $400 million sale to PJM and a $400 million purchase from PJM, the net purchase from PJM would be zero and the only ENEC cost remaining to be paid by load would be the cost of the self-generation. That mechanism was explained in testimony from Mr. Vaughn, for the Companies:

> A. Yes. So regardless of your resources, you're purchasing all your load out of the RTO every hour of the year, right. You submitted an estimated load, which is your day ahead load, and then you have actual operating day. Results always vary. Any differences are made up in the real time or balancing market.
>
> And so the same thing is true then with your generation resources. You submit all [of] them day ahead and then the same results vary. You settle it up. And the bottom line is if those two things actually match one another in some weird instance, right, the net cost to customers is the fuel cost then to produce, --- to run those resources.
>
> Q. Right. And the price paid is the LMP, short term energy price.
>
> A. [Yes.] LMP, you would have purchased --- you know, simple world, no congestion, no losses, you would have purchased the

---

thirteen states (Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia and West Virginia) and the District of Columbia. PJM's markets include energy (day-ahead and real-time), capacity and ancillary services. PJM was founded in 1927 as a power pool of three utilities serving customers in Pennsylvania and New Jersey. In 1956, with the addition of two Maryland utilities, it became the Pennsylvania-New Jersey-Maryland Interconnection, or PJM. PJM became a fully functioning Independent Systems Operator in 1996 and, in 1997, it introduced markets with bid-based pricing and locational marginal price (LMP). PJM was designated a Regional Transmission Operator in 2001. https://www.ferc.gov/industries-data/electric/electric-power-markets/pjm.

> [load] at an LMP and you would have sold at an LMP and those --- your market activity, wholesale activity nets to zero.
>
> And in theory you have fuel and purchase power cost left.
>
> Q. So if I bid in my coal plants and those coal plants clear the price, I'm essentially paying myself for that generation. And my cost is what it costs to run the plant, essentially?
>
> A. Yes, in that scenario where --- you know, where they match up, correct.
>
> Q. And if they don't match up, then I'm paying somebody else for that generation?
>
> A. You're either paying PJM a net purchase power bill in that hour or you're receiving system sales revenues that go through to customers to reduce the ENEC costs.

2021 ENEC, March 23, 2022 Hearing Transcript (Tr.) at 228-29.

We will refer to PJM transactions in various ways throughout this Order, depending on the context, but it is important to keep in mind that gross deliveries by a utility into PJM and gross receipts of a utility from PJM may be referred to at times as sales and purchases, but those transactions must be considered as a net value to determine if there are any remaining MWhs to be considered a sale, or purchase. Otherwise, for self-generation that equals load, as Mr. Vaughn explained, the companies are receiving their own power back to serve load and "wholesale activity nets to zero." In that case, the PJM transaction portions of the ENEC would likewise net to zero and the ENEC cost would be, essentially "what it costs to run the plant."

Returning to the 2021 ENEC, the Commission allowed the under-recovery balance as of February 2021 to be recovered through rates over one year with the annual recovery increments being included in rates in the 2021 ENEC. The Commission indicated, however, that it might adjust or disallow continuing under-recoveries for rate making purposes. At the time of our September 2, 2021 Order in the 2021 ENEC, we established rates to go into effect for recovery of projected costs that should have been sufficient if future net PJM costs and Company generation costs, or the relationships between those costs, were reasonably close to the projections made by the Companies, and if the Companies relied more on self-generation for their power supply.

The history and record of the current case (2023 ENEC) are heavily intertwined with the previous two ENEC proceedings of the Companies: the 2021 ENEC referenced above and Case No. 22-0393-E-ENEC (2022 ENEC). The final and substantive procedural orders issued in those cases document the record and Commission decisions leading to the Orders in this proceeding.

After a reopening of the 2021 ENEC Case in the spring of 2022, we learned that under-recoveries were growing because the net cost of PJM transactions was escalating, and the Companies were relying even more on expensive non-self-generated power supply than they had originally projected. 2021 ENEC, Mar. 23, 2022 Tr. at 29-33. It was also becoming even more apparent that, as the Commission had concluded in its September 2, 2021 Order in the 2021 ENEC, the LMP for PJM power was becoming even more expensive than the cost of self-generation. By the spring of 2022, the Companies were no longer claiming that self-generation was more expensive than PJM power. Instead, they blamed their increased reliance on PJM power on an inability to obtain sufficient coal supplies to maximize economical self-generation. 2022 ENEC, Petition, Apr. 19, 2022 at Exh. JCD-D generally; 2023 ENEC, Cos. Initial Br. at 6.

The Commission ordered Commission Staff to "conduct a review . . . of the Companies' generation plant availability and utilization and ENEC costs." 2021 ENEC, Comm'n Order, May 13, 2022. The Staff review had not been completed and filed when the Commission entered its final order on February 3, 2023, in the 2022 ENEC. In that order, the Commission denied an ENEC increase until Staff completed the review ordered in the 2021 ENEC. After issuance of the Staff-contracted report on the reasonableness of the Companies' net ENEC costs and the prudency of their decisions and actions relating to self-generation and net purchasing and selling power through PJM (Prudence Review), the Commission reopened the 2021 ENEC and 2022 ENEC by order entered May 26, 2023. The Commission scheduled an evidentiary hearing on the Prudence Review to begin immediately prior to the evidentiary hearing in the 2023 ENEC case.

In the 2023 ENEC, the Companies were represented by William C. Porth, Esq. and Anne C. Blankenship, Esq., and Jonathan C. Stanley, Esq. of Robinson & McElwee PLLC.; James R. Bacha, Esq. of American Electric Power Service Corporation; and Keith D. Fisher, Esq., of Appalachian Power Company. Intervenor Kanawha County Commission (KCC) was represented by Marc J. Slotnik, Esq. and Christopher M. Settles, Esq. Intervenor West Virginia Energy Users Group (WVEUG) was represented by Derrick P. Williamson, Esq., Barry A. Naum, Esq., Steven W. Lee, Esq., and Susan J. Riggs, Esq. of Spilman, Thomas & Battle, PLLC. Intervenor West Virginia Coal Association (WVCA) was represented by H. Brann Altmeyer, Esq. and Jacob C. Altmeyer, Esq. of Phillips, Gardill, Kaiser & Altmeyer, PLLC. Intervenor Consumer Advocate Division (CAD)

was represented by Robert F. Williams, Esq., Heather B. Osborn, Esq., and John Auville, Esq. Staff was represented by Lucas Head, Esq.

In the 2021 ENEC, the Companies, WVEUG, CAD, and Staff were represented by the above-named individuals and firms. Intervenor Steel of West Virginia, Inc. (SWVA) was represented by Charles K. Gould, Esq. of Jenkins Fenstermaker PLLC. In the 2022 ENEC, the Companies, WVEUG, WVCA, SWVA, CAD, and Staff were represented by counsel set forth above.

## DISCUSSION

### I. Prudency and Disallowance of Unreasonable, Imprudently Incurred ENEC Costs.

The actions taken by the Companies leading to the amount of power generated at their three coal-fired generation plants occurred during months encompassed by the 2021, 2022, and 2023 ENEC cases. The 2023 ENEC case included a request for a $552.9 million under-recovery revenue requirement for the period from March 1, 2021, through February 28, 2023, to be paid by customers in the rates to be set in the 2023 ENEC case. The actions of the Companies to minimize their ENEC costs is the initial issue confronting the Commission.

It is necessary to consider the entire record of the 2021, 2022, and 2023 ENEC cases to determine if the Companies prudently, efficiently, and reasonably used economic self-generation from their own power plants in lieu of higher cost net PJM power. In order to determine if excessive costs were incurred because of the Companies' decisions and actions that left them with insufficient supplies of coal for economical self-generation, it is also critical for the Commission to consider whether the Companies used the minimum amount of high-priced PJM energy market electricity over the period of review or whether the net power supplied through PJM transactions in lieu of self-generation was excessive.

We have determined that having insufficient supplies of coal in inventory and scheduled for delivery into the Companies' plants led to the lowest level of generation in the last twenty years[5] during a period when the PJM LMP spiked to the highest levels experienced in the last twenty years.[6] This "perfect storm" led to an inability to maximize economic generation while using excessive amounts of PJM power. The burden of a significant portion of the resulting excessive costs

---

[5] EIA Power Plant data. See Table 2, infra.

[6] PJM 2022 State of the Market Report, See Table 1, infra.

must fall on the Companies because their fuel supply failures and related market offer strategies that lead to rejection of their power plants for dispatch by PJM directly caused the excessive ENEC costs.[7]

The parties put forward a number of recommendations regarding prudency and disallowance of the under-recovery for ratemaking purposes. The Companies, obviously, recommended and requested full recovery of the $552.9 million.[8] To moderate the impact on customers, the Companies proposed two alternative recovery mechanisms. One mechanism is to amortize the deferred under-recovery over three years with a carrying charge at the Companies' weighted cost of capital. The alternative mechanism is to securitize the deferred under-recoveries along with additional securitization of unrecovered investments in certain power plants and certain other deferred costs.

The CAD, at the other end of the spectrum, recommended that the Commission disallow the entire under-recovery. Alternatively, to the extent the Commission allows any portion of the $552.9 accumulated under-recovery in rates, the CAD recommended that the amount allowed be amortized over no less than five years with no carrying charge.

The WVEUG recommended a disallowance of $82.6 million before any consideration of amortization or securitization. WVEUG further recommended that any balance recoverable in rates be allowed a carrying charge of four percent. However, instead of amortization, WVEUG preferred securitization with certain other conditions attached. Those conditions were: (1) a freeze on the ENEC filings for at least one year; (2) a freeze on filing a full Base Rate case until April 2025; and (3) a minimum $82.6 million disallowance. Given those conditions, WVEUG preferred the securitization proposal.

Staff, through the testimony and evidence of Critical Technologies Consulting (CTC), recommended that the Commission find imprudence on the part of the Companies and disallow $257,993,417 of the under-recovery. 2023 ENEC, Tr. Sept. 7, 2023 at 408.

---

[7] Q. If the Companies could have, based on the market conditions that we've talked about, the outages at the time and then also the lack of coal, if they could have hit the 69-percent capacity factor, would they have?
A. Yes. There's nothing --- in a hypothetical world where we had an abundant or unlimited amount of coal last fall [fall of 2021] and the units weren't in outage, we would have [run] them nonstop in these power prices. 2021 ENEC, Testimony of Mr. Vaughn, Mar. 23, 2022 Tr. at 246-47.

[8] On December 27, 2023, the Companies, WVEUG, and WVCA recommended reducing this amount by $50 million if the Companies could finance the remaining amount through securitization. 2023 ENEC; Stipulation filed Dec. 27, 2023. Staff, KCC, and CAD opposed the Stipulation. Staff letter filed Dec. 28, 2023; KCC filing, Jan. 2, 2024; CAD filing Jan. 5, 2024.

Staff engaged CTC to conduct the Prudence Review. The focus of the review was the Companies' policies and procedures for maximizing and maintaining adequate fuel inventory levels, and bidding their plants into the PJM market to maximize economical self-generation, recognizing that it may be necessary to deliver into the PJM Market at a small loss in some hours to capture the net benefits of higher market prices within any twenty-four-hour period. 2021 ENEC, Comm'n Order, May 13, 2022, at 6. The Prudency Report prepared by CTC (Prudency Report) determined that the Companies' plants were dispatched by PJM at an aggregate 32.5 percent per year. 2021 ENEC, Prudency Report filed April 28, 2023 at 39 (Bates No. 42). CTC found that the Companies' coal plants are in good condition and capable of dispatch. CTC found, however, that over the ten-year period prior to the report being filed with the Commission, the Companies placed an overreliance on net power supply from the PJM market and significantly reduced self-generation. Prudency Report at 10; Staff Initial Br. at 4-5. Further, the Companies did not appear to take seriously the Commission decision in the 2021 ENEC and 2022 ENEC that directed the Companies to self-generate more of their required power.

As discussed in the Prudency Report and testimony, the Companies built up larger than normal coal stockpiles through 2020. However, by May 2021, the Companies should have been concerned by the diminishing stockpiles of coal in inventory. The Companies should have realized in May 2021, but no later than July 2021, that the coal shortages at their plants would prevent them from self-generating at a meaningful level to offset rising PJM Energy market prices. In July 2021, the stockpiles were critically short, yet no action was taken until September 20, 2021, when the Companies issued a coal supply Request for Purchase (RFP)[9]. By this point, it was already too late to replenish the stockpiles. Only one coal supplier responded in the affirmative to the RFP and even that offer was rescinded. 2022 ENEC, Oct. 4, 2022 Tr. at 279.

CTC expressed concern that the Companies did not appear to take seriously the Commission directive to increase the plant capacity factors to 69 percent. The Companies argued for several months that the September 2021 Commission Order was not clear, and the Commission has since failed to clarify it despite numerous requests to do so.[10] 2022 ENEC, Petition, Apr. 19, 2022 at Exh. JCD-D pp. 14-15.

---

[9] Ms. Chilcote testified for the Companies that they realized the shortfall in late August 2021. Sept. 6, 2023 Tr. at 137.

[10] The Commission has explained several times that we arrived at the 69% capacity factor as a minimum target to strive for, based on the evidence before us in the 2021 ENEC that self-generation was more

CTC did not find any evidence that the Companies made changes in the fuel procurement process or bidding their energy into PJM to allow them to provide more self-generation and increase the capacity factor of their plants. The Companies failed to tell a key employee, Mr. Dial, who was in charge of fuel procurement, of the 69 percent capacity factor target set forth in the September 2, 2021 Commission Order. 2021 ENEC, Mar. 23, 2022 Tr. at 173, 211; 2022 ENEC, Oct. 4, 2022 Tr. at 280. Eighteen days later, Mr. Dial issued an RFP for more coal, unaware, pursuant to his testimony, of a need to not only replenish the stockpiles, but also to be able to meet the 69 percent average generating rate target that had been established by the Commission. 2021 ENEC, Mar. 23, 2022 Tr. at 173-74. The Companies presented conflicting testimony on this issue with Mr. Scalzo testifying during the 2021 ENEC hearing on the Petition to Reconsider that the September 2021 RFP was a direct reaction to the Commission's September 2021 order. 2021 ENEC, Mar. 23, 2022 Tr. at 90, lines 1-9.

Even after the March 2, 2022 Commission Order on the Petition for Reconsideration, the Companies did not tell Mr. Dial to procure sufficient coal that would allow the Companies to achieve the 69 percent capacity factor target if PJM energy prices continued to increase above earlier projected prices and far above the low levels of PJM market prices in 2020. 2021 ENEC; Mar. 23, 2022 Tr. at 211. The Companies appear to be short of contracted coal supply to self-generate at a maximum capacity factor, or at a minimum 69 percent capacity factor, even if it is economical to self-generate and save money for ratepayers, as shown in Companies' Post-Hearing Exhibit 2 filed on September 15, 2023. That exhibit shows that the Companies required more coal to generate at a 69 percent annual capacity factor at each of their plants than they had under contract.[11]

---

economical than relying on non-self-generated power. There should be no misunderstanding about maximizing self-generation and striving for a minimum target capacity utilization level when self-generation was the most economical power supply choice. If the projections regarding the economic benefit of self-generation had been incorrect, the Companies could have planned their daily generation accordingly and explained why that resulted in not meeting the target capacity utilization level. As it turned out, there was no question that self-generation would have been economic for most of the period March, 2021 through February 28, 2023 if the Companies had adequate coal supplies. Not understanding the intent of our capacity utilization target is no excuse for failing to maintain adequate coal stockpile levels to maximize generation when the economic benefits of self-generation turned out to be even greater than had been anticipated in the 2021 ENEC. The issue in this case is not whether the Companies achieved a 69 percent capacity factor, or any specific capacity factor, it is that they did not maintain adequate coal stockpiles and incoming coal supplies to maximize generation when it was prudent to do so.

[11] The exhibit shows that Amos requires 9,982,020 tons per year to operate at full load, and 6,887,594 tons to operate at a 69 percent capacity factor. It also shows 6,483,855 tons of coal under contract. It is not clear whether the contract amount is per year, or over multiple years. Even if the amount shown represents annual tons under contract it represents only 65 percent of what is needed to run at full load and only 94 percent of what is needed to run at a 69 percent capacity factor. For Mountaineer, the volume

## II. Commission Findings.

The Companies have the burden of proving that their ENEC costs were reasonable and the result of prudent management of their generation assets, fuel supplies, and net power supply from PJM in lieu of self-generation. 2021 ENEC, Comm'n Order, May 13, 2022, at 6. While any contemporary action must be based on what is known or reasonably knowable at the time the action is taken, a continuum of actions leading up to a decision point must also be taken into consideration when determining prudency. The contemporary actions and abilities regarding self-generation in any single month from March 2021 through February 2023 are part of a continuum of practices and actions which we determine were unreasonable and not prudently designed to protect customers against excessive net ENEC costs. We have been told by the Companies that their coal-fired plants are valuable assets that provide a physical hedge against high and volatile PJM energy prices.[12] We have agreed that coal-fired power plants are valuable assets and have ruled favorably on acquisition and upgrades of power plants. It is not our job, however, to manage and operate the plants so that they will provide the expected hedge against volatile energy costs when needed. To take advantage of the hedge benefit, it is the responsibility of the Companies to assure that they can operate the plants when the volatile energy markets they warned of expose them to high ENEC costs.

During the period of the under-recovery under consideration in these proceedings, the Companies did not prudently maintain adequate fuel supplies and manage operations of their coal-fired power plants to provide the physical energy hedge that they have described as a protection against volatile energy costs. As described in the Prudency Report, the Companies did not react prudently to the warning signals they were receiving. There was a clear decline in coal stockpiles from the end of 2020 to mid-2021. This drop may have been a concern, but not alarming, except for the fact that the PJM market prices, using Amos Day Ahead PJM LMP as a yardstick, had climbed from near $20.00 per MWh in 2020 to $23.81 per MWh in March 2021 (a 19 percent cost increase), then to $34.87 per MWh in July 2021 (an <u>additional</u> 46 percent cost increase), and were on an upward trajectory that would eventually peak at $91.88 per MWh in August 2022 (an <u>additional</u> 163 percent cost increase).

---

under contract also is only 65 percent of what is needed to run at full load and 94 percent of what is needed to run at a 69 percent capacity factor. For Mitchell, the volume of coal under contract is only 43 percent of what is needed to run at full load and only 63 percent of what is needed to run at a 69 percent capacity factor.

[12] "Amos and Mountaineer also serve as a physical hedge, and without them, our customers would be increasingly exposed to potentially volatile energy costs." Case No. 20-1040-E-CN; Tr. of June 8, 2021, at Cos. Exh. CTB-D, p. 6, lines 4-5.

By May 2021, the Companies should have been concerned by the diminishing stockpiles of coal in inventory. They apparently were not concerned as stockpiles continued to decline. By July 2021, the coal stockpiles were critically short, yet no action was taken until September 20, 2021, when the Companies issued an RFP for coal. By then the average PJM Day Ahead LMP at Amos had already doubled from the 2020 levels to $43 per MWh and self-generation was clearly prudent and necessary to minimize quantities of net purchased power. It is unfathomable that the Companies; with (1) a long history of reliance and expertise in coal-fired generation, (2) prior requests for ratepayer support of base-load coal-fired generation, which were generally granted by the Commission; and (3) purported commitment to upgrade, maintain and preserve these valuable generation assets for many years, could not operate the plants when needed to offset non-self-generated power because of a lack of adequate coal stockpiles and incoming coal supplies to replenish stockpiles as they were used.

Declining coal stockpiles, lack of attention to timely contracting for incoming coal to replenish stockpiles and a rapidly rising PJM LMP are a recipe for a catastrophic level of ENEC costs. The Companies claim that they did nothing wrong and that their actions were reasonable and prudent. We disagree. Instead, we find that their lack of action was unreasonable and imprudent. ENEC under-recoveries were climbing dramatically due to over-reliance on third-party power supplies at rising cost levels that could have been offset by self-generation if the Companies had acted reasonably and prudently in a timely manner.

As a result of their unreasonable and imprudent management, the Companies incurred excessive net ENEC costs that should not be shouldered entirely by customers. The Commission has long supported self-generation not only as a hedge against over-reliance on volatile outside power but also because of the reliability of properly managed, fuel-secure, steam-powered generating plants. It is unconscionable that the Companies would allow their inventories of coal to drop to such low levels that they were unable to generate electricity in any semblance of reasonable quantities to offset incoming PJM energy at costs that were not just marginally higher, but were much higher, than self-generation.

Furthermore, the Companies demonstrated an imprudent lack of ongoing attention to assure that they had a continuous supply of coal to maintain adequate stockpiles of coal to maximize generation when it was cheaper than PJM energy prices. It was the Companies' responsibility to structure their coal supply contracts in a manner that would allow them to respond to rising PJM LMPs by increasing the utilization of their power plants without running out of coal. This may take a mix of long-term, medium-term, and short-term contracts and spot purchases when necessary.

It is not our responsibility to manage the day-to-day operations of the Companies or dictate the mix of coal contracts. That responsibility lies squarely on the management of the Companies. As utilities have often reminded us, the Supreme Court of Appeals of West Virginia has held that the Commission is not a super board of directors. However, at the same time, the Court has held that when the utility management acts in an unreasonable and imprudent manner, the Commission has the authority to protect customers from the negative financial consequences of the utility unreasonable actions, or inactions.[13] [14]

The Companies are required by law to: "maintain a minimum 30-day aggregate coal supply under contract for the remainder of the life of those [coal-fired generation] plants." W. Va. Code § 24-2-1q. They claim to have met that statutory requirement, although the data submitted in Companies' Post-Hearing Exhibit 2 filed on September 15, 2023 (discussed above), calls that into question since a shortfall in annual coal quantities under contract necessary to generate at full load may also signal a shortfall in quantities to meet a minimum 30-day supply unless the annual amounts are deliverable monthly at a greater than pro-rata level. Reasonable and prudent management must assure not only that contracts are in place to cover a minimum 30-day aggregate coal supply for the remainder of the life of the generating plants, but also assure that the incoming coal supplies replace coal as it is used so that the plants could actually operate to offset purchased power quantities (and bring the net of receipts from PJM minus deliveries to PJM close to zero, or below) without running inventories down to dangerously low levels. If the Companies had managed their stockpile levels reasonably and prudently, they would not have experienced the unreasonably low inventory levels that they now use to excuse their inability to maximize the use of the plants when PJM hourly day-ahead LMP reached levels that resulted in net ENEC costs of hundreds of millions of dollars that the Companies now expect customers to pay.

The Commission finds that the Companies failed to obtain adequate fuel supplies and manage power plant operations in a reasonable, prudent, and efficient manner. As a result, during the period under review in these proceedings

---

[13] While the PSC is not to be seen as a super board of directors for the public utility companies of the State, at the same time "[t]heir function is to regulate and disapprove any dishonest or clearly inefficient conduct and practice by the utility. Lumberport-Shinnston Gas Co. v. Public Serv. Comm'n 271 S.E.2d 438 (1980),(citing United Fuel Gas Co. v. Public Serv. Comm'n, 154 W.Va. 221, 243, 174 S.E.2d 304, 317 (1969), (citing, Southern Bell Telephone and Telegraph Company v. Georgia Public Serv. Comm'n, 203 Ga. 832, 848, 49 S.E.2d 38, 66 (1948)).

[14] The Public Service Commission is not a super board of directors. Its sole power is to see that in the matter of rates, service and facilities, their treatment of the public is fair. United Fuel Gas Co. v. Public Serv. Comm'n, 154 W.Va. 221, 243, 174 S.E.2d 304, 317 (1969), (citing Northern Pennsylvania Power Co. v. Pennsylvania P.U.C.)

Table 1

| | Day-Ahead Load-Weighted Average LMP | | | Year to Year Change | | | |
|---|---|---|---|---|---|---|---|
| | Average | Median | Standard Deviation | Average | Average Percent | Median | Standard Deviation |
| 2001 | $36.01 | $29.02 | $37.48 | NA | NA | NA | NA |
| 2002 | $31.80 | $26.00 | $20.68 | ($4.21) | (11.7%) | (10.4%) | (44.8%) |
| 2003 | $41.43 | $38.29 | $21.32 | $9.63 | 30.3% | 47.3% | 3.1% |
| 2004 | $42.87 | $41.96 | $16.32 | $1.44 | 3.5% | 9.6% | (23.4%) |
| 2005 | $62.50 | $54.74 | $31.72 | $19.62 | 45.8% | 30.4% | 94.3% |
| 2006 | $51.33 | $46.72 | $26.45 | ($11.16) | (17.9%) | (14.6%) | (16.6%) |
| 2007 | $57.88 | $55.91 | $25.02 | $6.55 | 12.8% | 19.7% | (5.4%) |
| 2008 | $70.25 | $62.91 | $33.14 | $12.37 | 21.4% | 12.5% | 32.4% |
| 2009 | $38.82 | $36.67 | $14.03 | ($31.43) | (44.7%) | (41.7%) | (57.7%) |
| 2010 | $47.65 | $42.06 | $20.59 | $8.83 | 22.7% | 14.7% | 46.8% |
| 2011 | $45.19 | $39.66 | $24.05 | ($2.46) | (5.2%) | (5.7%) | 16.8% |
| 2012 | $34.55 | $31.84 | $15.48 | ($10.64) | (23.5%) | (19.7%) | (35.6%) |
| 2013 | $38.93 | $35.77 | $18.05 | $4.37 | 12.7% | 12.3% | 16.6% |
| 2014 | $53.62 | $39.84 | $59.62 | $14.70 | 37.8% | 11.4% | 230.4% |
| 2015 | $36.73 | $30.60 | $25.46 | ($16.89) | (31.5%) | (23.2%) | (57.3%) |
| 2016 | $29.68 | $27.00 | $11.64 | ($7.05) | (19.2%) | (11.8%) | (54.3%) |
| 2017 | $30.85 | $28.21 | $12.64 | $1.17 | 3.9% | 4.5% | 8.6% |
| 2018 | $37.97 | $32.49 | $24.76 | $7.13 | 23.1% | 15.2% | 95.9% |
| 2019 | $27.23 | $25.28 | $10.18 | ($10.74) | (28.3%) | (22.2%) | (58.9%) |
| 2020 | $21.40 | $19.78 | $7.59 | ($5.83) | (21.4%) | (21.7%) | (25.5%) |
| 2021 | $39.37 | $33.72 | $19.30 | $17.97 | 84.0% | 70.5% | 154.3% |
| 2022 | $75.44 | $64.13 | $41.25 | $36.07 | 91.6% | 90.2% | 113.8% |

*The nominal yearly PJM day-ahead load-weighted average LMP for 2022 was the highest since the first full year of the PJM day-ahead energy market in 2001. 2022 State of the Market Report for PJM, Section 3, Energy Markets. https://www.monitoringanalytics.com/reports/PJM_State_of_the_Market/2022/20*

they received excess amounts of power from the PJM market, that were not offset by self-generation, at prices that, as shown in the above Table (Table 1) and report of the PJM Independent Market Monitor, were at the highest level in PJM History. The Day-Ahead system-wide LMP nearly doubled in 2021, going from an average of $21.20 per MWh in 2020 to $39.37 per MWh in 2021. Then, the price jumped to an average of $75.44 per MWh in 2022.

Unfortunately, rather than being in a position to offset incoming power from PJM at prices that far exceeded what it would cost the Companies to generate from their own plants, the Companies continued on a dangerous downward slope of underutilization of their plants, culminating in the worst level of utilization in twenty years, occurring precisely at the worst time as the PJM LMP reached, on average, over $75 per MWh and were at times in excess of $90 per MWh.

The following chart (Table 2) taken from the Energy Information Administration (EIA) Power Plant data shows that all three coal-fired power plants

of the Companies are capable of generation far in excess of the abysmal usage level they achieved in 2021 and 2022, while the Companies were paying so much for net incoming PJM power in lieu of self-generation that their ENEC under-recovery didn't just balloon, it rocketed to the stratospheric level of $524.9 million.

Table 2



While the Companies paint a picture of declining PJM prices in 2019 and 2020 that made self-generation of limited benefit at best, that was a period of economic downturn, collapsing natural gas prices, and Covid shutdowns. Failure to realize that even a modest turnaround could significantly increase the market price of power led to failure to maintain coal inventories and adequate incoming supply to cover the inevitable increase in PJM market prices after the recovery from the economic downturn of 2019/2020. These failures left the Companies' customers dangerously and disastrously exposed to price escalations in 2021 and 2022. As PJM average LMP climbed from $21.40 per MWh in 2020 to $39.37 in 2021, the Companies' coal burn and related MWh generation at its power plants ticked upward only slightly. Table 2. Even worse, when the PJM LMP skyrocketed to an average of $75.44 in 2022, the Companies' coal burn and MWh output plummeted in the opposite direction. Id. The results were excessive net incoming PJM power to meet internal load and little, if any, sales of excess self-generated power not needed for internal load that could have generated net positive margins to offset ENEC costs.

We have previously recognized that low-cost self-generation benefits customers in two ways: First, because such low-cost generation could serve internal load in lieu of purchasing more expensive power to serve internal load; and second, net system sales into the wholesale market could generate margins that further reduce net ENEC costs. From the outset of what the Commission referred to as "Fuel-Review" proceedings in the late 1970s, and subsequent evolution into "Energy Cost" proceedings, "Net Energy Cost" (NEC) proceedings, and "Expanded Net Energy Cost" proceedings, we have cautioned electric utilities that they have the responsibility to minimize the net ENEC costs that are passed through to customers, particularly in expedited, non-base rate proceedings. Achieving net system sales (wholesale sales in excess of purchases that produce net positive margins) has always been a goal that we have stressed that the utilities must maximize.

The purchased power and capacity related components of our present ENEC proceedings are often referred to as system transactions or system sales. They involve day-to-day power sales and purchases both intra-system (American Electric Power or American Electric Power Service Corporation) and inter-system (neighboring non-affiliated utilities). These expanded cost components were incorporated into the ENEC with the Commission warning the utilities that automatic pass-through was not guaranteed and that the Companies had the burden to prove that they were maximizing the net margins from system transactions (revenue in excess of marginal costs) through aggressive management of their generation assets. The Commission explained the potential

downside and the potential upside of expedited reviews of power supply costs when it first considered an "Expanded" NEC procedure in 1984.

> Generally, system sales is the term used to describe voluntary opportunity transactions with the member companies of the AEP System as sellers and other independent, unaffiliated interconnected utilities as buyers. . . .
>
> The stipulation [in Case No. 83-697-E-42T] points out that these opportunity sales are unpredictable with respect to volume and profitability since they are dependent on a variety of factors that are difficult to predict. . . . Recognizing the difficulty in predicting a sales realization that will closely reflect the actual system sales realized, Staff and Company agreed upon a concept for purposes of the stipulation. This concept, which is experimental in nature, will remove all system power costs and system sales revenue from rate cases and consider them in the Annual Net Energy Cost (NEC) review proceedings. Inclusion of these items in an "Expanded Net Energy Cost" concept and the application of deferred accounting treatment will greatly reduce the risk associated with predicting future system sales levels or costs associated with such sales. Moreover, customers will receive the benefits associated with these sales on a more timely basis. . . . (Stipulation, pp. 22-24).
>
> CAD opposes incorporating the test year level of system sales in rates as well as to the adoption of the expanded NEC, even on an experimental basis. . . . CAD argues that if no system sales occur under expanded NEC, ratepayers alone bear the risk of supporting excess capacity. . . .
>
> The stipulation adopts the expanded NEC concept on an experimental basis. System sales, as pointed out by the stipulation's discussion, are opportunity sales which are difficult to forecast as to volume or profit. . . . We will adopt the expanded NEC concept, but only on an experimental basis. Therefore, APCo is on notice that we may remove the expanded portion of the NEC in any future fuel review or general rate case and return that increment to base rates.

Appalachian Power Co., Case No. 83-697-E-42T, Comm'n Order, Sept. 28, 1984, at pp. 15-17.

For many years of the Fuel Review, NEC, and ENEC proceedings, the system transactions were bi-lateral in nature, involving day-to-day power plant

operational decisions, including economic dispatch, energy sales and energy purchases, agreed to between our West Virginia electric utilities and neighboring utilities. Beginning around 2000, however, PJM, which the Federal Energy Regulatory Commission (FERC) encouraged to assume operational control over electricity transmission within a multiple state footprint, began operating bid-based energy markets. Transactions that had been ad hoc arrangements between neighboring utilities[15] became PJM market-based transactions. Initially, the PJM prices were high compared to the cost of generation by West Virginia or affiliated utility-owned, mostly coal-fired, steam generation facilities. As was the case when system transactions were a function of trading available lowest cost generation between neighboring utilities, the transactions into (sales) and out of (purchases) the PJM Market favored West Virginia utility and affiliate-owned power plants. As low-cost producers, it took little effort to plan to serve internal load from the lowest cost utility-owned power generation available and to sell any excess energy from the higher cost generation into the PJM Market at a positive net margin (incremental profit).

As can be seen in Table 1 above, PJM energy market prices were relatively high from 2001 until approximately 2018. Self-generation costs varied in those years, but typically were in the range of $15 per MWh to the mid $20 per MWh range.[16] Our expectations, both before and after the creation of the PJM energy markets, and our message to the utilities, has been not only to minimize the percentage of load served from purchased power, but also to sell their excess power to neighboring utilities or into the PJM market at net margins to be used as "credits to cost of service" to reduce the rates of West Virginia customers.

In 2019 the PJM market prices dropped and in 2020 they had collapsed to below $22 per MWh average for the year and temporarily dropped below West

[15] These arrangements worked quite well, producing a shared benefit for both buyers and sellers.

[16] The following table shows costs of generation as reported by APCo in its Annual Reports to the Commission.

| Fuel, Allowance and Steam Expenses Cost of Generation per Net MWh<br>Data from Annual Reports Filed by APCo * | | |
|---|---|---|
| Year | Amos | Mtr |
| 2000 | $13.32 | $16.08 |
| 2005 | $16.41 | $16.81 |
| 2010 | $24.51 | $28.39 |
| 2015 | $25.71 | $25.08 |
| 2020 | $25.65 | $22.18 |
| * Includes all Steam and Miscellaneous Steam Expenses reported. All of these costs may not be directly variable prorata to production. Therefore, these values likely overstate actual variable costs. | | |

Virginia generation costs. Therefore, the Companies understandably acquired, larger percentages of the power supply to serve West Virginia load at those low market prices. The cost of coal-fired generation, however, remained close to the cost of PJM energy. We never suggested to the Companies in any previous ENEC orders, or any orders, that they should forego having sufficient fuel inventories, having sufficient coal under contract, prudently bidding into the PJM market, and operating power plants to maximize their coal-fired generation and instead, become addicted to price-volatile PJM Energy Market electricity. Even when PJM energy prices are low on average, there are opportunities for the Companies to earn positive net margins during certain hours and peak periods and there are reliability benefits of having always-available, fuel-secure, thermal generating plants on line and prepared to balance load and generation. Thus, it was and is necessary that they manage their fuel and generation resources to remain prepared to take advantage of those opportunities and contribute to maintaining system reliability, even at relatively low PJM prices, and to be able to quickly respond with increased generation when PJM prices or load increased.

In the 2021 ENEC proceeding, the Commission noted that the Companies' own projections indicated an over-reliance on net market supplied power at cost levels that were already trending upward from the 2020 price levels. The Commission further stated that over-reliance on net purchased power indicated an imprudent under-reliance on the utilization of the Companies' power plants. 2021 ENEC, May 13, 2022 Comm'n Order at 4-5. The Commission warned the Companies that failure to maximize the output of their own power plants could result in disallowance of costs in future ENEC proceedings. Id. at Conclusion of Law 3.

In the first months of 2021, the difference between the cost of self-generation by the Companies and purchasing power was relatively small, but significant enough to warrant a close review of the Companies' projections of seemingly unreasonably high levels of net quantities of PJM power needed to serve their load. During, and immediately after, our analysis in the 2021 ENEC proceeding, our concerns were proven painfully correct as the difference between purchasing power and self-generation costs at the Companies' power plants escalated. The following Table (Table 3) shows the monthly changes in average day-ahead PJM energy market prices based on the PJM price at the Mountaineer power plant and compares the escalating PJM market prices to the cost of generation at Mountaineer. Similar relative trends occur at Amos and Mitchell.

Table 3




For this table we have calculated the variable cost of generation using the Coal Report data submitted to this Commission and the fuel data submitted by APCo to the EIA. These production cost calculations are based on the cost of monthly incoming coal rather than an inventory value. In a rising cost market, use of last-in costs in place of average inventory value costs will overstate the production costs to some degree. We do not expect that the Companies have or should change their average inventory cost accounting. We make the calculations based on incoming coal costs for Table 3 merely for purposes of simplification. The Coal Report data includes a breakdown of Free on Board (FOB) Mine costs, transportation costs, and handling costs. That level of detail may not be in the data reported to the EIA. This different reporting detail may account for the slight differences between the EIA and Coal Report data. To allow for consumables, we have added $4 per MWh to the calculated production costs for both the EIA and coal report data.

Table 3 data illustrates that the narrow differences between PJM market prices and the Companies' production costs widened dramatically from early 2021 to December 2022. The magnitude of the excess costs of PJM energy is represented by the differential, green-striped bars between the production cost curves and the PJM market price curve. The differential values go from a small negative in March 2021 to positive values beginning in April 2021. Those positive differentials were relatively small, but significant up to July 2021 before they

ballooned to extreme levels, except for a narrower differential in December 2021 due to a dip in the PJM price in that month.

The Companies have argued that they faced rising coal costs beginning in 2021, so their generation costs also rose. Clearly, the coal costs and resulting calculated production costs increased starting in mid-2021, and the rate of increase became more significant from March 2022 to July 2022. The calculated production cost increase from approximately $20 per MWh in March 2021 to almost $40 per MWh would have caused increased ENEC costs. But the roughly $20 per MWH increase in production costs pales in comparison to the PJM market price which jumped from around $30 per MWh in the spring of 2021 to $60 per MWh by November 2021, and then after a brief pull-back climbed in 2022 reaching $90 per MWh in August of 2022.

The Companies have discussed rising coal prices occurring at the same time that they finally attempted to replenish their coal stockpiles. The Commission recognizes the fact that coal costs were increasing. However, we have taken that into consideration in our calculations, and will not use higher priced coal as a reason to disallow any of the ENEC costs reported by the Companies. The Coal Report data we use clearly shows that new coal contracts were at prices that were in excess of historical coal prices. In some cases, coal purchases detailed in recent Coal Reports reached and exceeded $100 per ton. With coal purchased in 2022 at prices well in excess of historical values, the calculated variable production cost increased from below $30 per MWh in December 2021 to $40 per MWh in December 2022. While this is a significant increase in production costs, over the same period PJM energy market prices increased from around $30 per MWh to $80 per MWh (after peaking in excess of $90 per MWh in August, 2022). Thus, even with higher coal costs, the Companies would have benefitted from relatively low cost self-generation to serve internal load and increased margins on net system sales. Those benefits would have been passed-on to customers as lower net ENEC costs. That did not happen. Clearly, the Companies' efforts to utilize the coal-fired power plants - touted by them as a hedge against volatile PJM prices- were too little and too late.

As an example of the magnitude of the excess PJM prices and their impact on ENEC costs, the Amos plant is capable of outputting to the grid approximately 440,000 net MWh per week after taking plant load and losses into consideration. The Mountaineer plant is capable of outputting approximately 200,000 net MWh per week. When the difference between generation costs and PJM market prices is just $10 per MWh, failure to generate from these plants costs the Companies (and ultimately the customers) approximately $6.4 million per week either in excessive purchased power costs or lost margins. When the PJM price excess over production costs differential rose as high as $60 per MWh in the summer of

2022, the excessive purchased power costs or lost margins would have been as high as $38 million in a single week. Throughout 2021 and particularly in 2022, every day of down-time, de-rating, scheduled outage, extended outages, or bids designed to limit or eliminate dispatch of the Companies' power plants by PJM due to lack of adequate coal supplies that caused the West Virginia power plants to be under-utilized and in some cases not utilized at all for weeks at a time, was a lost opportunity to earn positive margins and lower the Companies' ENEC costs.

As discussed earlier, the Companies had a responsibility to manage their coal contracts to assure an adequate supply of coal under contract and structure incoming coal supplies to replenish stockpiles as they were used. Such management would allow increasing self-generation to offset high cost incoming power serving load. Yet, throughout this proceeding, the Companies' defense of the under-recovery is that they could not have increased self-generation to offset the incoming power necessary to serve load because they did not have sufficient stockpiles of coal and incoming coal supply. That defense merely highlights that the cause of the growth in ENEC under-recoveries traces back to poor and imprudent management and maintenance of adequate coal stockpiles.

During this proceeding, the Companies have maintained that they did not have sufficient stockpiled coal or incoming supply when needed but have taken steps to contract for future coal supplies that would be sufficient to replenish stockpiles as needed. They have expressed concerns with Commission reaction to the fact that the new coal supplies are more expensive than historical coal supplies. We do not dispute that coal costs increased in 2021 and 2022 and it was necessary to reflect the increases in new contracts. We do not criticize the contracts or restrict recovery of the cost of new coal supplies through our disallowance of a portion of the ENEC under-recoveries in this case. In fact, had the Companies reacted sooner and acquired even more new coal supplies its under-recovery would have been less and it would be facing less of a cost recovery disallowance. Nor do we question PJM LMPs. Our adjustment to the allowable ENEC under-recovery is due to the imprudent decisions and management that resulted in insufficient stockpiles of coal to self-generate more energy to serve load and possibly to have excess energy to sell in the PJM market.

We expect the Companies to consider 2021 and 2022 a lesson learned, to honor those new coal contracts, and negotiate more contracts when needed to allow them to maximize use of their power plants, both daily and hourly, as well as to provide a physical hedge against volatile purchased power prices. However, while the Companies may have modified their practices to assure adequate supplies of fuel and adequate inventory levels in the future, we cannot disregard or excuse the past practices that led to a catastrophic level of net ENEC costs and

under-recoveries from March 2021 through February 2023. We will not allow full recovery of those costs.

With this background and the Commission's conclusion that the Companies' (1) failure to maintain adequate coal inventories at levels that allow them to fully operate their plants at high capacity factors when it was economical to do so; (2) failure to bid into the PJM Market in a manner that would assure maximization of net margins on net PJM transactions; and (3) failure to flexibly reschedule outages when market conditions, made it obvious that extending outages was unreasonable and imprudent in face of skyrocketing net ENEC costs due to over-reliance on external power in lieu of economical self-generation, the Commission will quantify the extent of excess ENEC costs or lost margins that should be imputed and offset against deferred ENEC costs.

For our calculation we begin with post-hearing Exhibit 4, which the Companies filed in response to a Commission request to document their market bids and cost-based bids into the PJM market, the corresponding LMP clearing prices, and the resulting market clearing volumes of their self-generation. The Companies' filed this data in three spreadsheets labeled: "Market Data - Mar 2021 to Feb 2022 CONFIDENTIAL; Market Data - Mar 2022 to Feb 2023 CONFIDENTIAL; and Market Data - Mar 2023 to July 2023 CONFIDENTIAL. Companies' Sept. 15, 2023 filing. For purposes of our calculations in this proceeding, which covers the review periods from March 1, 2021 through February 28, 2023, we use the data from the first two spreadsheets.

In these spreadsheets the Companies detailed hourly values for each day of the indicated periods. For each generation unit these hourly data were divided into:

> Date; Hour of the day; Market Offer; Cost-Based Offer; Net Available Capacity; MWh Sold to PJM; and DA LMP[17].

Using this historical data, the Companies calculated an hourly value at each generating unit for what they labeled:

> Winners Only Additional Margin; Winners Only Additional MWh; Full Out Additional Margin; and Full Out Additional MWh.

To calculate "Winners Only Additional MWh" the Companies first determined whether the hourly LMP was above the amount that they bid as their "Cost-based

[17] PJM has a Day Ahead (DA) Energy Market and a Real Time Market. Efficient operation of coal-fired power plants to maximize their use requires bidding and planning generation on a day-ahead basis.

Offer."[18] If the LMP was above their "implied cost" they considered that additional generation in that hour would have been a "winner." In those hours that were "winners" with LMP being higher than their cost-based offer, or implied costs, the Companies determined the amount of additional MWh by subtracting the amount sold to PJM from the amount available as shown in the column they labeled "Net Available Capacity." To determine "Winners Only Additional Margins", they then multiplied the additional MWhs that could have been sold into the PJM Market by the increment of the PJM LMP for each hour over the cost-based offer. The following Table (Table 4) is an example of the structure and calculations in the Companies' filing. We do not show the actual values in this example, but show the structure of the calculations that the Companies made. We will subsequently use the Companies' methodology, but will modify the Companies' cost numbers for reasons we will explain supra.

Table 4

| Line | Unit | Date | Hour | Market Offer | Cost-Based Offer | DA LMP | Potential Margin per MWh | Winner For Generation (Y) or (N) | Net Available Capacity | MWh Sold to PJM | Winners Only Add'l MWh | Winners Only Add'l Margin |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Amos 1 | xxx | # | $110.00 | $45.00 | $40.00 | ($5.00) | N | 750 | 600 | 0 | $0 |
| 2 | Amos 2 | xxx | # | $100.00 | $42.00 | $44.00 | $2.00 | Y | 750 | 400 | 350 | $700 |
| 3 | Amos 3 | xxx | # | $105.00 | $42.00 | $65.00 | $23.00 | Y | 1,300 | 300 | 1,000 | $23,000 |
| 4 | Mtr | xxx | # | $0.00 | $0.00 | $65.00 | $65.00 | ? | 0 | 0 | 0 | $0 |
| 5 | Mtr | xxx | # | $0.00 | $0.00 | $65.00 | $65.00 | ? | 0 | 0 | 0 | $0 |
| 6 | Mtr | xxx | # | $75.00 | $75.00 | $65.00 | ($10.00) | N | 1,300 | 0 | 0 | $0 |
| 7 | Mtr | xxx | # | $125.00 | $100.00 | $75.00 | ($25.00) | N | 1,300 | 0 | 0 | $0 |
| 8 | Amos 3 | xxx | 1 | $100.00 | $115.00 | $75.00 | ($40.00) | N | 1,300 | 0 | 0 | $0 |
| 9 | Amos 3 | xxx | 2 | $100.00 | $115.00 | $73.00 | ($42.00) | N | 1,300 | 0 | 0 | $0 |
| 10 | Amos 3 | xxx | 3 | $100.00 | $115.00 | $78.00 | ($37.00) | N | 1,300 | 0 | 0 | $0 |
| 11 | Amos 3 | xxx | 4 | $100.00 | $115.00 | $70.00 | ($45.00) | N | 1,300 | 0 | 0 | $0 |
| | | | | | | | | | | | Total | $23,700 |

Performing similar calculations for 8,760 hours per year at each generating unit for the period March 2021 through February 2023, the Companies calculated that selling additional MWh for periods when their cost-based offer was lower than the PJM LMP would have resulted in selling a significant number of additional MWh and the calculated Winner Only Additional Margins on a total company basis would have been nearly $130 million.

For purposes of our analysis of ENEC costs that would have been avoided by maximizing self-generation there are several factors in the Companies' derivation of the nearly $130 million Total Company "Winners Only Additional Margins" (or additional margins that would have occurred if all available power in every hour when their generation costs were lower than the market clearing price

[18] We put "cost-based" in quotes because, as we will address later, some of these offers escalate out of proportion to changes in coal costs in certain months to such degree that we cannot accept them as the true variable cost of generation. We will refer to the "cost-based" offer as an "implied cost" but do not accept all of the implied-costs as being representative of true incremental variable costs.

was dispatched or scheduled as "must run") that we do not accept as being reasonable.

First, we note that the Companies have used cost-based bids rather than true variable costs for purposes of their calculations. In many instances, the representation of costs as reflected in the Companies' cost-based bids appears to be reasonable and rational. In some instances, however, their cost-based bids cannot be explained by any evidence that the actual incremental variable cost of generation could fluctuate as much as the Companies reflect. While we asked the Companies to document their market and cost-based bids that would control signals to be dispatched into the PJM market, there has been significant emphasis and testimony in these proceedings that adders to implied cost of generation that do not represent true incremental variable costs do not provide a realistic representation of the margins that can be achieved from self-generation. Even witnesses for the Companies admitted that instead of representing variable costs, adders were a tool to restrict dispatch of generating units. For example:

> [T]he Company started using adders, which is an attempt to conserve coal for when it's more valuable in the future.

Testimony of Jeff Plewes, Sept. 5, 2023 Hearing Tr. at 197.

> So what you do, this is again why I think that adders were well done, is that you ensure that you don't generate when prices are lower than you expect the prices to be in the future in the market.

Id. at 214.

> So for example, if prices are, say, at $80, as they were in October . . . wouldn't it be great to just burn as much coal as possible . . . because every megawatt hour you generate with your coal is giving you a savings for your customer over getting it in the market. But if your coal is constrained, you have to think about, well, what happens if in December and January, for example, when prices are expected to be higher. . . . What if the power prices are $200, as they exceeded later in 2022? . . . if you burn it to save some consumers some money in October, and you don't have a way to replace it, and you're not available when you call for an event, thousands of dollars per megawatt hours lost. And so what you do is you put in adders. You don't just take the units out, you put in adders that represent the opportunity cost of that coal in the future.

Id. at 214-215.

This testimony, while applauding the Companies' efforts to conserve coal by putting adders on their "cost-based" bids to reduce the likelihood of getting into the market, demonstrates that the failure to minimize market purchases and to maximize self-generation was a direct result of a failure to maintain adequate coal stockpiles and incoming coal supplies to self-generate even when doing so could reduce ENEC costs.

While PJM market rules may allow adders other than incremental variable costs, such adders result in a number that does not represent the true incremental variable cost of generation. A fixed cost adder to a cost-based bid, even if allowed by a PJM tariff, does not make that fixed cost adder a variable cost that will be incurred on each additional unit of production. Although FERC has allowed fixed cost adders to energy cost bids, there was significant opposition to such adders from the PJM Independent Market Monitor and others, explaining why energy market cost-based bids should be based on the true marginal variable cost of generation.[19]

In the bid data filed by the Companies we find instances where the cost-based offer jumps from the range of $45 per MWh to over $100 per MWh in a three- or four-month period. Whether that is due to adders to the cost-based bid, or some other calculus adopted by the Companies, we find that level of "cost of generation" is unlikely and unreasonable. Thus, if the generation had been dispatched at the more realistic $45 per MWh true variable cost, the margins earned by the Companies would be significantly higher than the computed "winner only margins" that are based on the difference between the PJM LMP and the representation of variable costs embodied in the implied costs used in the Companies' calculations.

We find instances when the Companies' cost-based offers exceed $65 per MWh for extended periods of time. As we review the implied cost of generation as compared to increases in reported fuel costs, we do not find any months in which

[19] The [Independent Market Monitor] IMM and PJM Load Coalition oppose PJM's proposal [for certain maintenance adders] and argue that major maintenance costs incurred as a result of electric production should be recovered in the capacity market, and not the energy market, because they are not short-run marginal costs. The IMM explains that short-run marginal costs consist of fuel and variable operation and maintenance costs associated with other consumables used at the time of electric production... The IMM explains that ... it is not necessary to incur any specific maintenance expenditure to produce power in the short run because a resource does not consume a defined amount of maintenance parts and labor in order to start or produce additional MWh. FERC Order, Docket Nos. ER19-210-001, EL19-8-000, EL19-8-001, ORDER ON PROPOSED TARIFF AND OPERATING AGREEMENT REVISIONS (Issued April 15, 2019). 167 FERC ¶ 61,030.

the variable cost of generation should have exceeded $50 per MWh, even after reflecting coal purchases that sometimes exceeded $100 per ton. By representing cost of generation as equal to their cost-based bids, or implied costs, when some of those implied costs are not true variable costs and are inconsistent with the cost of fuel delivered and handled at the individual plants plus the cost of consumables, the calculations that the Companies made of "Winner Only Additional Margins" are understated.

We will base our initial months' calculations on the apparently reasonable and "truly variable," cost-based bids that were used in early 2021 as found in the Companies' post-hearing exhibit 4 filed on September 15, 2023. However, in place of excessively increasing implied costs used by the Companies, we will adjust the generation costs based on the increasing purchased fuel costs, including transportation and handling, throughout 2021 and 2022 when the costs as implied by the Companies in their cost-based bids are out of line with any reasonable expectation of increased costs of generation that can be explained by actual increased coal prices as reported in the monthly coal reports.[20]

Table 5 below shows the additional margins from additional generation in lieu of market purchases that the Companies would have achieved from March 1, 2021, through February 28, 2023, as calculated by the Companies. We also show the calculation made by the Commission based on the methodology used by the Companies but adjusting the cost of generation to reflect cost of generation based on increased coal cost reported by the Companies over that period of time. We determine that the sudden and irregular increases in implied generation costs used by the Companies are unreasonable and cannot be justified based on the cost of coal being acquired by the Companies at each of their generating plants over the calculation period. We show only the totals in Table 5 below.[21]

---

[20] We note that the Companies have argued that their own example of $130 million total Company increased margins, or any calculation of potential increased generation if their bidding had reflected lower costs than PJM market clearing prices, is flawed because they did not have sufficient coal supplies to actually generate the energy that would have been scheduled from its plants. However, this argument is circular and not appropriate for purposes of our disallowance calculations because we have determined that there were unreasonable and imprudent decisions by the Companies that led to that shortage of adequate coal supplies. If the Companies had maintained adequate coal supplies more reasonably and prudently, they should have been able to clear the market at the levels we have calculated and would have benefitted by lower cost power for internal load and would also, at times, generated additional margins from net system sales, which would have further reduced the net ENEC costs for the period March 1, 2021, through February 28, 2023.

[21] The Table 5 calculation for Amos and Mountaineer lost margins are allocated to West Virginia jurisdictional operations of APCo at a 41.4 percent average allocation factor. The data filed by the Companies for the Mitchell units reflected only the Wheeling share of the Mitchell output and potential output. Therefore, no ownership allocation of the Mitchell lost margins was necessary.

Table 5

| Unit | Date | Company Implied Cost Per MWH | DA LMP Per MWH | Winners Only Add'l Margin | Winners Only Add'l MWh | PSC Adjusted Cost Per MWH (Using Lower of Company Implied Cost or Calculated Cost from Coal reports) | PSC Adjusted Winners Only Add'l Margin | PSC Adjusted Winners Only Add'l MWh |
|---|---|---|---|---|---|---|---|---|
| **Twelve Months March 1, 2021 Through February 28, 2022** | | | | | | | | |
| Basic Data Filed By Companies | | | | Companies' Calculations | | Commission Calculations | | |
| Total Amos 1 Add'l Margin | | | | $7,735,918 | 529,656 | | $15,389,979 | 834,695 |
| Total Amos 2 Add'l Margin | | | | $6,961,732 | 472,785 | | $13,205,246 | 666,111 |
| Total Amos 3 Add'l Margin | | | | $8,134,580 | 705,062 | | $16,168,206 | 928,124 |
| Total Mtr. Add'l Margin | | | | $7,735,918 | 529,656 | | $11,797,407 | 762,083 |
| Total Amos and Mtr Add'l Margin | | | | $30,568,148 | 2,237,160 | | $56,560,838 | 3,191,014 |
| Total Mitchell 1 Add'l Margin | | | | $2,665,454 | 167,031 | | $7,736,229 | 409,337 |
| Total Mitchell 2 Add'l Margin | | | | $3,440,043 | 241,004 | | $8,020,645 | 364,551 |
| Total Mitchell Add'l Margin | | | | $6,105,497 | 408,035 | | $15,756,874 | 773,888 |
| Grand Total All Plants Add'l Margin | | | | $36,673,645 | 2,645,195 | | $72,317,712 | 3,964,902 |
| Allocated to West Virginia | | | | | | | | |
| Amos and Mountaineer 41.4% | | | | $12,991,463 | | | $23,416,187 | |
| Mitchell 100% | | | | $6,105,497 | | | $15,756,874 | |
| Total West Virginia | | | | $19,096,960 | | | $39,173,061 | |
| **Twelve Months March 1, 2022 Through February 28, 2023** | | | | | | | | |
| Basic Data Filed By Companies | | | | Companies' Calculations | | Commission Calculations | | |
| Unit | Date | Company Implied Cost Per MWH | DA LMP Per MWH | Winners Only Add'l Margin | Winners Only Add'l MWh | PSC Adjusted Cost Per MWH (Using Lower of Company Implied Cost or Calculated Cost from Coal reports) | PSC Adjusted Winners Only Add'l Margin | PSC Adjusted Winners Only Add'l MWh |
| Total Amos 1 Add'l Margin | | | | $15,800,281 | 733,100 | | $65,716,683 | 1,865,717 |
| Total Amos 2 Add'l Margin | | | | $22,192,330 | 1,096,015 | | $78,892,894 | 2,266,261 |
| Total Amos 3 Add'l Margin | | | | $18,011,096 | 356,406 | | $56,780,352 | 1,602,989 |
| Total Mtr. Add'l Margin | | | | $7,992,064 | 379,432 | | $71,515,811 | 2,129,766 |
| Total Amos and Mtr Add'l Margin | | | | $63,995,770 | 2,564,954 | | $272,905,740 | 7,864,732 |
| Total Mitchell 1 Add'l Margin | | | | $9,907,127 | 349,532 | | $34,806,549 | 916,481 |
| Total Mitchell 2 Add'l Margin | | | | $17,059,473 | 485,743 | | $44,806,844 | 895,804 |
| Total Mitchell Add'l Margin | | | | $26,966,600 | 835,275 | | $79,613,393 | 1,812,286 |
| Grand Total All Plants Add'l Margin | | | | $90,962,370 | 3,400,228 | | $352,519,133 | 9,677,018 |
| Allocated to West Virginia | | | | | | | | |
| Amos and Mountaineer 41.4% | | | | $27,198,202 | | | $112,982,976 | |
| Mitchell 100% | | | | $26,966,600 | | | $79,613,393 | |
| Total West Virginia | | | | $54,164,802 | | | $192,596,370 | |
| **Twenty Four Months March 1, 2021 Through February 28, 2023** | | | | | | | | |
| Total Amos and Mtr Add'l Margin | | | | $94,563,918 | | | $329,466,578 | |
| Total Mitchell Add'l Margin | | | | $33,072,097 | | | $95,370,267 | |
| Grand Total All Plants Add'l Margin | | | | $127,636,015 | | | $424,836,846 | |
| Allocated to West Virginia | | | | | | | | |
| Amos and Mountaineer 41.4% | | | | $40,189,665 | | | $136,399,163 | |
| Mitchell 100% | | | | $33,072,097 | | | $95,370,267 | |
| Total West Virginia | | | | $73,261,762 | | | $231,769,431 | |

The summary provided in Table 5 should suffice to provide an understanding of the Commission calculations. The actual calculations encompass 8,760 hourly observations per year, over two years, at each of the six coal-fired generating units (three Amos units, one Mountaineer unit and two Mitchell units), or 105,120 lines of data. Each line includes six calculations for a total of over 630,000 calculated results. The Commission usually provides its calculations underlying decisions in tables within its orders or on appendices. In this case, the tables would cover over 1,500 properly formatted pages. Therefore, we will present the hourly calculations in a spreadsheet detailing the calculations instead of on printed tables. Initially, because the calculations contain variables that the Companies have labeled as confidential, we will provide the detailed calculations made by the Commission on a confidential DVD disk. A copy will be provided to the Companies with the issuance of this Order. Other parties to this case may request a copy which the Commission may provide upon request, providing that the party documents that it has entered into an appropriate Confidentiality Agreement with the Companies.

Based on our calculations as explained above and summarized in the Table 5, shown above, the Commission determines that if the Companies had planned and operated prudently, they could have reduced their West Virginia jurisdictional ENEC costs by $231,769,431. We will reduce the under-recovery for the period March 1, 2021, through February 28, 2023, that is allowable for ratemaking purposes, by $231,769,431.

In reaching this decision, we have fully considered the arguments and testimony of the Companies regarding the unexpectedness and exigency of the situation they found themselves in when market prices skyrocketed, and they were caught with insufficient coal supply to maximize their use of their lower cost generation. We have also considered the Companies' arguments regarding the prudence of their actions. As discussed above, we cannot agree that the Companies are blameless and without fault in building up an ENEC under-recovery of over $550 million. Having fully considered those arguments and all testimony offered by the Companies we determine that the costs incurred were unreasonable and the result of imprudent decisions, actions, and inactions, and have, therefore, quantified a disallowance amount of $231,769,431.

We have also fully considered the disallowances recommended by other parties. The methodologies for calculating those disallowances will not be adopted by the Commission. Instead, we use a detailed calculation of additional margins that could have been achieved as compared to what actually happened, as recommended by Company witness, Mr. Plewes.[22] We have, however, considered

[22] So I heard him [Mr. Ferrer] refer to it, his calculation, as simplistic, which is actually what I called it as well. I don't think that's a good thing when hundreds of millions of dollars [are] on the line to have something

all of the arguments and evidence presented by the parties addressing the reasonableness of the incurred ENEC costs and the prudence or imprudence of the Companies' actions or inactions.

Our calculation and disallowance of $231,769,431 does not take into consideration that the power plants were offline and unavailable for generation at times when market prices were very high and there was no effort by the Companies to expedite repairs or upgrades, or forego deferrable maintenance to return the plants to operational status in face of those high PJM market prices. The testimony by witnesses for the Companies indicates that return to service was possible, but that the Companies maintained the out-of-service status due to insufficient coal supplies. Thus, we could calculate additional lost margins during those periods but have not done so for purposes of this Order. Instead, in recognition of the very high remaining under-recovery balance and the likelihood that the imprudence in fuel planning, fuel practices and market strategies that caused a lack of adequate coal supplies, contributed to the inability or unwillingness of the Companies to offset a portion of the remaining $321,106,227 under-recovery by different decisions for taking or keeping plants out-of-service, we will defer any recovery of the remaining balance until September 2024. At that time, subject to review of the methodology and amount of the annual amortization in the next ENEC case, as discussed below, we will allow recovery of the remaining portion of the under-recovery in the amount of $321,106,227 over a ten-year period at a carrying charge rate of four percent per year beginning September 1, 2024.

Accordingly, the requested under-recovery balance of $552.9 million will not be fully allowed for recovery in rates. Instead, $231.8 million will be specifically disallowed for reasons explained herein. The remaining balance, currently $321.1 million, will continue to be deferred until September 1, 2024, at which time we will allow amortization through rates over a ten-year period. The calculation of the carrying charge will begin on September 1, 2024, and be applied to the unrecovered amount net of income taxes. A levelized amortization is preferable, but we will consider a straight-line amortization over ten years with a declining annual carrying charge if the Companies propose something other than a levelized annual amortization. In the next ENEC case the Companies will present their

---

simplistic. There are better ways to do this calculation. But first of all, before I even say anything about that, talking about recommendations, my recommendation is no disallowance because I haven't seen anything that's [imprudent.] ...

But if it were to be found that there was [imprudence] I think that any disallowance calculation should follow some very basic principles. First of all, you'd have to determine what was even imprudent in the first place, what decision it was that they are finding imprudent and then finding out what the impact of that imprudency was and then comparing that to what actually happened. Right. It's very simple. It's used all the time. Mr. Plewes Testimony, Sept. 5, 2023 Tr. at 183-84.

proposed rate increments for the amortization of the under-recovery and other parties may address the calculation of the amortization of the under-recovery and class rate increments.

## III. <u>Proposed Stipulated Resolution.</u>

The Commission has considered the proposed resolution of this case as filed in a stipulation among the Companies, the WVEUG, and the WVCA. Stipulation, Dec. 27, 2023. The Stipulation proposes that the Companies will absorb $50 million of its requested $553 million under-recovery, leaving $503 million to be securitized. The securitization is intended to make a net $503 million price tag more palatable to customers, however, it is still a reward for the Company which will receive $503 million in upfront cash upon the sale of the securitized bonds. The precise annual revenue requirement for a $503 million securitized 20-year bond issuance is unknown at this time. Based on Mr. Scalzo's estimates presented in his Direct Testimony, after reducing the under-recovery portion of the securitization by $50 million, we can calculate an annual revenue requirement of $41 million for a twenty-year securitization. Customers would be paying that amount through a non-bypassable rate increment for twenty years. The total amount paid by customers will be $820 million.

We understand that the intent of the Stipulation is to bundle the securitized $503 million net under-recovery with unrecovered investment in the Amos and Mountaineer power plants. This additional amount is estimated by Mr. Scalzo to be approximately $1.2 billion. Under the securitization proposal the Companies would be rewarded for their imprudent management of their power plants by receiving an upfront cash payment of $1.2 billion from the bond receipts. The Companies argue that they will be giving up the earnings they presently receive on the investment in Amos and Mountaineer; but these foregone earnings would come with a check for $1.2 billion that could be reinvested in whatever profitable assets they, or AEP, propose to invest in. Customers will be obligated to pay approximately $98 million per year for 20 years, or a total of $1.9 billion to fund the $1.2 billion up-front payment to APCo for the Amos and Mountaineer power plants. In effect, customers will "buy" the West Virginia share of the plants for $1.9 billion, but APCo will retain ownership.

The securitization proposed in the Stipulation would also hand another $88 million up-front payment to the Companies for past expenses that have been deferred on their books.

In total, based on the Companies' estimates presented by Mr. Scalzo, adjusted for the $50 million reduction in ENEC under-recovery allowance, the Stipulation would require a debt commitment by the customers that would result in

a non-bypassable rate requirement of approximately $147 million per year for 20 years. Customers will pay a total of over $2.9 billion over the expected twenty year term of the securitized bonds.

We understand the hope that the annual revenue requirement on securitized bonds for the power plants will be less than the current capital costs of the rate base value of the power plants and will offset the revenue requirements on the $503 million under-recovery proposed in the Stipulation and the $88 million other securitized costs. It is more than likely that securitizing the unrecovered investment in the power plants would result in an offset greater than the rate base cost of service on the power plants. There is no assurance, however, that the combination of bond payment requirements and base rate offsets would be a zero-sum game if the securitization were finalized.

There are many good intentions in the Stipulation and certain benefits for the Companies. It is certain that the Companies will voluntarily waive recovery of $50 million of their requested $553 under recovery. In return, it is certain that the Companies would receive an immediate $503 million cash payment for under-recoveries that we have determined contain at least $232 million in unreasonable costs incurred due to imprudent management by the Companies. It is certain that the Companies would also receive an immediate cash payment for around $88 million for deferred costs. It is certain that to give the Companies these cash payments, totaling $591 million, would obligate customers to pay non-bypassable debt service payments that will likely be approximately $49.2 million per year, or $984 million over 20 years. It is certain that the debt service revenue requirements on the $1.2 billion securitized unrecovered investment in Amos and Mountaineer will likely be approximately $147 million per year for 20 years, and that debt service will be lower than the capital rate base/rate of return revenue requirements on the unrecovered investment in Amos and Mountaineer. It is uncertain, however, how much lower the revenue requirements will be and the extent to which that would offset the debt service on the securitized under-recovery and deferred costs.

Admittedly, there is a price tag of the decision to disallow $231.8 million of the under-recovery and allow the balance of $321.1 million to be recovered over ten years beginning September 2024. With the four percent carrying charge authorized in this Order, the allowable under-recovery will carry a price tag for customers of about $39 million per year. This level of recovery will last for ten years, rather than a higher amount proposed in the Stipulation lasting for 20 years.

The result of our decision today will cost an average 1,000 KWh per month residential customers approximately $2.50 per month for ten years. The Stipulation would cost an average 1,000 KWh per month residential customer around $3.17 per month for twenty years for the under-recovery and deferred cost

components. To offset the $3.17 per month rate impact of the under-recovery and deferred cost cash payments to the Companies, the Stipulation does offer the potential benefit of an offsetting revenue requirement for the securitized unrecovered cost of Amos and Mountaineer that will be lower than the traditional rate of return revenue requirements on the rate base value of Amos and Mountaineer.

We have considered the Stipulation's proposal and are concerned that it rewards the Companies in spite of their unreasonable and imprudent actions, in return for the potential benefits of an offset for lower capital costs related to the unrecovered cost of Amos and Mountaineer. Given the currently unknown net results of a securitization and the fact that the securitization would include an immediate $503 million cash payment to the Companies for their stipulated under-recovery at a cost to customers of $41 million per year for twenty years, as measured against a known $31.1 million (plus a carrying charge) annual cash payment to the Companies over ten years for the allowable under-recovery as ordered herein, we find that the stipulated resolution is not a fair and balanced outcome.

## IV. Motions for Protective Treatment.

In the 2023 ENEC, the Companies filed a Motion for Protective Order on May 5, 2023, and addenda to that motion on August 18, 2023, and September 22, 2023. The Companies filed the following information under seal in conjunction with these motions: Exhibits RRS-D attachment (att.) 2, KKC-D atts. 2 and 3, SAS-D att. 4, TCK-D att. 1, and JMS-D att. 2, JJS-SD att. 2, and post-hearing exhibit 4.

It is not necessary to rule on the Motions for Protective Treatment at this time. The documents filed under seal are in the custody of the Executive Secretary and the Commission will continue to maintain the confidentiality of those documents. Upon the filing of a West Virginia Freedom of Information Act (WV FOIA) request for the sealed information, pursuant to W. Va. Code § 29B-1-1 et seq., the Commission will notify the Companies and will provide an opportunity to present arguments regarding continued protective treatment. Any parties in possession of any confidential material shall maintain the confidentiality of that information until further order.

## FINDINGS OF FACT

1. The Companies had insufficient supplies of coal inventory during the period in question.

2. In July 2021, coal stockpiles were declining yet the Companies took no action to replenish the stockpiles until September 20, 2021, when they issued an RFP for additional coal supply.

3. The PJM market prices, using Day Ahead PJM Energy prices for the Amos Plant, had climbed from near $20 per MWh in 2020 to $23.81 per MWh in 2021 (a 19 percent increase), then to $34.87 per MWh in July 2021 (an additional 46 percent increase), and were on an upward trajectory that would eventually peak at $91.88 per MWh in August 2022 (an additional 163 percent increase).

4. During the two year review period of March 1, 2021 through February 28, 2023, the Companies had the lowest level of generation in the past twenty years.

5. Also during the two year review period, the PJM market prices spiked to the highest level in the last twenty years.

6. The Day-Ahead average PJM system-wide LMP moved from an average of $21.20 per MWh in 2020 to $39.37 per MWh in 2021 and $75.44 per MWh in 2022. Table 1.

7. Based on past generation levels, Amos, Mountaineer, and Mitchell power plants are capable of generation far in excess of the generation levels they achieved in 2021 and 2022.

8. As PJM prices climbed from $21.40 per MWh in 2020 to $39.37 in 2021, the Companies' coal burn and related MWh generation at their power plants increased only slightly. Table 2.

9. When the PJM price climbed dramatically to an average of $75.44 per MWh in 2022, the Companies' coal burn and MWh output from their coal-fired generation plants decreased. Table 2.

10. The Companies did not make changes to their fuel procurement process or bidding into PJM to increase the capacity factors of their plants during the period March 1, 2021 through February 28, 2023.

11. Mr. Dial, who was employed by American Electric Power Service Corporation to manage fuel procurement for the Companies, was unaware of the 69 percent generating rate identified by the Commission in its September 2, 2021 Order in the 2021 ENEC.

12. Generation of net system sales (wholesale sales in excess of purchases that produce net positive margins) has always been a goal that we have stressed that the utilities must maximize. Appalachian Power Co., Case No. 83-697-E-42T, Comm'n Order, Sept. 28, 1984, at pp. 15-17.

13. The Commission never suggested to the Companies in any previous ENEC orders, or any orders, that they should forego having sufficient fuel inventories, having sufficient coal under contract, prudently bidding into the PJM market, and operating power plants to maximize their economical coal-fired generation over a daily LMP curve.

14. Even with new coal contracts at prices well in excess of historical price levels, self-generation from the Companies power plants would have reduced ENEC costs as that self-generation displaced high-priced PJM energy costs.

15. The narrow differences between PJM market prices and the Companies' production costs widened dramatically from early 2021 to December 2022 as the market prices increased at a greater rate than production costs. Table 3.

16. An approximate $20 per MWh increase in production costs pales in comparison to the PJM market price which jumped from approximately $30 per MWh in the spring of 2021 to $60 per MWh by November 2021, and then after a brief pull-back climbed in 2022 reaching $90 per MWh in August of 2022.

17. The Amos plant is capable of outputting to the grid approximately 440,000 net MWh per week after taking plant load and losses into consideration.

18. The Mountaineer plant is capable of outputting approximately 200,000 net MWh per week.

19. When the difference between lower generation costs and higher PJM market prices is just $10 per MWh, failure to generate at Amos and Mountaineer costs the Companies, and ultimately the customers, approximately $6.4 million per week either in excessive purchased power costs or lost margins.

20. Under the Stipulated settlement proposed by the companies and two parties to the case, the Companies would receive an immediate $503 million cash payment for under-recoveries that we have determined contain at least $232 million in unreasonable costs incurred due to imprudent management by the Companies. They would also receive an immediate cash payment for around $88 million for deferred costs.

21. To give the Companies proceeds from a $591 million securitized bond issue for their stipulated under-recovery and other deferred costs would obligate customers to pay non-bypassable debt service payments of approximately $49.2 million per year or $984 million over twenty years.

## CONCLUSIONS OF LAW

1. The Companies have the burden of proving that their ENEC costs were reasonable and the result of prudent management of their generation assets, fuel supplies, and purchased power costs. 2021 ENEC, Comm'n Order, May 13, 2022, at 6.

2. While any contemporary action must be based on what is known or reasonably knowable at the time the action is taken, a continuum of actions leading up to a decision point must also be taken into consideration when determining prudency.

3. It is the responsibility of the Companies to assure that they can operate their own plants when the volatile energy market exposes them to high prices.

4. When utility management acts in an unreasonable and imprudent manner, the Commission has the authority to protect customers from the negative financial consequences of the utility's unreasonable actions or inactions. Lumberport-Shinnston Gas Co. v. Public Serv. Comm'n, 271 S.E.2d 438 (1980)(citing United Fuel Gas Co. v. Public Serv. Comm'n, 174 S.E.2d 304, 317, 154 W. Va. 221, 243 (1969)(citing Southern Bell Telephone and Telegraph Co. v. Georgia Public Serv. Comm'n, 49 S.E.2d 38, 66 (1948))).

5. Reasonable and prudent management must ensure not only that contracts are in place to cover a minimum 30-day aggregate coal supply for the remainder of the life of the generating plants, but also must ensure that the incoming coal supplies replace coal as it is used.

6. If the Companies had managed their coal stockpile levels reasonably and prudently, they would not have experienced the unreasonably low inventory levels that they now use to excuse their inability to maximize the use of their coal-fired power plants.

7. The Companies failed to manage their fuel supplies and power plant operations in a reasonable, prudent, and efficient manner during the time period March 1, 2021 through February, 2023.

8. In lieu of self-generation, the Companies' purchase of excess amounts of power from the PJM market at prices that were at the highest level in PJM History was unreasonable and the result of imprudent decisions regarding coal inventories, coal procurement, bidding into the PJM energy market, and minimization of out-of-service time .

9. If the Companies had planned and operated prudently, they could have reduced their West Virginia jurisdictional ENEC costs by at least $231,769,431 during the time period of March 1, 2021 through February 28, 2023.

10. Incurred costs of $231,769,431 were unreasonable and the result of imprudent decision, actions, and inactions by the Companies.

11. The Stipulation is not a fair and balanced outcome given the unknown results of a securitization that would include an immediate $503 million cash payment to the Companies for their under recovery when the Companies acted imprudently causing excessive ENEC costs that the commission has determined were a minimum of $231,769,431.

12. It is not necessary to rule on the Motion for Protective Order at this time.

## ORDER

IT IS THEREFORE ORDERED that the Commission disallows $231,769,431 of the under-recovery requested by the Companies. The Commission approves the remaining approximately $321.1 million under-recovery to be recovered through an ENEC rate increment designed to recover that amount over ten years, including a 4 percent per year carrying charge, with both the rate increment and carrying charge beginning September 1, 2024.

IT IS FURTHER ORDERED that the Companies calculate the ENEC rate increment to recover the approximate $321.1 million under-recovery specified above plus the 4 percent per year carrying charge, and file that increment for consideration by the Commission in their next ENEC filing.

IT IS FURTHER ORDERED that the Executive Secretary hold the unredacted version of the information filed by the Companies and described in the Motion for Protective Order and addenda to Motion for Protective Order as confidential under seal, separate and apart from the remainder of the case file until the Commission receives and reviews a request for the information pursuant to WV FOIA.

IT IS FURTHER ORDERED that the Joint Stipulation and Agreement for Settlement filed on December 27, 2023, is not adopted.

IT IS FURTHER ORDERED that these proceedings are removed from the Commission's docket of active cases.

IT IS FURTHER ORDERED that the Executive Secretary of the Commission serve a copy of this Order by electronic service on all parties of record who have filed an e-service agreement, by United States First Class Mail on all parties of record who have not filed an e-service agreement, and on Staff by hand delivery.

A True Copy, Teste,

Karen Buckley

Karen Buckley, Executive Secretary

SMS/pkb
230377cf

# EXHIBIT B

## FEBRUARY 2023 ORDER

**PUBLIC SERVICE COMMISSION
OF WEST VIRGINIA
CHARLESTON**

At a session of the PUBLIC SERVICE COMMISSION OF WEST VIRGINIA in the City of Charleston on the 3rd day of February 2023.

CASE NO. 22-0393-E-ENEC

APPALACHIAN POWER COMPANY AND
WHEELING POWER COMPANY
public utilities.
Petition to Initiate the Annual Review and to Update the ENEC Rates Currently in Effect.

## COMMISSION ORDER

The Commission denies an Expanded Net Energy Cost (ENEC) increase until Commission Staff completes a prudence review and defers ruling on a Motion for Protective Treatment.

## BACKGROUND

On April 19, 2022, Appalachian Power Company (APCo) and Wheeling Power Company (WPCo) (jointly Companies), filed their 2022 petition to initiate the annual review and update of ENEC rates, supported by the pre-filed testimonies of Randall R. Short, Clinton M. Stutler, Jeffrey C. Dial, Shelli A. Sloan, Michael J. Zwick, Jason M. Stegall, Ruby A. Greenhowe, and John J. Scalzo. The Companies propose to increase ENEC rates to produce an additional $297 million in annual ENEC revenues in order to achieve an appropriate balance between ENEC costs and revenues.

On April 26, 2022, the Companies filed a Motion for Protective Treatment. On September 28, 2022, the Companies filed an Addendum to the Motion for Protective Treatment.

The Commission granted intervenor status to the West Virginia Energy Users Group (WVEUG), Consumer Advocate Division (CAD), the West Virginia Coal Association (WVCA), and SWVA, Inc. (SWVA). Commission Orders; June 2 and Aug. 1, 2022.

CAD filed two Motions to Compel the Companies to provide responses to discovery requests. Motions, filed Sept. 28, 2022, and Oct. 3, 2022.

The Commission held the evidentiary hearing in this case on October 5, 2022. During the evidentiary hearing, the Commission granted the Motions to Compel. Transcript of Evidentiary Hearing (Tr.) at 19-20. The Commission also held public comment hearings in Wheeling, Princeton, Huntington, and Charleston, West Virginia. Transcripts of these public comment hearings are available in the case docket. The Commission received 346 comments in opposition to the requested ENEC increase.

During the pendency of this case, the Companies were represented by Keith D. Fisher, Esq, William C. Porth, Esq, and Ann Blankenship, Esq. of Robinson & McElwee. WVEUG was represented by Derrick P. Williamson, Esq, Barry A. Naum, Esq., Steven W. Lee, Esq, and Susan J. Riggs, Esq, all of Spilman, Thomas & Battle. CAD was represented by Robert F. Williams, Esq, Heather B. Osborn, Esq, and John Auville, Esq. WVCA was represented by H. Brann Altmeyer, Esq. and Jacob C. Altmeyer, Esq. SWVA was represented by Charles K. Gould, Esq., of Jenkins Fenstermaker, PLLC, and Staff was represented by Lucas Head, Esq.

## DISCUSSION

### ENEC Surcharge

The Commission reopened Case No. 21-0339-E-ENEC on March 2, 2022 to address the Companies' revised projections for their 2021 ENEC case (March 2 Order). During the reopened case, the Companies requested an additional $93 million in revenue for projected ENEC costs, and total additional revenues of $155.2 million, effective May 1, 2022. The Companies stated that their under-recovery had grown to $216.1 million as of February 2022. We directed Staff to conduct an in-depth review of the prudence of Companies' policies and procedures for maximizing and maintaining adequate fuel inventory levels and prudent plant maintenance and availability. At that time, we postponed ruling on accumulated under-recoveries until the completion of the prudence review. Case No. 21-0339-E-ENEC; Commission Order, May 13, 2022, at 6.

In the present case, the Companies seek $297 million over and above the amount the Commission approved in the reopened 2021 ENEC. Because the prudence review is incomplete, the increases requested by the Companies include costs and revenues that must be evaluated for reasonableness. The reasonableness of the costs and revenues will depend on the prudence of the Companies' management of fuel supplies and purchased power decisions. The Commission granted a $93 million revenue increase in May which also is still subject to a final determination based on the reasonableness of the underlying

costs. The Commission will not adjust the ENEC rates again until the completion of the prudence review by Commission Staff. We remain concerned about the Companies' historical and projected fuel and purchased power costs and continuing under-recoveries. As we stated in the 2021 ENEC, we believe that self-generated power has been shown to be more economical than reliance on more expensive and less reliable purchased power. We based the projected costs underlying the current ENEC rates on maximizing self-generated power at the Companies' power plants which we determined should be capable of operating at a minimum 69 percent capacity factor.

In this case and the 2021 ENEC case the Companies have repeatedly questioned their ability to achieve a 69 percent capacity factor and the implications of a failure to operate the power plants at that level over time. Most recently, the Companies addressed a 69 percent capacity factor in their rebuttal testimony.

> However, the reasonableness of any analysis based on a 69% capacity factor is entirely dependent on precisely what that standard is actually intended to be. An aspiration? An inflexible and exceptionless minimum requirement? An operational objective when circumstances allow? A standard that applies in conjunction with the principle of economic dispatch? Or a standard that overrides the principle of economic dispatch? Over the course of the past year, the Companies have respectfully asked the Commission to tell them what the 69% capacity factor standard is and they remain hopeful that the Commission will do so.

Cos. Exh. JJS-R at 3. After the testimony asking what the 69 percent capacity factor means, the Companies "explained" in their initial Brief:

> When the Commission first addressed a 69% capacity factor in its September 2, 2021 Order in Case No. 21-0339-E-ENEC, it concluded that the Companies should be "focusing on maximizing generation from its owned power plants." Order at 6. The Commission applied a capacity factor of 69% to the Companies' projected ENEC costs. [ ] And the Commission expressly noted: "This decision is for purposes of projecting ENEC costs, subject to true up in a future ENEC proceeding." [ ] Nowhere in the September 2nd Order did the Commission expressly direct the Companies to run their coal-fire units at a minimum capacity factor. Conclusion of Law No. 4 merely states that "[t]he capacity factor for the three plants [Amos, Mountaineer, and Mitchell] should be 69

> percent in this case with the potential for an increased capacity factor as described in this Order." [ ]

Cos. Initial Brief, Nov. 1, 2022, at 11. (Internal citations omitted). After explaining the express language in the September 2, 2021, Order, the Companies bemoan a lack of clarity in the Commission's use of the 69 percent capacity factor and plead:

> The Companies would greatly appreciate an unequivocal articulation by the Commission of the course it wants the Companies to take in operating their coal-fired generating units when they are available to operate. . . . In the absence of a clear statement from the Commission that it wants to see capacity factors of 69%, regardless of economic considerations, the Companies have stated that they will not presume that is the Commission's intent. Company Exh. JJS-R at 4; Tr. Oct. 5 at 198-200 (Scalzo). But all uncertainty could be eliminated if the Commission is willing to clarify its intention.

Cos. Initial Brief at 11-14.

The above question sounds like the Companies expect a day to day, hour by hour, directive from the Commission on operating its generating units. Those decisions are management's responsibility, not the Commission's. What we have articulated is that if generation from Company owned generation is more economical than purchased power, the Companies have the burden to prove the necessity and prudence of purchased power costs before the Commission will allow the excess cost for ratemaking purposes.

> If the Companies fail to achieve the level of capacity utilization established as a reasonable target by the Commission for their generating plants because of displacement of generation with purchased power, the necessity and prudence of its decisions leading to that result will be considered by the Commission when determining whether such future costs should be allowed for rate making purposes.
>
> We do not know now whether the Companies are influenced by a decarbonization policy or not. However, the Commission's intent, when setting a utilization target for the Companies' fossil-fuel fired plants, is to require the Companies to follow a power supply policy to maximize their use of fossil-fuel generation that is cheaper than purchased power rather than a policy geared to decarbonization at any cost. The Commission will consider the success or failure of the

> Companies to maximize the utilization of economically priced fossil generation in future ENEC cases and will address final cost recovery in those cases.
>
> The need for increased market purchases from PJM is not evident when considering that the cost of PJM purchases reached nearly $61 per MWH in November 2021 and averaged $57.42 per MWH in September, October, and November 2021.

March 2 Order at 4, 7, and Conclusion of Law 5 respectively.

The 69 percent capacity factor was clearly a Commission estimate based on a record that indicated that generation from coal-fired Company-owned plants would be less expensive than purchased power, including power from the PJM energy market. We recognized that a baseload plant cannot ramp from zero to maximum output in minutes. At times it may be necessary to run a baseload plant at a cost that exceeds the purchased power alternative for a few hours in order to take advantage of the ensuing hours when purchased power would be the more expensive option. For example, according to the publicly available PJM Data Miner 2, on December 18, 2022 the energy price at the AEP Amos Aggregate bus was only $35 per Megawatt hour (MWh) from midnight to 6 a.m. Assuming that the cost of generation at the Companies' plants was $45 per MWh, it would have been more expensive to generate than to purchase power for those six hours. However, for the next eighteen hours that day the PJM energy price was nearly $53 per MWh and the average price for the day was over $48 per MWh. At an assumed cost of $40 to $45 per MWh the Companies clearly would have minimized their power supply costs from 6 a.m. through midnight on the 18th of December by self-generating. If they missed out on the opportunity to produce power for $40 to $45 per MWh and sell into the market at $53 or even $48 per MWh because they did not want to sell below cost for the first six hours on that day, the total power supply costs would have been unnecessarily high. That possibility can occur on many days, and the Companies have the responsibility of managing their plant availability, fuel availability and bidding strategies to produce the lowest power supply costs possible even if it means that self-supply is more costly than purchased power during some hours when the plants must be up and running to take advantage of ensuing hours.

The Commission selected a 69 percent capacity factor over an entire year because we knew that there would be periods of time that the plants would be out of service for planned maintenance and other times for unplanned outages. However, during hours when the plants were capable of running and when the true variable cost of generation was near or below alternative purchased power

costs, and when we expected them to run as near to 100 percent as possible. We also took into consideration that to be available during hours when purchased power prices increased above the variable cost of generation, it would be necessary to have the plants ready to ramp up to maximum output in the minimum ramp time possible.

The 69 percent was, therefore, an expected minimum based on the record before us at the time regarding purchased power costs and generation costs. We made it clear that the first step in our future review of the reasonableness of net ENEC costs would be to determine if the Companies had achieved that expectation. Reaching that goal would not, by itself, be dispositive of the question of reasonableness of net ENEC costs if the costs were challenged by competent evidence. However, it would be easier for the Companies to meet their burden of proof regarding reasonableness of costs and prudence of their management of ENEC costs if they achieve the 69 percent annual capacity factor. On the other hand, if they do not achieve the 69 percent capacity factor, we made it clear that the burden would be on the Companies to demonstrate that their actions that affected net ENEC costs were prudent and that the resulting net ENEC costs were reasonable and should be included in rates. The actions that would be necessary to demonstrate prudence will include: (1) maintaining adequate economical fuel supplies, (2) keeping plants available for generation the maximum amount of time, (3) maximum reduction, in accordance with good engineering and operating practices, of outage times related to maintenance, repairs, equipment modifications, site modifications, or other reasons, and (4) effectively bidding to clear the PJM energy market considering the possibility of some negative hourly net margins that were necessary to maximize ensuing positive hourly net margins.

Motion for Protective Treatment

It is not necessary to rule on the Motions for Protective Treatment at this time. The documents filed under seal are in the custody of the Executive Secretary and the Commission will continue to maintain the confidentiality of those documents. Upon the filing of a West Virginia Freedom of Information Act (WV FOIA) request for the sealed information, pursuant to W. Va. Code § 29B-1-1 et seq., the Commission will notify the Companies and will provide an opportunity to present arguments regarding continued protective treatment. Any parties in possession of any confidential material shall maintain the confidentiality of that information until further order.

Motions to Compel

CAD filed two motions to compel. The Commission granted both motions at the Evidentiary Hearing held on October 5, 2022.

**FINDINGS OF FACT**

1. The Companies seek a $297 million increase in ENEC revenues.

2. Staff is still conducting a prudence review of the Companies' fuel costs.

**CONCLUSIONS OF LAW**

1. The Commission should not grant additional rate increases for fuel costs until the Staff completes its prudence review.

2. It is not necessary to rule on the Motion for Protective Order at this time.

**ORDER**

IT IS THEREFORE ORDERED that the request of Appalachian Power Company and Wheeling Power Company to increase ENEC rates by $297 million is denied.

IT IS FURTHER ORDERED that that the Executive Secretary hold the unredacted version of the information filed by the Companies and described in the Motion for Protective Order and Addendum to Motion for Protective Order as confidential under seal, separate and apart from the remainder of the case file until the Commission receives and reviews a request for the information pursuant to WV FOIA.

IT IS FURTHER ORDERED that on entry of this Order this case is removed from the Commission's docket of active cases.

IT IS FURTHER ORDERED that the Executive Secretary of the Commission serve a copy of this Order by electronic service on all parties of record who have filed an e-service agreement, by United States First Class Mail on all parties of record who have not filed an e-service agreement, and on Staff by hand delivery.

A True Copy, Teste,

Karen Buckley

Karen Buckley, Executive Secretary

SMS/pkb
220393cd

# EXHIBIT C

## MAY 2022 ORDER

**PUBLIC SERVICE COMMISSION**
**OF WEST VIRGINIA**
**CHARLESTON**

At a session of the PUBLIC SERVICE COMMISSION OF WEST VIRGINIA in the City of Charleston on the 13th day of May 2022.

CASE NO. 21-0339-E-ENEC

APPALACHIAN POWER COMPANY AND WHEELING POWER COMPANY.
Petition to initiate the annual review and to update the ENEC rates currently in effect.

## COMMISSION ORDER

The Commission requires Commission Staff to undertake a review of the prudence of Appalachian Power Company (APCo) and Wheeling Power Company (WPCo) (jointly the Companies) Expanded Net Energy Cost (ENEC) including fuel purchasing practices, power plant utilization, bidding strategy to sell generation into the PJM energy market, extent to which generation from the Companies' plants failed to clear the PJM energy market during hours of PJM energy prices in excess of the incremental variable costs of self-generation, and reliance on PJM energy relative to self-supply options. The Commission grants recovery for a portion of revised projected ENEC costs subject to future evaluation of recoveries, costs, prudence, reasonableness and determinations of the reasonableness of inclusion of under-recoveries in future ENEC rates.

## BACKGROUND

On April 16, 2021, the Companies filed their 2021 petition to initiate the annual review and update of ENEC rates, supported by the pre-filed testimonies of Nancy A. Heimberger, Jeffrey C. Dial, Clinton M. Stutler, Michael J. Zwick, Ruby A. Greenhowe, and John J. Scalzo. The Companies propose to increase ENEC rates to produce an additional $73 million in annual ENEC revenues in order to achieve an appropriate balance between ENEC costs and revenues. Of that $73 million, $55.4 was for under-recovery of fuel costs, including $32 million in deferred under-recovery collection from 2020, and $17.6 million in projected fuel costs for the period September 1, 2021 through August 31, 2022. The Companies proposed a modification in cost allocation and rate design for large industrial class and special contract customers.

On June 3, 2021, the Commission granted intervenor status to the Consumer Advocate Division (CAD), the West Virginia Energy Users Group (WVEUG), and SWVA, Inc. (SWVA). Commission Order, June 3, 2021. The Commission Order also

set a procedural schedule and required notice by publication of filing and hearing. The Companies filed Affidavits of Publication. June 22, 2021 and July 21, 2021 filings.

The evidentiary hearing was held on July 30, 2021. The Companies filed post-hearing exhibits as requested by the Commission and CAD, on August 9, 2021. The Companies, CAD, WVEUG, and Staff filed initial briefs. August 10, 2021 Filings. The Companies, Staff, WVEUG, and SWVA filed reply briefs. August 17, 2021 Filings.

On September 2, 2021, the Commission issued an Order (Final Order) that approved ENEC rates using a capacity factor of 69 percent for the Companies' West Virginia generation units. The Commission projected generation costs for incremental additional self-generation targeted by the Commission, and an all-in weighted average purchased power cost of $35.44 per megawatt hour as the basis for ENEC rates. The Final Order also required the Companies to file monthly reports providing net generation from all APCo and WPCo power plants by month; retail and wholesale energy load by month; purchased power energy purchases by month and supplier; and purchased power demand and energy costs by month and supplier.

On September 13, 2021, the Companies filed a Petition for Reconsideration or Clarification of the September 2, 2021 Commission Order (Petition). On September 22, 2021, WVEUG and Staff filed responses opposing the Companies' Petition.

On March 2, 2022, the Commission modified its Final Order to reflect an increased ENEC rate and reopened the case for the Companies to explain the significant growth in the reported under-recovery of ENEC costs. The Companies filed their modified tariff on March 4, 2022.

On March 14, 2022, the Companies filed the direct testimony of John J. Scalzo, Jeffrey C. Dial, Clinton M. Stutler, Michael J. Zwick, Shelli Sloan, and Alex E. Vaughan including confidential exhibits filed under seal. Staff, WVEUG, and CAD filed comments or testimony in response to the Companies' filing. March 21, 2022 Filings.

The Commission held the evidentiary hearing on the reopened proceeding on March 23, 2022. On March 30 and April 5, 2022, the Companies filed requested post-hearing exhibits.

On April 6, 2022, the Companies, CAD, WVEUG, SWVA, filed comments on reopening.

## DISCUSSION

ENEC Under-Recovery

In originally creating the ENEC specialized and limited rate proceeding, the Commission contemplated an annual filing to enable the Companies to adjust rates for fuel related generation costs and certain purchased power and transmission related costs to avoid filing a full base rate case to reflect changes in those cost components. The Commission authorized the development of ENEC rates based on projections of future ENEC cost elements. An important element of the ENEC procedure was an over or under-recovery mechanism whereby companies using the ENEC procedure would defer costs that exceeded or were less than their ENEC revenues and request recovery of under-recoveries or rate crediting of over-recoveries (true-up mechanism). This true-up mechanism, however, is subject to Commission review of the incurred costs and a determination that the costs resulted from prudent actions on the part of the utility and were reasonable. Absent such a finding, there was no guarantee that under-recoveries would be passed on to customers.

In September, 2021, due to concerns over increasing reported under-recoveries of ENEC costs and further concerns over purchases of expensive power at costs that exceeded self-generation costs the Commission required the Companies to file monthly reports showing energy costs as well as net generation and other energy related information. Commission Order, Sept. 2, 2021. In the November 2021 report, filed on January 21, 2022, the Companies reported large actual and projected under-recoveries of ENEC costs. At that time, the actual under-recovery balance was reported to have grown to $176.1 million as of November 30, 2021. The Commission determined that it should review these reported high energy costs and projections now, rather than allowing the under-recovery to grow until the fall of 2022, when new ENEC rates would normally go into effect. Therefore, the Commission reopened the case and held a second evidentiary hearing to address the excessive under-recovery.

The Companies recommended that the Commission increase ENEC rates to produce additional revenues of $155.2 million, a 9.7 percent increase, affective May 1, 2022. Part of the reason for the significant increase proposed by the Companies was their calculations of continuing and growing ENEC cost under-recoveries. The February 28, 2022 ENEC under-recovery balance as calculated by the Companies had grown to $216.1 million. Without regard to the additional accumulated under-recoveries above those built into the rates approved by the Commission in September, the Companies projected a need for an annual increase of $93 million just to recover their projected annual ENEC costs. Cos. Exh. on Reopening JJS-RO at 8.

The Commission is concerned with the high under-recovery amounts and will continue to review the 2021-22 recovery period in Case No. 22-0393-E-ENEC. We are

also concerned that the Companies have been over-relying on PJM energy market purchases in lieu of planning for maximum self-generation through utilization of the capacity they own, and which customers are paying for, at the John Amos, Mountaineer and Mitchell power plants. The Companies claim that they plan on running their plants when it is economical to do so. However, for a variety of reasons including fuel shortages they did not do that at the worst possible time as the PJM energy market prices grew to unprecedented levels beginning in the fall of 2021 and continued at unprecedented levels through the winter of 2021/2022. The Companies claim that when the PJM market prices exploded, they attempted to obtain more fuel for their plant, but to no avail. However, part of the fuel problem faced by the companies was the result of their decision to allow fuel inventories to decline to levels which were unreasonably low.

It is clear that reliance on the PJM energy markets is producing unreasonable cost levels and ENEC under-recoveries that the Companies now ask West Virginia customers to pay. The Commission recognized the excessive cost of relying on the PJM energy market in September 2021 when we ordered the Companies to increase self-generation in lieu of the PJM market and high cost purchased power contracts. If the Companies had been able to increase self-generation and foregone reliance on PJM energy, then the recent spate of under-recoveries would have been greatly reduced or eliminated. Instead, we now learn that utilization of their power plants was limited by unreasonably low fuel supplies and an inability to acquire fuel supplies to accommodate the maximum possible capacity utilization of their power plants.

We were not told by the Companies at the initial stage of this proceeding that they were scraping the bottom of their coal inventory which would make it difficult for them to use their power plants at maximum levels no matter how much could be saved by self-generation. It is clear that the Companies' fuel supply planning and overreliance on market purchases are self-inflicted wounds. However, the Commission is not prepared at this time to determine how much, if any, of the excessive ENEC costs should be disallowed due to imprudence on the part of the companies or deferred for consideration of future, rather than current, recovery due to the unreasonable levels of the purchased power costs. We require more information to determine whether the self-inflicted under-recovery wounds were the result of imprudent decisions. For that reason, we will defer any consideration of the reported under-recoveries for rate making purposes until a more complete record is developed in Case No. 22-0393-E-ENEC, the current ENEC case.

Turning to the projected costs as presented by the Companies, we face a similar problem. All of the projected costs may be allowable for ratemaking, or a significant portion may be subject to disallowance, depending on our determination of the prudence of the Companies' planning and reliance on market purchases. However, we find that prudence dictates that we authorize an increase to cover higher ENEC costs than are built into present ENEC rates. We continue to direct the Companies to plan on self-generation rather than reliance on the PJM markets. It is well known that natural gas prices set the

PJM energy market. With natural gas futures continuing to hold steady or increase at levels that have not been seen for years, the PJM market price is likely going to exceed the cost of self-generation by the Companies, even at increased coal prices.

It is not clear to us how the Companies were not more concerned in late 2020 and 2021 that rising gas prices and other market modifications that have been driven by PJM policy changes in recent years would make the benefits of low PJM market prices a distant memory. Instead of allowing coal inventories to decline precipitously, the Companies should have been doing everything possible to use their plants more and increase fuel inventories at the same time.

The following chart depicts the trend of spot natural gas prices at Henry Hub from January 2019 to the present.




Perhaps the Companies were lulled into a false expectation of continuing low PJM market prices by the downward trend in gas prices in 2019 and the extremely low levels in the first half of 2020. But by mid-2020 it was clear that natural gas prices in the $2.00 per MMBTU range would soon be a distant memory.

Strategy for bidding into the PJM energy market is a critical element of prudent use of self-generation capabilities. Self-generation may not be the most economical option during parts of a day, but could become very valuable during other parts of the same day. Base load coal plants are not easily cycled from no load to maximum load, whereas PJM market prices can vary hourly. Selling into a soft PJM market price for a number of hours in order to have plants up and running to take advantage of peak pricing hours is how we expect the Companies to operate. When it became apparent that rising gas prices were going to lead to more and more hours when PJM market prices would

exceed the cost of self-generation, the Companies should have been more aggressive both in building fuel supply inventory and bidding to maximize their generation plant utilization. We are not satisfied with the Companies saving a few pennies during some low-price hours or during an unreasonably low-priced market period in early 2020, but spending many dollars as gas prices drove PJM market prices to very high levels by mid-2021 and into the present and likely into the future.

Both CAD and WVEUG requested that the Commission conduct a prudency review of the energy costs incurred by the Companies. Comments filed March 21, 2022. Normally, a review of whether these costs were prudent would be completed within an ENEC case. Given the large under-recovery balance and the Commission's direction to the Companies to run their coal-fired generation plants at 69 percent capacity, which has not yet been achieved, the Commission will require Commission Staff to conduct a separate prudency review for expenses incurred in the 2020-21 and 2021-22 ENEC years. Because accumulated under-recoveries span successive ENEC true-up periods, we will defer any consideration of under-recoveries until the next ENEC case or later, depending on the timing of receipt of the Staff prudence review and the Companies meeting their burden to demonstrate that their ENEC costs are reasonable and the result of prudent management of their generation assets, fuel supplies and purchased power costs.

We direct our Staff to do an in-depth prudence review of the Companies' policies and procedures for maximizing and maintaining adequate fuel inventory levels, bidding their plants into the PJM market to maximize economical self-generation, recognizing that it may be necessary to sell at a small loss in some hours to capture the net benefits of higher market prices within any twenty-four-hour period. We also require evidence of proper and prudent plant maintenance and availability so that the benefits of self-generation can be realized when the opportunities arise. Until we get a full report and gather further information on the Companies' practices, we cannot find that the under-recoveries that have accumulated should be passed on fully to customers. We will nevertheless set rates at the level proposed by the Companies to recover the ongoing costs going forward subject to a later determination of the reasonableness of those costs.

We will grant an increase to produce $93 million in additional revenue to attempt to prevent future rate shock for customers should the Companies' costs, both actual and projected, be determined to be prudent. The Companies are placed on notice that in adopting those requested rates to cover their updated ENEC cost projections, we are not guaranteeing them recovery of those costs if we later determine that some of those costs are excessive, unreasonable, and not prudently incurred. That decision will be made in the future when we further consider the Companies' planning, operating procedures, and commitment to use self-generation from fuel supplies inventoried in large enough quantities to smooth spikes in energy prices and soften the phase-in of a steady upward movement in their generation fuel prices.

Second and Third Addendum to Motion for Protective Treatment

During the reopening of this case, the Companies filed a second and third addendum to their Motion for Protective Treatment. Filings, Mar. 21, 2022 and Apr. 6, 2022. On March 14, 2022, the Companies filed Cos. Exhs. MJZ-RO1 and SAS-RO7 under seal. Cos. Exh. MJZ-RO1 contained historical period (January 2021 through February 2022) Equivalent Availability Factor data for the Companies' fossil-fuel generating fleet. Cos. Exh. SAS-RO7 contained information regarding the Companies' forecasted generation of electricity by generation unit and the expenses associated therewith. On March 30, 2022, the Companies filed under seal post-hearing exhibits Commission Reopened Requested Exh. Nos. 1 and 2 and Staff Reopened Requested Exh. No. 1. The Companies argued that the requested exhibits contained confidential information regarding the Companies' coal inventories, burn data for their coal-fired power plants in West Virginia, and bids received in response to requests for purchase issued by the Companies in the past four years. The Companies argued that all of this information constituted trade secrets. The Commission is sensitive to the Companies' argument regarding forecasts. However, we note that much fuel inventory and fuel use, and cost information is public information either in Energy Information Administration (EIA) reports or the fuel reports required to be filed by West Virginia statute. We direct the Companies to file redacted exhibits and to leave information that is available in coal reports and EIA data or is otherwise publicly available unredacted. Redacted public exhibits must follow the specifications established by the Commission in prior orders including limiting redactions, leaving the length of redacted material unchanged from the unredacted material, and being marked on the cover and every page as public documents. Redacted public documents must be accompanied by confidential versions properly marked on each page as confidential and with material that is redacted in the public version marked with bold double brackets - **[[ ]]** - as has been directed by the Commission in prior orders.

## FINDINGS OF FACT

1. The Companies reported an ENEC under-recovery of $176.1 million as of November 30, 2021. Report, Jan. 21, 2022.

2. The Companies have not achieved 69 percent capacity at their coal-fired generating plants as ordered by the Commission. See generally, Transcript of Mar. 23, 2022 Evidentiary Hearing.

## CONCLUSIONS OF LAW

1. Staff should conduct a review of the Companies' ENEC costs as described in this order.

2. The Commission should allow the Companies an additional $93 million in rate recovery to prevent future possible rate shock to the customers.

3. ENEC costs recovered by ENEC rates approved by the Commission will be subject to future review and may be subject to disallowance if the Commission determines that they are unreasonable and the result of imprudent management of generation assets, generation costs and purchased power expenses.

4. The confidential information contained in Cos. Exhs. MJZ-RO1 and SAS-RO7 and Commission Reopened Requested Exh. Nos. 1 and 2 and Staff Reopened Requested Exh. No. 1 should be resubmitted by the Companies, properly redacted as described in this Order.

## ORDER

IT IS THEREFORE ORDERED that the rates approved in this Order will be in effect for all services rendered on and after the date of this Order.

IT IS FURTHER ORDERED that Commission Staff shall conduct a review, as further described above, of the Companies' generation plant availability and utilization and ENEC costs. Staff shall file a report of their review, in this case, within ninety days of the date of this Order unless an extension is granted by the Commission.

IT IS FURTHER ORDERED that the Executive Secretary of the Commission shall maintain under seal and separate and apart from the case file the information filed under seal in Cos. Exhs. MJZ-RO1 and SAS-RO7 and Commission Reopened Requested Exh. Nos. 1 and 2 and Staff Reopened Requested Exh. No. 1.

IT IS FURTHER ORDERED that within ten days of the date of this Order, the Companies shall file calculations of the new rates necessary to recover additional ENEC costs as described herein and an original and six copies of revised tariff sheets to reflect those rates. Those rates may be implemented for billing purposes without further order of the Commission, subject to further review of the prudence of the underlying costs, the reasonableness of the rates and subject to future modification by the Commission.

IT IS FURTHER ORDERED that the Companies shall refile, within ten days of the date of this Order, the confidential information contained in Cos. Exhs. MJZ-RO1 and SAS-RO7 and Commission Reopened Requested Exh. Nos. 1 and 2 and Staff Reopened Requested Exh. No. 1 properly redacted as described in this Order.

IT IS FURTHER ORDERED that the Executive Secretary of the Commission serve a copy of this Order by electronic service on all parties of record who have filed an e-service agreement, and by United States First Class Mail on all parties of record who have not filed an e-service agreement, and on Commission Staff by hand delivery.

A True Copy, Teste,

Karen Buckley

Karen Buckley, Executive Secretary

SMS/pb
210339cd

# EXHIBIT D

## MARCH 2022 ORDER

**PUBLIC SERVICE COMMISSION**
**OF WEST VIRGINIA**
**CHARLESTON**

At a session of the PUBLIC SERVICE COMMISSION OF WEST VIRGINIA in the City of Charleston on the 2nd day of March 2022.

CASE NO. 21-0339-E-ENEC

APPALACHIAN POWER COMPANY AND WHEELING POWER COMPANY.
Petition to initiate the annual review and to update the ENEC rates currently in effect.

## COMMISSION ORDER

The Commission denies a petition to reconsider but reopens the evidentiary record to examine increases in fuel costs.

## BACKGROUND

On April 16, 2021, Appalachian Power Company (APCo) and Wheeling Power Company (WPCo) (jointly the Companies), filed their 2021 petition to initiate the annual review and update of Expanded Net Energy Cost (ENEC) rates, supported by the pre-filed testimonies of Nancy A. Heimberger, Jeffrey C. Dial, Clinton M. Stutler, Michael J. Zwick, Ruby A. Greenhowe, and John J. Scalzo. The Companies propose to increase ENEC rates to produce an additional $73 million in annual ENEC revenues in order to achieve an appropriate balance between ENEC costs and revenues. Of that $73 million, $55.4 was for under-recovery of fuel costs, including $32 million in deferred under-recovery collection from 2020, and $17.6 million in projected fuel costs for the period September 1, 2021 through August 31, 2022. The Companies proposed a modification in cost allocation and rate design for large industrial class and special contract customers.

On June 3, 2021, the Commission granted intervenor status to the Consumer Advocate Division (CAD), the West Virginia Energy Users Group (WVEUG), and SWVA, Inc. (SWVA). Commission Order, June 3, 2021. The Commission Order also set a procedural schedule and required notice by publication of filing and hearing. The Companies filed Affidavits of Publication. June 22, 2021 and July 21, 2021 filings.

The evidentiary hearing was held on July 30, 2021. The Companies filed post hearing exhibits as requested by the Commission and CAD, on August 9, 2021. The Companies, CAD, WVEUG, and Staff filed initial briefs. August 10, 2021 Filings. The

Companies, Staff, WVEUG, and SWVA filed reply briefs. August 17, 2021 Filings. On September 2, 2021, the Commission issued an Order (Final Order) that approved ENEC rates using a capacity factor of 69 percent and an all-in weighted average purchased power cost of $35.44 per megawatt hour as the basis for projections in this ENEC. The Final Order also required the Companies to file monthly reports providing net generation from all APCo and WPCo power plants by month, retail and wholesale energy load by month, purchased power energy purchases by month and supplier, and purchased power demand and energy costs by month and supplier.

On September 13, 2021, the Companies filed a Petition for Reconsideration or Clarification of the September 2, 2021 Commission Order (Petition). On September 22, 2021, WVEUG and Staff filed responses opposing the Companies' petition.

**Discussion**

**A. Companies' Petition for Reconsideration**

The Companies take issue with the Commission's recalculation of the Companies' projected ENEC costs. The Commission reduced the projected West Virginia jurisdictional ENEC costs by $66,681,445. The Companies argued that the Commission's adjustment shown in Appendix A attached to the September 2, 2021, Commission Order (Final Order) is incorrect. Attached to the petition for reconsideration as Attachment B is the Companies' alternative calculation for the Commission Order Appendix A. Under the Companies' calculation, the ENEC would increase by $4,877,799 instead of the Commission's projected decrease of $66,681,445.

Cost of Additional Generation at the Companies' Coal-fired Generating Plants

The Companies argued that the Commission miscalculated the Projected Cost of Incremental Generation per MWH. They contend that the calculations made by the Commission to project additional generation from the Companies' generation plants erroneously exclude fuel handling charges. They base the purported error on their assumption that fuel handling varies with generation and that the costs should have been included on the additional generation that the Commission expected from the Companies' generation, just as the cost of consumables and allowances were included in the Commission calculation. Petition at ¶8.

Commission Decision

The Commission explained in the Final Order that it included the level of handling costs as originally projected by the Companies in the Commission revised projection of reasonable ENEC costs for the projection period. Final Order at 5. The projections used by the Commission included $42.3 million for fuel handling at Amos, Mountaineer, and

Mitchell. The Companies base their claim of purported error on their assumption that fuel handling varies directly on a one to one basis with generation. While handling may vary directly with generation, we are not sure that the relationship will be 1 for 1. The Commission did not include additional fuel handling charges in its calculation because, as we stated in the Final Order, we do not consider the handling costs as varying in direct proportion to volumes generated. Final Order at 5, fn. 1.

Because of our concern that other factors are contributing to higher costs than anticipated in the current ENEC period, we will reconsider the variability of handling costs on incremental generation targeted by the Commission. As stated above, it is likely that handling costs will increase as fuel use increases due to incremental additional generation. However, since we do not have evidence that the change will be directly proportional to increased generation, we will include increased handling costs in our revised projection based on a seventy-five percent relationship between increased generation and increased fuel handling.

Just as the Companies made a projection of future ENEC costs the Commission chose to make an alternate projection. Unlike base rate cost recovery, the projected ENEC costs are subject to true-up. The actual costs incurred may be greater or less than the projections made by the Companies, and they may be greater or less than the projections made by the Commission based on our decision that the Companies should be maximizing their use of the capacity at their generation plants. As we pointed out in the Final Order, "[t]his decision is for purposes of projecting ENEC costs, subject to true-up in a future ENEC proceeding." Final Order at 6. If the Companies incur higher fuel handling costs than the amount we build into the ENEC rates, "under recoveries will be subject to recovery by the Companies in the form of debits to cost of service in future ENEC cases." Id. At that time, if there are under recoveries because actual costs exceed the projected costs included in rates by the Commission, the Companies will have the opportunity to recover the actual costs if they can demonstrate that the costs are reasonable and prudently incurred.

Reduction in Purchased Power Costs

The Companies argued that the Commission incorrectly combined both the cost and megawatt hours associated with non-discretionary power purchased under certain contracts with the cost and megawatt hours associated with discretionary purchases from PJM's energy market. The Companies argued that it was an error for the Commission to conclude that both non-discretionary purchases and market purchases of power could be displaced by increasing generation from the Companies' owned plants. The Companies further argued that these contracts had been submitted for Commission approval in prior cases and that the costs incurred under the contracts had been included in previous ENEC cases.

Commission Decision

Because the ENEC rates are in effect subject to true-up, the issue of discretionary or non-discretionary purchases of power and whether the costs thereof are reasonable and prudently incurred is premature. In the next ENEC proceeding, if the Companies purchase higher cost power because they claim that power is non-discretionary, the Commission will determine whether related costs incurred by the Companies should be allowed or disallowed for ratemaking purposes.

We repeat what we said earlier about a projection and a true-up. "This decision is for purposes of projecting ENEC costs, subject to true-up in a future ENEC proceeding." Final Order at 6. If the Companies fail to achieve the level of capacity utilization established as a reasonable target by the Commission for their generating plants because of displacement of generation with purchased power, the necessity and prudence of its decisions leading to that result will be considered by the Commission when determining whether such future costs should be allowed for rate making purposes.

Without ruling on the prudence of, or prejudging the Companies purchasing decisions, we will address the argument that the prior contract filings with this Commission justify the costs under the contracts and entitles the Companies to rate recovery. We note what was said by the Commission when the option of entering into certain wind energy contracts was brought to the Commission for "approval." In Case Nos. 07-1731-E-PC and 07-1848-E-PC, the Commission specifically noted that it does not typically pre-approve ratemaking but rather considers matters such as contracts in rate proceedings, to the extent that those transactions may impact the ratemaking process. December 21, 2007 Commission Order at 4-5. The Commission also noted that in those cases, even though the Companies had originally requested approval of the transactions for future rate recovery purposes, they agreed to withdraw the request, so approval of future rate recovery was never granted by the Commission. The Commission made it clear that "the proposed Joint Stipulation approved by the Commission in this order returns the ratemaking issues to future Commission proceedings by removing APCo's request for assurance that the costs associated with these two contracts are reasonably and prudently incurred and recoverable in rates from ratepayers." (emphasis added). Appalachian Power Company, Case Nos. 07-1731-E-PC and 07-1848-E-PC; December 21, 2007 Final Order at 5.

We also point out that language in the stipulation in case numbers 07-1731-E-PC and 07-1848-E-PC was "in the event that any expenses to be incurred under the contracts with are deemed unrecoverable in a future case, including an ENEC proceeding, the Staff, CAD and WVEUG agree not to oppose the Commission approval to sell, allocate, transfer or assign the … contracts." As a party to the case and stipulation, APCo was not only on notice that rate recovery was not guaranteed but APCo also agreed to language in

the stipulation that provided for sale, transfer or assignment of the contract costs to another party as one of the remedies if there was such denial.

With regard to the Companies argument that the costs of purchased power under the contracts were included in previous ENEC cases, we note that the Commission must be free to decide issues of cost recovery anew, based on current circumstances, even when those costs are incurred under long-term contracts and previous purchases under those contracts had been approved for cost recovery in the past. The West Virginia Supreme Court of Appeals has held that the Commission is not bound by decisions of its predecessors. Addressing the Commission disallowance of costs incurred by Chesapeake and Potomac Telephone Company for purchases from Western Electric when similar costs had been allowed in prior cases, the West Virginia Supreme Court said:

> Furthermore, it is generally recognized that the doctrine of stare decisis does not normally apply to administrative decisions. As Professor Davis states in his respected treatise:
>
> When the purpose is one of regulatory action, as distinguished from merely applying law or policy to past facts, an agency must at all times be free to take such steps as may be proper in the circumstances, irrespective of the past decisions . . . . Even when conditions remain the same, the administrative understanding of those conditions may change, and the agency must be free to act.

The C&P Telephone Company v. Public Service Commission of West Virginia 300 S.E.2d 607 (1982).

We make this observation without any pre-judgement to the ultimate outcome in a true-up of current ENEC costs and recoveries. We, however, do not agree with the Companies that our substitution of lower cost generated power for higher cost purchased power in a projection that still affords the Companies an opportunity to request recovery of those higher costs in a true-up of the projected ENEC costs was an error. Because the Companies have entered into a contract for certain costs, and labels those costs as non-discretionary, does not mean that this Commission must send a signal at this time that it considers those costs reasonable by projecting higher ENEC costs due to low utilization of more economical self-generated power.

Adjustment to WPCo Purchased Power Costs

The Companies also argued that the Commission erred in assuming that increased generation will result in decreased purchase power costs for WPCo at an all-in weighted average purchased power cost of $35.44 per MWH. This value was derived using only APCo data and not considering the megawatt hours or cost of WPCo's projected power

purchases and was applied to an imputed reduction in the projected purchased power costs of WPCo.

Commission Decision

We will further consider in the next ENEC case the argument that we should have offset the cost of purchased power for WPCo based on the projected purchased power cost specific to WPCo. The Companies' argument seems to imply that WPCo should be treated as a standalone entity for power supply purposes. Whether that is appropriate or whether we erred in favor of the Companies by not including the lower cost of WPCo purchases in the average combined cost of purchased power, we agree that a modification to the calculation made in our original order is appropriate. We will revise our calculation to reflect WPCo's generation, purchased power, and load on a standalone basis. In future ENEC cases the Companies must demonstrate that power supply for WPCo is scheduled independently of APCo.

Commission Examination at the Hearing and Post-Hearing Exhibit Request

The Companies argued that they and other parties were denied due process because the Commission conclusions were based on an exhibit not seen until the day of the evidentiary hearing. They also claim a due process violation because the Commission requested a post-hearing exhibit to be filed by the Companies.

Commission Decision

The Final Order is based on the testimony and evidence presented in the case. The Companies originally submitted aggregate amounts and costs for fossil generation and aggregate net energy requirements. Cos. Exh. NAH-D1. The Commission requested, as a post-hearing exhibit, that these aggregate costs, the costs submitted with the initial case filing, be broken down on a plant-by-plant basis. This was not new information but was merely a breakout by plant of the same data and costs that had been presented in combined form by the Companies. Furthermore, the data contained in the Commission Questions Exhibit 2, and used for questioning during the hearing, was also not new information and was available to all parties prior to the hearing. There was no error or surprise that was unfair to any party simply because the Commission asked that the aggregate volume and cost data for their projections be presented on a plant-by-plant basis.

Commission Staff viewed the request for a post-hearing exhibit as an additional chance for the Companies to prove their case, which they did not. Both WVEUG and Staff argued that regardless of whether the Final Order is correct or not, the ENEC is subject to reconciliation in the 2022 ENEC. The Commission acknowledges this point as well. The Companies, or any other party to the case, would have the opportunity to

pursue or oppose the methods used by the Commission in the ENEC case to be filed in April 2022.

Request for Future Cost Recovery Clarification

The Companies also requested clarification from the Commission as to the recovery of the differential between the costs incurred when they self-select their units to run rather than purchasing lower-priced power from the PJM market and how will the excess costs be allocated to customers. WVEUG objected to the request for clarification because the Companies asked the Commission to make decisions for future cases based on assumptions. WVEUG argued that there is no basis for the Commission to issue a premature determination on this question at this time.

Commission Decision

The Commission will not make future cost recovery decisions at this time. We agree with WVEUG that it is premature to address future cost recovery based on assumptions.

The Companies apparently presume that the costs to run their own plants will be more expensive than purchasing power from PJM. The Commission does not agree with this premise, which is the reason the Commission made the decisions in the Final Order.

We do not know now whether the Companies are influenced by a decarbonization policy or not. However, the Commission's intent, when setting a utilization target for the Companies' fossil-fuel fired plants, is to require the Companies to follow a power supply policy to maximize their use of fossil-fuel generation that is cheaper than purchased power rather than a policy geared to decarbonization at any cost. The Commission will consider the success or failure of the Companies to maximize the utilization of economically priced fossil generation in future ENEC cases and will address final cost recovery in those cases.

Based on our decision to modify our projection of reduced WPCo purchased power costs and to impute additional fuel handling costs we increase the previously authorized ENEC revenue requirements by $31,438,236. APCo shall recalculate its ENEC rates using the same allocation factors and rate design as was used for the previous rate adjustment.

**B.** Reopening

The Commission has denied in part and granted in part the petition for reconsideration with a correction for the reduced cost of purchased power by WPCo and an allowance for additional handling costs on the incremental increase in generation

which we projected for the ENEC projection. Our original decision and the revisions herein ordered were based on the record as developed by the parties. The Companies' projections of future ENEC costs including purchased power volumes and costs influenced our decision. We believe that the record supported a reduction in the ENEC rate requested by the Companies as reflected in our Final Order, and as adjusted herein for the cost of reduced purchased power by WPCo and additional fuel handling costs on the increased generation incorporated into our projections. However, we have reviewed with alarm the monthly filings submitted by the Companies as closed entries in this case. Those filings indicate that there may have been significant deflections from the projections regarding purchased power volumes and purchased power costs and a failure to use lower cost generation in lieu of more expensive purchased power. As a result, the under-recoveries booked by the Companies is now reported to be at an alarming level. Therefore, it is necessary that we reopen this proceeding to determine what is currently happening in the PJM markets and what is happening with the ability of the Companies to utilize their coal-fired power plants.

The projections originally filed by the Companies reflected annual purchased power by APCo of 9,856,000 MWH, or 821,000 MWH per month. Their projected annual cost for this purchased power was $349,254,000, or $29,100.000 per month. The Companies projected that the APCo purchased power costs would average $35.44 per MWH.

The projected power supply purchases by WPCo were 2,390,000 MWH per year, or 199,200 MWH per month. The projected cost of WPCo purchased power was $59,400,000 per year or $4,950,000 per month. The Companies projected that the WPCo purchased power costs would average $24.85 per MWH.

The Commission reduced these projected levels of purchased power based on our directive for the Companies to maximize their more economical generation. However, from September to December 2021 the actual volumes, costs and average cost per MWH of only the PJM market purchases, which the Companies have described as discretionary, have been far in excess of even the Companies' original projections of total purchased power.

The Companies' monthly PJM purchased power data reported in the closed entry reports as compared to the average monthly total purchased power in the Companies' original projections in this case are reflected in the following table:

| | SEPT | | | OCT | | | NOV | | | TOTAL Three Months | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | MWH | Cost | Avg per MWH | MWH | Cost | Avg per MWH | MWH | Cost | Avg per MWH | MWH | Cost | Avg per MWH |
| APCo PJM market Purchases Only | 577,389 | $ 28,516,499 | $ 49.39 | 1,603,306 | $ 91,437,154 | $ 57.03 | 1,803,487 | $ 109,899,520 | $ 60.94 | 3,984,182 | $ 229,853,173 | $ 57.69 |
| Compare To Original Projections of Total APCo Purchased Power | 821,000 | $ 29,100,000 | $ 35.44 | 821,000 | $ 29,100,000 | $ 35.44 | 821,000 | $ 29,100,000 | $ 35.44 | 2,463,000 | $ 87,300,000 | $ 35.44 |
| Wheeling PJM Market Purchases Only | 161,319 | $ 7,414,616 | $ 45.96 | 255,539 | $ 14,339,379 | $ 56.11 | 308,282 | $ 18,818,345 | $ 61.04 | 725,140 | $ 40,572,340 | $ 55.95 |
| Compare To Original Projections of Total Wheeling Purchased Power | 199,200 | $ 4,950,000 | $ 24.85 | 199,200 | $ 4,950,000 | $ 24.85 | 199,200 | $ 4,950,000 | $ 24.85 | 597,600 | $ 14,850,000 | $ 24.85 |
| Total APCo and Wheeling PJM Only | 738,708 | 35,931,115 | $ 48.64 | 1,858,845 | 105,776,533 | $ 56.90 | 2,111,769 | 128,717,865 | $ 60.95 | 4,709,322 | $ 270,425,513 | $ 57.42 |
| Compare To Original Projections of APCo and Wheeling Total Purchased Power | 1,020,200 | 34,050,000 | $ 33.38 | 1,020,200 | 34,050,000 | $ 33.38 | 1,020,200 | 34,050,000 | $ 33.38 | 3,060,600 | $ 102,150,000 | $ 33.38 |

The Commission is concerned that power purchased from the PJM market has increased above projections originally made by the Companies and even more above the targets set by the Commission. The need and justification for increased market purchases from PJM is not evident when considering that the cost of PJM purchases reached nearly $61.00 per MWH in November 2021 and averaged $57.42 per MWH in September, October, and November of 2021.

We are also concerned that the growth in purchases of high-cost discretionary purchased power has accompanied declining utilization of the Companies' West Virginia generating plants. In spite of our goal of a minimum sixty-nine percent capacity factor from West Virginia power plants, which appear to be able to produce power at costs that are well below the cost of purchased power, the capacity factors have not approached that level in September, October, and November of 2021.

In fact, the information filed by the Companies in monthly reports directed by the Commission indicate incredibly low capacity utilization factors as shown in the following table.

| | SEPT | | | OCT | | | NOV | | |
|---|---|---|---|---|---|---|---|---|---|
| | Energy MWH | Capacity | Capacity Factor | Energy MWH | Capacity | Capacity Factor | Energy MWH | Capacity | Capacity Factor |
| **Amos 1** | **430,645** | **815** | **73.4%** | **311,501** | **815** | **51.4%** | **71999** | **815** | **12.3%** |
| **Amos 2** | **33,380** | **815** | **5.7%** | | **815** | **0.0%** | | **815** | **0.0%** |
| **Amos 3** | **742,799** | **1,300** | **79.4%** | **27,527** | **1,300** | **2.8%** | | **1,300** | **0.0%** |
| **Total Amos** | **1,206,824** | **2,930** | **57.2%** | **339,028** | **2,930** | **15.6%** | **71,999** | **2,930** | **3.4%** |
| **Total Mountaineer** | **269,509** | **1,300** | **28.8%** | | **1,300** | **0.0%** | | **1,300** | **0.0%** |
| **Total Apco** | **1,476,333** | **4,230** | **48.5%** | **339,028** | **4,230** | **10.8%** | **71,999** | **4,230** | **2.4%** |
| **Mitchell 1** | **130,815** | **408** | **44.5%** | **27,613** | **408** | **9.1%** | | **408** | **0.0%** |
| **Mitchell 2** | **157,126** | **408** | **53.5%** | **133,877** | **408** | **44.1%** | **85,257** | **408** | **29.0%** |
| **Total Mitchell** | **287,941** | **816** | **49.0%** | **161,490** | **816** | **26.6%** | **85,257** | **816** | **14.5%** |
| **Total WV Coal** | **1,764,274** | **5,046** | **48.6%** | **500,518** | **3,746** | **18.6%** | **157,256** | **3,746** | **5.8%** |

APCo's capacity usage at Amos dropped from 57 percent in September to three percent in November. Mountaineer capacity usage dropped from twenty-nine percent to zero in October and November. The capacity factor at Mitchell dropped from 49 percent in September to six percent in November.

We previously had projected that reduced output from the coal plants and increased reliance on purchased power were detrimental to the interests of customers. However, the detriments to customers are multiplied by the actual "perfect storm" of reduced utilization of our coal plants while PJM market prices were jumping to levels of nearly $60 per MWH or more than double the cost of self-generation.

The current ENEC rates were designed to recover projected ENEC costs incurred from September 2, 2021 through August 31, 2022 plus the February 2021 under-recovery balance. The true-up period (sometimes referred to as the over-under recovery period or the actual cost period) used in this case was the year ending February 28, 2021. The under-recovery balance at the end of the true-up period used in this case was approximately $53 million.[1]

Because of the timing lag between the true-up period and new ENEC rates, we are always faced with the potential that the actual true-up increment may be higher or lower than the balance used to set ENEC rates. In this case, although the ENEC under-recovery built into ENEC rates requested by the Companies was $53 million, Mr. Scalzo testified for the Companies in rebuttal that the under-recovery had grown to $74 million by June 30, 2021.

In its Petition for Reconsideration, the Companies stated that the under-recovery had grown to $80 million by the end of August, 2021. They stated that they were "concerned the rates granted, which are based on the Commission's flawed calculation of projected costs, will lead to an even larger under-recovery balance." Subsequent to the petition for Reconsideration, in their monthly filings, the Companies have reported astounding increases in their under-recoveries with the balance reaching $174 million by the end of December 2021.

The Commission has explained earlier in this Order that our calculations of projected costs were not as "flawed" as the Companies argued. We did, however, agree to treat WPCo as a stand-alone entity for calculating the reduced purchased power expense that we expected if WPCo increased its generation at Mitchell and reduced its purchased power volumes. We have also modified our projection of fuel handling costs based on our targets for increased generation. Those modifications will increase the ENEC revenue requirement previously authorized by approximately $31.4 million above the Companies present ENEC, which is still less than the original request by the Companies. However, even if we had authorized 100 percent of the increase requested by the Companies, annual revenues beginning in September would have been higher by only $66 million or roughly $5 to $6 million per month. Collecting $6 million more per month from September 2021 through December 2021, or $24 million, would not nearly

---

[1] The Companies referred to an under-recovery of $55 million in their original filing, but that total included deferred COVID-related costs which are not an ENEC under-recovery.

cover the $174 million under-recovery reported by the Companies at December 31, 2021. Clearly, there are factors currently affecting ENEC costs that require further investigation immediately.

We find it necessary to reopen this proceeding and require the Companies to:

(1) explain the reasons that they have been purchasing increasing quantities of high-cost power while severely curtailing their own generation;

(2) redo the projections that they originally provided in this case based on what has actually happened since September and their expectations regarding all ENEC cost components through August 2022;

(3) provide exhibits and testimony explaining the new projections;

(4) file information in sufficient detail that will allow the replication of the Commission calculations, as modified herein, based on self-generated power at a 69 percent capacity factor;

(5) separate the ENEC rate year cost recovery revenue requirements and rates based on a recast of the projections originally made in this case from the embedded under-recovery revenue requirements and rates;

(6) provide a schedule showing the under-recovery revenue requirements and under-recovery rate increments that were built into the current ENEC rates; and

(7) provide the under-recovery revenue requirement and rate increments that would recover the August 31, 2021 under-recovery balance over a future twelve month period.

Parties are placed on notice that the Commission may modify the current ENEC cost recovery rates, the current under-recovery rate increment, or both. The Commission will not delay this reopened proceeding and any change in rates may be required as soon as May 1, 2022. Any under-recovery rate increment authorized for ENEC under-recoveries after February 28, 2022 and before August 31, 2022 will be considered as interim rates and will be subject to future true-up. The current ENEC cost recovery rate and any future ENEC cost recovery rates established in this reopened proceeding will continue to be interim rates, subject to true-up.

## FINDINGS OF FACT

1. The costs of fuel handling may not vary in direct proportion to volumes generated.

2. The Companies did not present any evidence that the fuel handling costs are directly variable with production and will increase in exactly the same percentage as generation increases.

3. In Case Nos. 07-1731-E-PC and 07-1848-E-PC, the Commission did not approve future rate recovery for the wind energy purchased power contracts that were the subject of those cases.

4. Power purchased from the PJM market has increased above projections originally made by the Companies and even more above the targets set by the Commission.

5. The Companies' reported under-recovery of ENEC costs was $174 million at the end of December 2021. Monthly Report, January 21, 2022.

## CONCLUSIONS OF LAW

1. Fuel handling costs should be considered in the projection of ENEC costs but not at a directly one to one ratio because the costs of fuel handling may not vary in exact proportion to volumes generated.

2. The Commission should include increased fuel handling in its projections of increased generation, but not at a level exactly proportional to increased generation.

3. The Commission should revise the reduced cost of projected purchased power for WPCo to treat WPCo power supply on a standalone basis, subject to true-up, after future review in the next ENEC proceeding as discussed herein.

4. The Commission did not err when it requested at the evidentiary hearing that the aggregate volume and cost data for the Companies' projections be presented on a plant-by-plant basis.

5. The need for increased market purchases from PJM is not evident when considering that the cost of PJM purchases reached nearly $61 per MWH in November 2021 and averaged $57.42 per MWH in September, October, and November 2021.

6. This case should be reopened to require the Companies to explain the significant growth in the reported under-recovery of ENEC costs.

**ORDER**

IT IS THEREFORE ORDERED that the Petition for Reconsideration or Clarification of the September 2, 2021 Commission Order is denied except as modified herein.

IT IS FURTHER ORDERED that this proceeding is reopened for further review of information and possible further rate modifications as described herein.

IT IS FURTHER ORDERED that the Companies will file the information described in this Order on or before March 14, 2022.

IT IS FURTHER ORDERED that all parties to this proceeding may file comments on the information provided by the Companies on or before March 21, 2022.

IT IS FURTHER ORDERED that this reopened proceeding is set for hearing to be held in the Howard M. Cunningham Hearing Room beginning 9:30 a.m. March 23, 2022.

IT IS FURTHER ORDERED that the ENEC revenue requirement for the Companies will increase by $31.4 million to reflect a recalculation by the Commission of WPCo's reduced purchased power costs and additional fuel handling costs as shown on Appendix A, attached hereto.

IT IS FURTHER ORDERED that the Companies will file as soon as possible new tariff sheets effective on all usage on and after the date of this order to reflect the increased ENEC revenue requirement ordered herein.

IT IS FURTHER ORDERED that the Companies promptly publish the Notice of Hearing attached as Appendix B to this Order one time in newspapers of general circulation in each county served by Appalachian Power Company and Wheeling Power Company and file proof of publication as soon as possible.

IT IS FURTHER ORDERED that the Executive Secretary of the Commission serve a copy of this Order by electronic service on all parties of record who have filed an e-service agreement, and by United States First Class Mail on all parties of record who have not filed an e-service agreement, and on Commission Staff by hand delivery.

A True Copy, Teste,

Karen Buckley

Karen Buckley, Acting Executive Secretary

SMS/pb
210339cc

Appendix A

## Calculation of Adjustments to APCo Projected ENEC Costs

| Revised Commission Projections for WPCo Purchased Power Cost Reduction and Increased Fuel Handling at a 75% Incremental Increase Factor | | | |
|---|---|---|---|
| | Amos | Mountaineer | Mitchell (WPCo 50% Share) |
| Maximum capacity MW | 2,930 | 1,320 | 780 |
| 100% Capacity Factor MWHs | 25,666,800 | 11,563,200 | 6,832,800 |
| 69% Capacity Factor MWHs | 17,710,092 | 7,978,608 | 4,714,632 |
| APCo projected generation MWHs | 12,730,386 | 6,621,342 | 2,369,000 |
| Additional Generation @ 69% Capacity Factor | 4,979,706 | 1,357,266 | 2,345,632 |
| Commission Projected Cost of Incremental Generation per MWH Including Fuel Handling of $1.43/MWH at Amos, $1.62/MWH at Mtr. and $1.16/MWH at Mitchell. | $23.73 | $22.03 | $23.39 |
| Increased Incremental Generation Cost | $ 118,183,723 | $ 29,901,101 | $ 54,858,976 |
| Purchased Power Cost per MWH | $ 35.44 | $ 35.44 | $ 24.85 |
| Decreased Purchased Power Costs @ $35.44 per MWH for APCo and $24.85 for WPCo | $ (176,480,781) | $ (48,101,507) | $ (58,288,955) |
| Net change in ENEC Power Supply Costs | $ (58,297,057) | $ (18,200,406) | $ (3,429,979) |
| WV Jurisdictional Allocation Factor | 41.5873% | 41.5873% | 100.0000% |
| Net change in WV Allocated Projected ENEC Cost | $ (24,244,172) | $ (7,569,057) | $ (3,429,979) |
| Total Net Change in Projected ENEC Costs | | $ (35,243,209) | |
| Original Commission Projected Net Change in ENEC Costs | | $ (66,681,445) | |
| ENEC Increase Above Commission Original Projections | | $ (31,438,236) | |

Appendix B

**PUBLIC SERVICE COMMISSION
OF WEST VIRGINIA
CHARLESTON**

CASE NO. 21-0339-E-ENEC

APPALACHIAN POWER COMPANY and
WHEELING POWER COMPANY,
public utilities.

Petition to initiate the annual review and update to the ENEC rates currently in effect.

## NOTICE OF EVIDENTIARY HEARING

On April 16, 2021, Appalachian Power Company (APCo) and Wheeling Power Company (WPCo), (jointly the Companies) filed their 2021 petition to initiate the annual review and update of Expanded Net Energy Cost (ENEC) rates. ENEC costs include the cost of generating plant fuel, purchased power, net wholesale transmission transactions and net wholesale power supply transactions. The Commission entered a Final Order in this case on September 2, 2021. Since that time, the Companies under-recovery balance for fuel costs has grown to $174 million as of December 31, 2021. The large under-recovery balance must be addressed. Customer rates may increase.

The Commission set a procedural schedule, including an evidentiary hearing to be held on March 23, 2022. The hearing will begin at 9:30 a.m. in the Howard M. Cunningham Hearing Room at the Commission's offices at 201 Brooks Street, Charleston, West Virginia. The Commission will require the Companies to update their projections of Purchased Power Costs and Fuel Costs. The Commission will also require an update on the status of the Commission expectations that the Companies maximize generation at their power plants in order to minimize more-expensive purchased power quantities and costs. The Commission may increase the adjustable ENEC surcharge as a result of this hearing in order to avoid a larger increase in September 2022 when the rate would normally be adjusted. Changes in ENEC rates, if any, will be interim changes subject to future true-up if the Commission determines that a true-up is warranted.

Anyone desiring to protest should file a written protest as soon as possible although protests will be accepted throughout the pendency of this proceeding. All written protests should briefly state the reason for the protest. All protests should state the case name and number and be addressed to Karen Buckley, Acting Executive Secretary, P.O. Box 812, Charleston, West Virginia 25323.

**APPALACHIAN POWER COMPANY and
WHEELING POWER COMPANY**

# EXHIBIT E

## SEPTEMBER 2021 ORDER

**PUBLIC SERVICE COMMISSION**
**OF WEST VIRGINIA**
**CHARLESTON**

At a session of the PUBLIC SERVICE COMMISSION OF WEST VIRGINIA in the City of Charleston on the 2nd day of September 2021.

CASE NO. 21-0339-E-ENEC

APPALACHIAN POWER COMPANY AND WHEELING POWER COMPANY.
Petition to initiate the annual review and to update the ENEC rates currently in effect.

## COMMISSION ORDER

The Commission (i) approves rates with adjustments, (ii) allows for the recovery of deferred COVID-19 expenses in this case, (iii) disallows the proposed changes for industrial customer rate modification, and (iv) requires the Companies to make changes intended to reduce the cost of fuel in the future.

## BACKGROUND

On April 16, 2021, Appalachian Power Company (APCo) and Wheeling Power Company (WPCo) (jointly the Companies), filed their 2021 petition to initiate the annual review and update of Expanded Net Energy Cost (ENEC) rates, supported by the pre-filed testimonies of Nancy A. Heimberger, Jeffrey C. Dial, Clinton M. Stutler, Michael J. Zwick, Ruby A. Greenhowe, and John J. Scalzo. The Companies propose to increase ENEC rates to produce an additional $73 million in annual ENEC revenues in order to achieve an appropriate balance between ENEC costs and revenues. Of that $73 million, $55.4 was for under-recovery of fuel costs, including $32 million in deferred under-recovery collection from 2020, and $17.6 million in projected fuel costs for the period September 1, 2021 through August 31, 2022. The Companies proposed a modification in cost allocation and rate design for large industrial class and special contract customers.

On April 23, 2021, the Companies filed a Motion for Protective Treatment of Exhibits JCD-D1, JCD-D3, and MJZ-D1 attached to the direct testimonies of Jeffrey C. Dial and Michael J. Zwick respectively. The exhibits contain i) data by coal purchase type, price per ton, and total weighted average forecasted price of coal delivered to APCo's generating stations for the forecast period; (ii) information regarding contracts between APCo and certain coal suppliers and the status of those contracts including quantity information; and (iii) historical period equivalent availability factor data for the

Companies' fossil-fueled generating fleet. No party objected to the Motion for Protective Treatment.

On June 3, 2021, the Commission granted intervenor status to the Consumer Advocate Division (CAD), the West Virginia Energy Users Group (WVEUG), and SWVA, Inc. (SWVA). Commission Order, June 3, 2021. The Commission Order also set a procedural schedule and required notice by publication of filing and hearing. The Companies filed Affidavits of Publication. June 22, 2021 and July 21, 2021 filings.

CAD filed the direct testimony of Emily S. Medine in both public and confidential versions. WVEUG filed the direct testimony of Stephen J. Baron and Russ Lang. Commission Staff filed the direct testimony of Geoffrey M. Cooke. July 7, 2021 filings.

The Companies filed an Addendum to the Motion for Protective Treatment on July 15, 2021 seeking protective treatment for information filed in the direct testimony of Emily S. Medine, a witness for CAD. The testimony addresses coal-inventory levels, coal-procurement contracts, and delivered costs for coal including data about coal purchase type, pricing, and quantity – all information that the Companies seek to keep confidential in the original Motion. Addendum at 2. No party objected to the Addendum.

The Companies filed the rebuttal testimony of Jeffrey C. Dial, Clinton M. Stutler, and John J. Scalzo. July 21, 2021 filing.

The evidentiary hearing was held on July 30, 2021. The Companies filed post hearing exhibits, requested by the Commission and CAD, on August 9, 2021. The Companies, CAD, WVEUG, and Staff filed initial briefs. August 10, 2021 Filings. The Companies, Staff, WVEUG, and SWVA filed reply briefs. August 17, 2021 Filings.

## DISCUSSION

ENEC Rates

The Companies seek an increase in their ENEC increment of approximately $73 million. The increase includes $55 million in under-recovery, $32 million of which was deferred from Case No. 20-0262-E-ENEC, the Companies' 2020 ENEC case. The Companies agreed with three adjustments recommended by Staff that reduce the ENEC under-recovery balance by $221,318. Staff Exh. GMC-D at 4.

WVEUG is concerned that the proposed ENEC rate increase would be overly burdensome on ratepayers in conjunction with other rate increases this calendar year and the expiration of the Tax Reform Rider credit. WVEUG suggested reducing the recommended increase in ENEC revenues by fifty percent until the Companies' 2022 ENEC proceeding. WVEUG Exh. SJB-D at 12. Under this proposal, the Companies' ENEC increase would be approximately $36.5 million and the deferred amount would be

approximately $18.8 million, or half of the prior period under-recovery amount. Id. SWVA supported this recommendation. SWVA Reply Brief at 2-3. WVEUG suggested that the deferral include a two percent carrying charge, a number similar to the amount the Companies earn on short-term debt. WVEUG Initial Brief at 6-7. The Companies argue that, if a portion of the ENEC amount is deferred, the carrying charge should be the pre-tax weighted average cost of capital, short-term debt, and long-term debt. Cos. Exh. JJS-R at 6. CAD requested that if the carrying charge is more than two percent, the Commission not defer half of the residential ratepayers' portion so as not to burden those ratepayers with additional debt caused by the carrying charge. CAD Initial Brief at 8-9.

One of the reasons the Companies' ENEC rate request is so high this year is because the Commission allowed a deferral of $32 million from Case No. 20-0262-E-ENEC because of the economic and health crisis brought on by the COVID-19 pandemic. To continue to defer recovery of ENEC collectibles from year to year will only continue to increase the costs for ratepayers. The Commission will not defer a portion of the ENEC recovery.

Deferred COVID-19 Pandemic Expenses

The Companies request recovery in this case of $2,299,383 in deferred COVID-19 expenses. The Companies argued that in GO 262.4 the Commission allowed deferred expenses related to COVID-19 pandemic to be addressed in future ratemaking proceedings in which the utility requests recovery. GO 262.4, May 15, 2020. Staff argued that the Commission intended that COVID-19 expenses could be considered in the next base rate case and that an ENEC is not the appropriate place to consider these rates. Staff Initial Brief at 3-4. In G.O. 262.4, the Commission did not limit recovery of COVID-19 expenses to base rate cases. Expenses like these typically are considered in a base rate case. The Commission, however, recognizes the unusual nature of the pandemic and the need to recover these expenses in a reasonable amount of time, particularly as the Companies have recently agreed to forgo filing a base rate case until at least June 2024. Case No. 20-1012-E-P, Affidavit, Aug. 25, 2021.

CAD argued that the Commission should not consider COVID-19 expenses in the present case because the Companies have not included cost-savings realized by COVID-19 that could mitigate the expenses. The Companies counter that the Commission allowed recovery of COVID-19 expenses in a recent ENEC case for other electric utilities, therefore, the Commission should also allow APCo and WPCo to collect these expenses in the ENEC. Monongahela Power Co. and The Potomac Edison Co., Case No. 20-0665-E-ENEC, Comm'n Order entered Dec. 16, 2020; Cos. Initial Brief at 7.

For the reasons stated above, the Commission will allow the deferred COVID-19 expenses to be recovered in this case.

Companies' Proposed Change in ENEC Rate Development for Special Contracts

The Companies propose to use a uniform approach to allocate revenue responsibility and to develop levelized rates for LCP customers, IP customers, and special contract customers A, C, D, I, J, and K. Cos. Exh. JJS-D at 7. Testifying for WVEUG, Stephen Baron testified that the proposal has the potential to negatively impact some customers. WVEUG Exh. SJB-D at 13-14. WVEUG objected to this change in allocation of revenue responsibility and stated that the Companies should seek these changes through contract negotiations between the Companies and individual industrial customers. WVEUG Initial Brief at 8-9. SWVA supported the requested change. SWVA Reply Brief at 2.

The Commission finds that the Companies did not provide evidence or a compelling reason to require modification of special contracts in this case. The Commission, therefore, declines to make these changes.

Suggestions for Reduced Fuel Costs

Emily S. Medine, testifying for CAD, suggested several actions the Companies could take to help reduce fuel costs in the future:

a) Review what, if any, changes can be made to reduce reliance on low sulfur coal from central Appalachia including non-traditional sources and power plant modifications;
b) Develop an extended coal procurement strategy to support a stable fuel supply for coal-fired units over an extended period;
c) Review natural gas procurement strategy to determine whether non-indexed purchases should be expanded or a hedging program should be adopted; and
d) Consider strategies that would allow for better management of the volatility in coal burn.

CAD Exh. ESM-D at 4-5.

The Companies argued that they are already pursuing the suggestions of Ms. Medine that are worth pursuing. Cos. Initial Brief at 6; Cos. Exh. JCD-R at 1-3; Cos. Exh. CMS-R at 1-3. The Companies argued that the suggestion for financial hedging for natural gas procurement would expose customers to additional costs and risks. Cos. Exh. CMS-R at 2. Additionally, according to the Companies, the suggestion to reduce coal burn volatility fails to recognize the limited control the Companies have over their coal burn within the PJM dispatch stack. Cos. Exh. JCD-R at 3; Commission Request post-hearing Exh. 2.

The Commission encourages the Companies to continue to find ways to reduce fuel costs for the benefit of the Companies and their ratepayers. At this time, the Commission will decline to require the Companies to implement Ms. Medine's

suggestions. The Commission, however, remains concerned regarding the fuel expenses for the Companies and addresses future ENEC costs in this Order.

In response to Commission questions regarding the low capacity utilization of the APCo and WPCo generation plants APCO filed a post hearing exhibit (Post Hearing Commission Request Exhibit or Request Exhibit). The exhibit showed that based on the maximum installed capacity of the West Virginia plants as reported on the Annual Reports of APCo and WPCo, the Companies projected capacity factors of 49.6 percent, 57.3 percent and 34.7 percent for Amos, Mountaineer and Mitchell, respectively. The Companies projected fuel costs of the three plants at $20.31, $18.61 and $22.23 per megawatt hour. Adding the cost of consumables and allowances to the projected fuel costs, the cost to produce power at the three plants is $22.30, $20.41 and $22.23 per megawatt hour. If the consumables and allowance costs are directly variable with production, the data indicates that increasing the capacity factor at the West Virginia power plants would increase aggregate production costs by $22.30, $20.41 and $22.23 per additional megawatt hour generated.[1]

APCo's projected ENEC costs include significant amounts of purchased power which could be prudent if it is clear that purchased power costs will be less expensive when compared to generation at the West Virginia power plants. The projected purchased power for APCo's ENEC, however, includes 8,488,000 megawatt hours of purchased power from unspecified sources at an all-in cost of $262,132,000, or $30.88 per megawatt hour.[2] Purchased wind generated power in the APCo projections is 1,332,000 megawatt hours at a cost of $85,819,000, or $64.43 per megawatt hour. Purchased solar power in APCO's projections is 36,000 megawatt hours at a cost of $1,303,000, or $36.19 per megawatt hour. Total purchased power in APCo's projections equal 9,856,000 megawatt hours at a cost of $349,254,000, or $35.44 per megawatt hour.

We are faced with projected ENEC costs that include utilization of West Virginia power plants at capacity factors of 49.6 percent, 57.3 percent and 34.7 percent for Amos, Mountaineer and Mitchell, respectively. At the same time, projected variable costs for those plants, as described above, are considerably lower than projected purchased power costs. We understand that there may be a variety of factors that will affect generation and purchased power on a day to day basis. We also understand that declining sales volumes and a soft energy market may lead to reduced generation due to reduced wholesale system sales. We are concerned, however, that APCo may not be maximizing the

---

[1] The Post Hearing Commission Request Exhibit also shows fuel handling costs based on APCo projected volumes will be $1.91 per megawatt hour at Amos, $2.16 per megawatt hour at Mountaineer and $1.55 per megawatt hour at Mitchell. The Commission accepts the projected handling costs at the capacity factors projected by APCo, however, for purposes of estimating additional generation we do not consider the handling costs as varying in direct proportion to volumes generated.

[2] APCo noted that a portion of the projected purchased power costs include demand-related purchases. There is nothing in the record, however, explaining the recipients or contractual obligations regarding the amounts classified as demand-related. For purposes of estimating purchased power offsets if additional generation is achieved at the APCo generation plants, we will calculate reduced purchased power costs at the all-in average cost included in the APCo projections.

utilization of its owned power plants and backing-off purchases in response to reduced wholesale system sales opportunities. We conclude that the public interest is better served by APCo reversing that trend, and focusing on maximizing generation from its owned power plants.

We have determined that capacity factors of 34.7 percent to 57.3 percent should not be the basis for projections in this ENEC case. In more favorable market conditions, which might well occur in the future, we would expect factors in the mid to high 70 percent range. At this time, however, we will use a capacity factor of 69 percent for the Companies' projected ENEC costs. We also will assume that increased generation will result in decreased purchased power costs at the all-in weighted average purchased power cost of $35.44 per megawatt hour.

This decision is for purposes of projecting ENEC costs, subject to true up in a future ENEC proceeding. The Companies' will continue to report actual generation and purchased power costs and actual recoveries in future ENEC cases. Over-recoveries will be subject to return to customers in the form of credits to cost of service and under recoveries will be subject to recovery by the Companies in the form of debits to cost of service in future ENEC cases. The Companies will have the burden of proof to demonstrate that its actual costs are reasonable, prudently incurred and not contrary to the public interest in West Virginia. Net costs that the Commission, after hearing, determines are not reasonable, not prudently incurred or are contrary to the public interest in West Virginia will be subject to disallowance in future ENEC cases.

Based on the adjusted projected ENEC costs as described herein, we reduce the Companies' projected West Virginia jurisdictional ENEC costs by $66,681,445. A summary of our calculations is contained on Appendix A, attached to this Order. We direct the Companies to recalculate their ENEC rates to reflect the modified projected net costs described herein.

To enable the Commission to monitor the Companies' success at increasing generation at its power plants, we will require the Companies to file monthly reports as closed entries in this docket. Each report should show net generation from all APCo and WPCo power plants by month, retail and wholesale energy load by month, and purchased power energy purchases by month by supplier. Each report should also show purchased power demand and energy costs by month by supplier.

Motion for Protective Treatment

The Companies filed a Motion seeking protective treatment for Exhibits JCD-D1, JCD-D3, and MJZ-D1 attached to the direct testimonies of Jeffrey C. Dial and Michael J. Zwick respectively. The exhibits contain (i) data by coal purchase type, price per ton, and total weighted average forecasted price of coal delivered to APCo's generating stations for the forecast period; (ii) information regarding contracts between APCo and certain coal suppliers and the status of those contracts including quantity information; and

(iii) historical period Equivalent Availability Factor data for the Companies' fossil-fueled generating fleet.

The confidential information contained in these exhibits and in the confidential testimony of Emily S. Medine commenting on this confidential information, if disclosed to other purchasers and suppliers of fuel, would have a substantially detrimental effect on the ability of the Companies to negotiate favorable future fuel supply arrangements and/or give its users an opportunity to obtain business advantage over competitors. The information, however, is time sensitive and no longer will be of commercial value after five years. The Commission, therefore, will grant protective treatment for a period of five years for the information filed under seal in this case. The Commission also continues to encourage the Companies to review the information for which they seek confidential treatment and ensure that the information is truly confidential and is not available publicly.

## FINDINGS OF FACT

1. The Companies filed a request for an ENEC increase of approximately $73 million. Petition.

2. The Companies agreed with three adjustments recommended by Staff that reduce the ENEC under-recovery balance by $221,318. Staff Exh. GMC-D at 4.

3. The Companies requested an additional increase to cover $2,299,383 in deferred COVID-19 expenses. Petition.

4. Based on the maximum installed capacity of Amos, Mountaineer, and Mitchell, the Companies expect the capacity factors for each of those plants to be 49.6 percent, 57.3 percent, and 34.7 percent respectively.

5. Including the cost of consumables and allowances and the projected fuel costs, the cost to produce power at Amos is $22.30, at Mountaineer is $20.41, and at Mitchell is $22.23 per megawatt hour generated.

## CONCLUSIONS OF LAW

1. The Commission should allow the Companies to recover their proposed ENEC under-recovery balance as requested in this case, less $221,318.

2. The Companies should be allowed to collect an additional $2,299,383 in deferred COVID-19 expenses in this case. If cost-savings are realized to offset these expenses, those cost-savings should be addressed in a future rate proceeding.

3. The Companies should not be allowed to change, in this case, the rate development for certain Special Contract Customers, as identified above.

4. Because projected ENEC costs include a utilization of West Virginia power plants at capacity factors of 49.6 percent for Amos, 57.3 percent for Mountaineer, and 34.7 percent for Mitchell and total purchased power is projected to be $35.44 per megawatt hour, the Companies' capacity factor projections are too low. The capacity factor for the three plants should be 69 percent in this case with the potential for an increased capacity factor as described in this Order.

5. Based on the adjusted projected ENEC costs as described in this Order, the Companies' projected West Virginia jurisdictional ENEC is reduced by $66,681,445.

6. The confidential information filed in Cos. Exhs. JCD-D1, JCD-D3, and MJZ-D1 and the confidential testimony of CAD witness Emily S. Medine should remain under seal for a period of five years.

**ORDER**

IT IS THEREFORE ORDERED that the rates approved in this Order for ENEC under-recovery and COVID-19 pandemic deferred expenses will be in effect for all services rendered on and after September 2, 2021.

IT IS FURTHER ORDERED that Appalachian Power Company and Wheeling Power Company shall file monthly reports as closed entries in this case reporting net generation from all APCo and WPCo power plants by month, retail and wholesale energy load by month, and purchased power energy purchases by month and supplier. The reports shall also report purchased power demand and energy costs by month and supplier.

IT IS FURTHER ORDERED that by September 10, 2021, the Companies shall file an original and six copies of revised tariff sheets to reflect the rates approved in this Order.

IT IS FURTHER ORDERED that the Executive Secretary of the Commission shall maintain under seal and separate and apart from the case file the information filed under seal in Companies exhibits JCD-D1, JCD-D3, and MJZ-D1 and the testimony of Emily S. Medine filed under seal. This information shall remain confidential for a period of five years from the date of this Order.

IT IS FURTHER ORDERED that on entry of this Order, this case shall be removed from the Commission docket of open cases.

IT IS FURTHER ORDERED that the Executive Secretary of the Commission serve a copy of this Order by electronic service on all parties of record who have filed an e-service agreement, and by United States First Class Mail on all parties of record who have not filed an e-service agreement, and on Commission Staff by hand delivery.

A True Copy, Teste,

Connie Graley

Connie Graley, Executive Secretary

SMS/pb
210339cb.doc

Appendix A

## Calculation of Adjustments to APCo Projected ENEC Costs

| | Amos (Total) | Mountaineer (Total) | Mitchell (WPCo 50% Share) |
|---|---|---|---|
| Maximum capacity MW | 2,930 | 1,320 | 780 |
| 100% Capacity Factor MWHs | 25,666,800 | 11,563,200 | 6,832,800 |
| 69% Capacity Factor MWHs | 17,710,092 | 7,978,608 | 4,714,632 |
| APCo projected generation MWHs | 12,730,386 | 6,621,342 | 2,369,000 |
| Additional Generation @ 69% Capacity Factor MWHs | 4,979,706 | 1,357,266 | 2,345,632 |
| Commission Projected Cost of Incremental Generation per MWH | $ 22.30 | $ 20.41 | $ 22.23 |
| Increased Incremental Generation Costs | $ 111,047,444 | $ 27,701,799 | $ 52,143,399 |
| Decreased Purchased Power Costs @ $35.44 per MWH | $ (176,480,781) | $ (48,101,507) | $ (83,129,198) |
| Net change in ENEC Power Supply Costs | $ (65,433,337) | $ (20,399,708) | $ (30,985,799) |
| WV Jurisdictional Allocation Factor | 0.415873 | 0.415873 | 1 |
| Net change in WV Allocated Projected ENEC Cost | $ (27,211,958) | $ (8,483,688) | $ (30,985,799) |
| Total WV ENEC Adjustment | | $ (66,681,445) | |