**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

BRUCE PERRONE, ROSANNA LONG, and
SIERRA CLUB,

       *Plaintiffs*,

v.                                  Civil Action No. 2:24-cv-00434

CHAIRMAN CHARLOTTE R. LANE, in her
official capacity; COMMISSIONER RENEE A.
LARRICK, in her official capacity, and
COMMISSIONER WILLIAM B. RANEY, in his
official capacity,

       *Defendants*.

**PROPOSED MEMORANDUM OF LAW IN SUPPORT OF PROPOSED MOTION TO
DISMISS OF APPALACHIAN POWER COMPANY AND
WHEELING POWER COMPANY**

Plaintiffs—an environmental organization and retail electric customers—seek to enjoin Commissioners of the West Virginia Public Service Commission (the "Commission") from enforcing a purported "69% Directive" allegedly requiring Appalachian Power Company ("APCo") and Wheeling Power Company ("WPCo") to operate their coal-fired power plants at a 69% capacity factor.[1]  Plaintiffs claim that the purported "69% Directive" is preempted by the Federal Power Act ("FPA") because it requires APCo and WPCo to participate more often in the wholesale electricity market regulated by the Federal Energy Regulatory Commission ("FERC").

Plaintiffs' complaint suffers from numerous flaws and should be dismissed.  *First*, Plaintiffs lack Article III standing because there is no "69% Directive."  The Commission has not,

---

[1] "Capacity factor" is the "ratio (usually expressed as a percentage) of energy produced by a generating unit for a period of time (usually one year) to the energy that could have been produced at continuous full power operation during the same period."  Compl. ¶ 2; *see also id.* ¶ 56.

as a matter of law, required APCo and WPCo to run their plants at a 69% capacity factor. To the contrary, the Commission's final order on this subject clearly states that the "issue in this case is not whether the Companies achieved a 69 percent capacity factor, or any specific capacity factor." January 2024 Order at 8 n.10 (Exh. A).[2] Because Plaintiffs have claimed injury arising from a requirement that does not exist, the Court should dismiss the suit for lack of subject-matter jurisdiction under Rule 12(b)(1). In the alternative, the Court should dismiss the suit as unripe under Rule 12(b)(1) or for failure to state a claim under Rule 12(b)(6), as the Court cannot offer an advisory opinion, nor can it grant relief, regarding a regulatory requirement that does not exist.

*Second*, Plaintiffs lack a cause of action (or, alternatively, prudential standing) because their alleged injury—paying higher retail rates—lies outside the FPA's zone of interests. The FPA does not regulate retail rates. Instead, it reserves to states the authority to regulate retail rates. Thus, there is a fatal disconnect between the injury asserted and the interests the statute protects.

*Third*, Plaintiffs claim to bring their preemption claim under *Ex parte Young*, 209 U.S. 123 (1908), Compl. ¶ 18, but they have no such cause of action. *Ex parte Young* allows potential defendants at law to bring an anticipatory federal suit in equity enjoining state officers from enforcing the state law against them. Plaintiffs, however, are not and could not be directly subject to any state enforcement proceedings relating to the alleged "69% Directive." Instead, APCo and WPCo are the directly regulated parties who would have a cause of action under *Ex parte Young*. *Ex parte Young* does not confer a cause of action on bystanders to police the boundaries of state

---

[2] The referenced Commission materials are all matters of public record and are integral to the complaint. *See Parsons v. Bd. of Trs. of the Boilermaker-Blacksmith Nat'l Pension Trust*, 2020 WL 1917338, at *4 (S.D. W. Va. Apr. 20, 2020) ("For purposes of a motion to dismiss, 'a court may consider official public records, documents central to the plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed.'" (citation omitted)); *McClendon v. Tibbs*, 2024 WL 3297495, at *3 (S.D. W. Va. July 2, 2024) (noting that in considering a motion to dismiss, the Court "may properly take judicial notice of matters of public record" (citing *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009))). The Commission Orders are attached as Exhibits A-E.

and federal jurisdiction merely because they can allege an indirect injury-in-fact.

*Fourth*, to the extent this Court nevertheless considers the merits of the preemption claim, Plaintiffs fail to state a preemption claim as a matter of law because, under the FPA, West Virginia has jurisdiction to set retail rates and regulate generation facilities. That is all the Commission has done here. The Commission has not directly adjusted any FERC-regulated wholesale price, and it is well-established that states are not preempted under the FPA from taking actions that may result in generators' more frequent participation in a FERC-regulated wholesale market or in an indirect impact on prices in a FERC-regulated wholesale market.

*Finally*, Plaintiffs' complaint should be dismissed because FERC has primary jurisdiction over this dispute. Plaintiffs allege that the "69% Directive" will impair FERC's ability to ensure just and reasonable wholesale rates, but that is a policy-laden judgment for FERC to make.

## BACKGROUND

### I.    REGULATORY BACKGROUND

The FPA divides jurisdiction between federal and state authorities. FERC has exclusive jurisdiction over wholesale electricity transactions in interstate commerce. Compl. ¶ 30 (citing 16 U.S.C. § 824(b)(1)). States have exclusive jurisdiction over "any other sale," 16 U.S.C. § 824(b), including "most notably, any retail sale[] of electricity," *FERC v. EPSA*, 577 U.S. 260, 265 (2016); *see* Compl. ¶¶ 33, 57. States' reserved authority also includes the "facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1); Compl. ¶ 34. Although the statute divides federal and state authority, the Supreme Court has recognized "that the wholesale and retail markets in electricity … are not hermetically sealed from each other." *EPSA*, 577 U.S. at 281. What states do in their domain inevitably has effects on the federal domain, and vice-versa. For example, "[s]tate[s] and municipal authorities retain the right to forbid new entrants from providing new

capacity, to require retirement of existing generators, to limit new construction to more expensive, environmentally-friendly units, or to take any other action in their role as regulators of generation facilities," even though "those choices ... affect[] the [wholesale] market clearing price." *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009). Congress did not preempt such indirect effects. "FERC's authority over interstate rates does not carry with it exclusive control over any and every force that influences interstate rates." *PPL Energyplus, LLC v. Solomon*, 766 F.3d 241, 255 (3d Cir. 2014).

In West Virginia, a regional transmission organization ("RTO") called PJM administers the wholesale electricity market, and FERC oversees that market to ensure it results in just and reasonable wholesale rates. Compl. ¶¶ 31-32; *see Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016); *EPSA*, 577 U.S. at 267. Utilities participating in PJM's energy market offer to sell their available energy output at a price the utilities designate. Compl. ¶ 39. Through an automated auction process, PJM determines a "[m]arket-[c]learing [p]rice" by identifying the price at which the supply of electric energy will suffice to meet demand, and it dispatches the plants that have offered to sell their output at or below the market-clearing price. *Id.* ¶¶ 42-44.

## II.    FACTUAL BACKGROUND

For purposes of a motion to dismiss, the factual background is based on the allegations in the complaint. APCo and WPCo are public utilities that both generate electricity and provide retail electric service to customers in West Virginia. *Id.* ¶¶ 59-60. On the generation side, APCo owns and operates two coal-fired electric generating facilities in West Virginia: the Amos Plant and the Mountaineer Plant. *Id.* ¶ 36. WPCo owns a 50% undivided interest in the coal-fired Mitchell Plant, which is also located in West Virginia. *Id.* ¶ 37. APCo and WPCo participate in the PJM market and, under PJM's FERC-approved rules, must offer their output in the PJM energy market.

*Id.* ¶¶ 39, 50. PJM, through its auction process, ultimately decides how much electricity the APCo and WPCo plants should generate. *Id.* ¶ 54. When fuel supply is constrained or when the PJM energy market's market-clearing price is less than the cost of generating electricity at the APCo and WPCo plants, APCo and WPCo will generally purchase power from PJM to meet their customers' needs in the most economical manner. *Id.* ¶ 55.

APCo and WPCo recover the costs of purchasing power in PJM's energy market and operating their plants—net of any revenues they receive from sales in the PJM markets—from retail customers under retail tariffs approved by the Commission. The costs of fuel (and related expenses) and purchased power used to serve customers in West Virginia are part of a group of costs known as Expanded Net Energy Cost ("ENEC"). *Id.* ¶ 67. Utilities make an annual filing to request that the Commission approve ENEC rate adjustments "that consist of (1) a true-up of actual costs for the previous year (the 'historical' or 'review' period) and (2) an estimate of the next year's projected costs (the 'forecast' period)." *Id.* ¶¶ 64-65. To "true-up" their ENEC rates in any given proceeding, utilities request to adjust the forecasted rates to make up for any under-recovery of their actual costs incurred during the review period, or to credit back to customers any over-recovery that exceeded their actual costs. *Id.* ¶ 66.

In APCo and WPCo's 2021, 2022, and 2023 ENEC cases, the Commission disallowed more than $200 million in cost recovery in its January 2024 Order. *Id.* ¶¶ 72-81. APCo and WPCo have appealed the January 2024 Order to the West Virginia Supreme Court of Appeals, and that appeal is pending. *See Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, No. 24-75 (W. Va. argued Sept. 4, 2024).

## **STANDARD OF REVIEW**

A motion to dismiss for lack of Article III standing implicates the Court's subject-matter

jurisdiction and is considered under Fed. R. Civ. P. 12(b)(1). The Court may grant a Rule 12(b)(1) motion where the "material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

In reviewing a motion to dismiss under Fed. R.Civ. P. 12(b)(6), the Court first "must separate the legal conclusions in the complaint from the factual allegations," and then, "assuming the truth only of the factual allegations … determine whether the plaintiff's complaint permits a reasonable inference that 'the defendant is liable for the misconduct alleged.'" *Cunningham Energy, LLC v. Vesta O&G Holdings, LLC*, 578 F. Supp. 3d 798, 807 (S.D. W. Va. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "To survive a Rule 12(b)(6) motion to dismiss, the facts alleged 'must be enough to raise a right to relief above the speculative level' and must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555, 570).

## ARGUMENT

### I.    PLAINTIFFS LACK ARTICLE III STANDING.

#### A.    Plaintiffs' Alleged Injury Is Not Fairly Traceable to the "69% Directive" Because There Is No "69% Directive" As a Matter of Law.

The complaint should be dismissed because Plaintiffs lack Article III standing to bring their claim.[3] A plaintiff "must show (1) it has suffered an 'injury in fact' … (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Vote No on Amendment*

---

[3] Alternatively, the Court can dismiss the suit as unripe under Rule 12(b)(1), as the Court has no jurisdiction to provide an advisory opinion on the legality of a regulatory requirement that does not exist and that may never exist. *See, e.g., Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022). The Court can also dismiss the suit under Rule 12(b)(6) for failure to state a claim on which relief can be granted, as the Court cannot grant relief regarding a fictional regulatory requirement.

*One, Inc. v. Warner*, 400 F. Supp. 3d 504, 512 (S.D. W. Va. 2019).  Plaintiffs allege an injury premised on the "69% Directive," *see* Compl. ¶¶ 21-28, but the Commission has not issued any such directive as a matter of law.  Plaintiffs therefore cannot claim any injury arising from a "69% Directive," nor can the Court redress any such injury.

The complaint rests on the erroneous legal premise that the Commission has imposed a "69% Directive" that requires APCo and WPCo to run their plants at a 69% capacity factor regardless of whether doing so is economic.  For example, Plaintiffs allege that the "69% Directive compels APCo and WPCo to achieve a particular outcome—a 69% capacity factor for its coal-fired power plants—which is higher than they would otherwise achieve" if APCo and WPCo were operating the plants based solely on economic principles.  Compl. ¶ 134; *see also id.* ¶¶ 1, 3, 5, 85 (similar).  Plaintiffs' premise is false as a matter of law for two reasons: (1) the Commission has not imposed any such directive to operate at a 69% capacity factor, either in the past or on an ongoing basis; and (2) even if any such mandate could be read into the Commission's orders and hearing transcripts, it plainly does not require the Companies to operate at that capacity factor even when it would be uneconomic to do so.  The complaint attempts to establish the existence of the "69% Directive" based on fragments in a handful of paragraphs from APCo and WPCo's 2021, 2022, and 2023 ENEC proceedings.  *Id.* ¶¶ 82-96.  Tellingly, *none* of the language quoted in the complaint directly mandates APCo and WPCo to operate at a 69% capacity factor, let alone when doing so would be uneconomic.  The proper reading of the Commission's orders and other statements makes clear that the Commission has not imposed any such requirement.

**January 2024 Order.**  The January 2024 Order resolving the 2021, 2022, and 2023 ENEC proceedings does not impose a "69% Directive."  Far from it: a 69% capacity factor is hardly mentioned.  When it is mentioned, the Commission *disclaims* any such mandate, explaining it was

merely an aspirational target the Commission identified based on information before it in the 2021 ENEC proceeding. Thus, the Commission states that it "has explained several times that we arrived at the 69% capacity factor as a minimum *target to strive for, based on the evidence before us in the 2021 ENEC*," and that "[t]here should be no misunderstanding about maximizing self-generation and *striving for* a minimum target capacity utilization level *when self-generation was the most economical power supply choice*." January 2024 Order at 8 n.10 (emphases added). The January 2024 Order directly stated that the "issue in this case is not whether the Companies achieved a 69 percent capacity factor, *or any specific capacity factor*." *Id.* (emphasis added). And in calculating the disallowance, the Order did not rely on a 69% capacity factor, again showing that there is no such "requirement" to operate at that level. *See id.* at 26-30; *see also id.* at 36 (Conclusion of Law 9) (stating only that "[i]f the Companies had planned and operated prudently, they could have reduced their West Virginia jurisdictional ENEC costs by at least $231,769,431…," with no reference to a "69% Directive").

**Prior Orders.** The complaint also cites four earlier orders of the Commission. Compl. ¶ 84(a), (b), (d), (g). Those orders are not relevant given the Commission's final word on this issue is the January 2024 Order. In any case, none of those orders imposes a "69% Directive," either. The September 2021 Order (Exh. E) states that the 69% figure is an estimated target subject to further revision, explaining that the Commission "will use a capacity factor of 69% for the Companies' projected ENEC costs" "subject to true up in a future ENEC proceeding," and that the Companies would be permitted to demonstrate that their "actual costs are reasonable, prudently incurred and not contrary to the public interest in West Virginia." September 2021 Order at 6.[4]

---

[4] In context, the language quoted in the complaint (¶ 84(a)) stating that the "capacity factor … should be 69 percent in this case" is clearly referring only to the Commission's "capacity factor projections," which the Commission made clear were based on its view of the evidence then before it and would be subject to future review. *See* September 2021 Order at 8.

Similarly, the March 2022 Order (Exh. D) does not impose a "69% Directive." To the contrary, it confirms that the 69% capacity factor was simply an "an alternate projection" adopted by the Commission that is "subject to true-up" in a subsequent proceeding. March 2022 Order at 3. The March 2022 Order further stated that the "actual costs incurred may be greater or less than … the projections made by the Commission based on our decision that the Companies should be maximizing their use of the capacity at their generation plants," and that the "Companies will have the opportunity to recover the actual costs if they can demonstrate that the costs are reasonable and prudently incurred." *Id.* That is not a "69% Directive" compelling a 69% capacity factor.

The May 2022 Order (Exh. C) again confirms that there is no mandate. The Commission found that a 69% capacity factor had not been achieved but then adopted a process to determine whether APCo and WPCo had acted prudently in operating their coal-fired plants. At most, this Order "direct[s] the Companies to plan on self-generation rather than reliance on the PJM markets," and indicated that 69% was an appropriate target based on the evidence the Commission had before it in that case, but it did not direct the Companies to rely on self-generation when doing so would be uneconomic. May 2022 Order at 4. Any stray language suggesting a directive to achieve a 69% capacity factor cannot be squared with the broader context of this Order, much less the clear disavowal of any such requirement in subsequent orders.

Indeed, the February 2023 Order (Exh. B) confirms that the 69% target was "an expected minimum *based on the record before us at the time* regarding purchased power costs and generation costs." Compl. ¶ 84(g) (quoting February 2023 Order at 6) (emphasis added). The February 2023 Order explains that the "69 percent capacity factor was *clearly a Commission estimate based on a record* that indicated that generation from coal-fired Company-owned plants would be less expensive than purchased power, including power from the PJM energy market."

9

February 2023 Order at 5 (emphasis added). And the February 2023 Order expressly disavowed issuing any directive in response to queries from the Company regarding the 69% figure, explaining that such "decisions" on "operating its generating units" "are management's responsibility, not the Commission's." *Id.* at 4. The Commission again confirmed that the 69% capacity factor target was not meant to require the Companies to operate uneconomically: rather, "[w]hat we have articulated is that if generation from Company owned generation is more economical than purchased power, the Companies have the burden to prove the necessity and prudence of purchased power costs before the Commission will allow the excess cost for ratemaking purposes." *Id.*[5] Thus, the Companies were never ordered to operate uneconomically and were free to demonstrate that a different capacity factor was prudent.

**Other Commission Materials.** Even though the Commission speaks through its orders, Plaintiffs rely on isolated comments from the various hearings held in the Companies' ENEC proceedings. The statements made by individual Commissioners or witnesses in those hearings plainly cannot prove the existence of an ongoing Commission policy requiring the Companies to operate at a 69% capacity factor. In any case, all those excerpts show is the Companies repeatedly seeking clarification as to whether any kind of directive was being imposed—not the existence of any such directive. Nor, finally, can the CTC Report, which Defendants commissioned to review the prudency of the Companies' actions in operating their coal-fired power plants, establish the existence of such a directive. *Cf.* Compl. ¶¶ 75, 88. That report suggested what disallowance would be appropriate based on a comparison to a 69% capacity factor, but, as noted, the January

---

[5] The language quoted in the complaint from the February 2023 Order in fact confirms the absence of a mandate: "Reaching that [69%] goal would not, by itself, by dispositive of the question of reasonableness of net ENEC costs if the costs were challenged by competent evidence." Compl. ¶ 86 (quoting February 2023 Order at 6). Indeed, the February 2023 Order left open the possibility that APCo and WPCo could still show they acted prudently even below that capacity factor. *Id.*

2024 Order did not use that methodology to calculate the disallowance actually imposed.[6]

Because the Commission has not in fact imposed a "69% Directive," Plaintiffs have not and cannot allege any injury fairly traceable to any such directive nor that a decision from this Court enjoining enforcement of a fictional policy would redress any claimed injury. The suit should therefore be dismissed for lack of subject matter jurisdiction.

**B.    The Sierra Club Lacks Associational Standing.**

Separately and in addition, the Sierra Club lacks associational standing to sue on behalf of its injured members. *Cf. id.* ¶¶ 25-26. An association has standing when at least one of its members "would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181; *see also Lane v. Holder*, 703 F.3d 668, 674 n.6 (4th Cir. 2012). To assess germaneness, the question is "whether an association's lawsuit would, if successful, reasonably tend to further the general interests that individual members sought to vindicate in joining the association and whether the lawsuit bears a reasonable connection to the association's knowledge and experience." *W. Va. Coalition Against Domestic Violence, Inc. v. Morrisey*, No. 19-cv-00434, 2020 WL 6948093, at *7 (S.D. W. Va. Nov. 25, 2020) (quoting *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006)). Here, the complaint does not adequately allege how the interests at stake—namely, lower retail rates—is "germane" to the Sierra Club's alleged mission to "replace fossil fuel generation with cleaner energy sources" and to "promot[e] … energy conservation" through "additional regulatory activity" and reduced "emission of

---

[6] Plaintiffs attempt to paper over this problem by alleging that the Commission's disallowance of $231 million in the January 9 Order was "similar" to the $202 million disallowance referenced in the CTC Report. Compl. ¶¶ 88-89. But the Commission arrived at its disallowance using a completely different methodology that makes no mention of the 69% capacity factor.

environmental pollutants." Compl. ¶ 26. Individuals do not join the Sierra Club to lower their electricity bills. Sierra Club should be dismissed from the case for lack of Article III standing.

## II.    PLAINTIFFS LACK A CAUSE OF ACTION BECAUSE THEIR INTEREST IN RETAIL RATES FALLS OUTSIDE THE FPA'S ZONE OF INTERESTS.

The Court also should dismiss the complaint because the injury Plaintiffs have alleged—higher retail rates—falls outside the zone of interests protected by the FPA. A "plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009) (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)); *see generally Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). In other words, "If a plaintiff is the sort of person the law intended to protect, he can press his claim." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 656 (4th Cir. 2019). If he is not, then he cannot press his claim. To make that determination, the Court should make "reference to the particular provision of law upon which the plaintiff relies." *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 956 (D.C. Cir. 2000) (quoting *Bennett*, 520 U.S. at 175-76).

Here, Plaintiffs allege that the "69% Directive forces West Virginia ratepayers—including Bruce Perrone, Rosanna Long, and Sierra Club members—to subsidize APCo and WPCo running their coal-fired power plants more often than they otherwise would through higher residential *retail* rates." Compl. ¶ 21 (emphasis added); *see also, e.g.*, *id.* ¶¶ 9-10, 22-25. But that injury does not fall within the zone of interests of the FPA provisions they reference. The FPA regulates the terms of *wholesale sales*—that is, sales for resale—but leaves regulation of *retail* rates (*i.e.*, those paid by end-use customers like Plaintiffs) to the states. 16 U.S.C. § 824(b). The "terms of sale at retail" is a "job for the States alone." *EPSA*, 577 U.S. at 280. Thus, another district court held that retail customers could not bring a preemption claim when their injury stemmed from the retail rates they

were charged; "[t]he consumer plaintiffs' claim is expressly excluded from [the FPA's] interests because the states have the power to regulate retail sales of electricity and impose retail charges that are subject to state regulation." *Village of Old Mill Creek v. Star*, 2017 WL 3008289, at *6 (N.D. Ill. July 14, 2017), *aff'd sub nom. EPSA v. Star*, 904 F.3d 518 (7th Cir. 2018). The Ninth Circuit has likewise held that where plaintiffs sought to "reduce [their utility's] costs, which are passed on to them," their claim fell outside the FPA's zone of interests. *Nw. Requirements Utils. v. FERC*, 798 F.3d 796, 809 (9th Cir. 2015). So too here. Plaintiffs allege an injury stemming from "higher residential *retail* rates." Compl. ¶ 21 (emphasis added). That falls outside the zone of interests protected by the FPA. Accordingly, Plaintiffs' suit should be dismissed.

## III.    PLAINTIFFS LACK A CAUSE OF ACTION UNDER *EX PARTE YOUNG*.

In addition, the complaint must be dismissed because Plaintiffs lack a cause of action under *Ex parte Young*, which is the vehicle Plaintiffs seek to use to invoke the Court's power to adjudicate their preemption claim. *Id.* ¶ 18. *Ex parte Young* establishes a cause of action only for the subjects of potential state enforcement proceedings. Here, those parties are APCo and WPCo, who are governed by the alleged "69% Directive." Plaintiffs, by contrast, claim indirect injury due to the alleged Directive's impact on retail rates. Because the Plaintiffs could not themselves be subject to any potential state enforcement proceeding for violating the alleged "69% Directive," they cannot bring a claim challenging it based on *Ex parte Young*.

The Fourth Circuit has explained that *Ex parte Young* "allows private citizens, *in proper cases*, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute." *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002) (emphasis added). The "Supreme Court has strictly limited the application of the *Ex parte Young* doctrine to circumstances in which injunctive relief is necessary

to 'give[] life to the Supremacy Clause.'" *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 292 (4th Cir. 2001) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)). Under a proper reading of *Ex parte Young*, a cause of action is available only for plaintiffs who "pre-emptive[ly] assert[] in equity … a defense that would otherwise have been available in the State's enforcement proceedings at law." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 983 (7th Cir. 2012) (internal quotation marks omitted). That is, the plaintiffs must be subject to potential state enforcement of the challenged policies. *See id.*; *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016) (noting that a proper plaintiff under *Ex parte Young* "generally invokes equity preemptively to assert a defense that would be available to it in a state or local enforcement action").

Indeed, this fact pattern describes the facts of *Ex parte Young* itself, in which shareholders of a railroad sued the Attorney General of Minnesota, alleging that the rates the state set for the railroad were unconstitutional. 209 U.S. at 144-45. The Attorney General had argued that "there is a plain and adequate remedy at law open to the complainants"—namely that they could violate the state order and invoke its unconstitutionality as a defense in an enforcement action. But the Supreme Court disagreed, as this approach "would place the company in peril of large loss and its agents in great risk of fines and imprisonment if … the act were valid." *Id.* at 165. Thus, the Court held that the shareholders could bring a suit in equity to enjoin the Attorney General from enforcing the state law against the railroad. *Id.*; *see generally* John Harrison, Ex parte Young, 60 Stan. L. Rev. 989, 997-1001 (2008). Consistent with this understanding, the Fourth Circuit has described "injunctive claims … prohibit[ing] Defendants from engaging in enforcement activities against [the plaintiff]" as "quintessential examples" of the *Ex parte Young* cause of action. *Indus. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 165 (4th Cir. 2023) (internal quotation marks omitted); *see*

*also Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998) (explaining that, under *Ex parte Young*, "federal courts may exercise jurisdiction over claims against state officials by persons at risk of or suffering from violations by those officials of federally protected rights").

Plaintiffs claim to rely on the *Ex parte Young* cause of action, Compl. ¶ 18, but they are not at any risk of state enforcement of the "69% Directive." Rather, they are bystanders who can at best claim an indirect, downstream injury from that purported policy. Plaintiffs cannot invoke *Ex parte Young* to exercise a roving authority to police the boundaries of state and federal jurisdiction based on an indirect injury.[7] *See, e.g.*, *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 895-96 (10th Cir. 2017) (rejecting the view that a "private plaintiff may enforce any provision of any federal statute 'in equity' whenever" (a) a state officer "violates that statute" and (b) "that private citizen suffers any alleged injury as a result"); *Friends of the E. Hampton Airport*, 841 F.3d at 146 (bystander plaintiffs who seek "to enforce federal law themselves" lack a cause of action). Because Plaintiffs lack a cause of action under *Ex parte Young*, the suit must be dismissed.

## IV.  PLAINTIFFS FAIL TO STATE A PREEMPTION CLAIM AS A MATTER OF LAW.

The complaint should also be dismissed because it fails to state a preemption claim. Under field preemption, a state action is preempted if "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989). Under conflict preemption, a state action is preempted if "it is impossible for a private party to comply with both state and federal law" or "where 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and

---

[7] Only Congress can create a statutory right of action to permit such plaintiffs to seek relief. But Plaintiffs do not contend that the Federal Power Act provides them with a cause of action.

objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (internal quotation marks omitted). Here, the complaint fails to state a claim under either theory.

### A.    The Alleged "69% Directive" Does Not Intrude into a Federal Field.

The "law of supply-and-demand is not the law of preemption," and "[w]hen a state regulates within its sphere of authority, the regulation's incidental effect on interstate commerce does not render the regulation invalid." *PPL Energyplus, LLC*, 766 F.3d at 255. Thus, states are permitted to take "action[s] in their role as regulators of generation facilities," even though "those choices … affect[] the [wholesale] market clearing price" or may induce generators to participate in the wholesale market. *Conn. Dep't of Pub. Util. Control*, 569 F.3d at 481; *see also EPSA v. Star*, 904 F.3d 518, 522-23 (7th Cir. 2018) (recognizing that the Supreme Court has "acknowledg[ed] that each use of authorized power [by the Commission and the states] necessarily affects tasks that have been assigned elsewhere"). Indeed, the complaint accepts that, while FERC has jurisdiction over wholesale sales, "States … have exclusive jurisdiction over '"any other sale"—most notably, any retail sale—of electricity.'" Compl. ¶ 33 (quoting *EPSA*, 577 U.S. at 265 and 16 U.S.C. § 824(b)); *see also id.* ¶¶ 57, 61, 127 (similar). And the complaint further acknowledges that "states' reserved authority includes control over in-state 'facilities used for the generation of electric energy.'" *Id.* ¶ 34 (quoting 16 U.S.C. § 824(b)(1)). Here, the Commission is regulating generation facilities and retail rates, which it may do under the FPA.

The scenarios in which courts have found preemption are markedly different, involving situations where a state has sought directly to adjust or alter FERC-regulated wholesale rates. For example, in *Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150 (2016) (cited by Compl. ¶¶ 6, 134), Maryland offered subsidy payments to new gas-fired generators but "condition[ed] receipt of those subsidies on the new generator selling capacity into a FERC-regulated wholesale auction."

*Id.* at 153.  The generator "receives no [subsidy]" at all "if its capacity fail[ed] to clear the auction." *Id.* at 159.  On those particular facts, the Court held that Maryland's program was preempted because, by conditioning payment on completion of a wholesale sale, it "sets an interstate wholesale rate" that is different than the rate FERC approved.  *Id.* at 163.  As the Court explained, Maryland's program "requires [the generator] to participate in the PJM capacity auction, but guarantees [the generator] a rate distinct from the clearing price for its interstate sales of capacity to PJM" established by the auction.  *Id.*  "*By adjusting an interstate wholesale rate*, Maryland's program invades FERC's regulatory turf."  *Id.* (emphasis added).

The "69% Directive," as alleged, does not operate in that fashion.  The "69% Directive," as alleged, simply requires APCo and WPCo to operate their plants at a certain frequency.  It does not, in contrast to the Maryland program in *Hughes*, require APCo and WPCo to sell their output in the FERC-regulated wholesale market.  Any such requirement is imposed by PJM's FERC-approved tariff, not by West Virginia.  Compl. ¶ 50.  Nor does the "69% Directive," as alleged, adjust any wholesale rate.  APCo and WPCo will sell their output into the marketplace and will receive whatever price FERC's energy market will pay them—and they will not receive any additional revenue or subsidy for that sale from the state.

*Hughes* thus shows why a "69% Directive," as alleged, would not be preempted.  Indeed, the *Hughes* Court made clear that its holding was "limited," and that "[s]o long as a State does not condition payment of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable."  578 U.S. at 166; *see also EPSA*, 577 U.S. at 284 (a regulation does not "set a [wholesale] electricity rate" unless it "establish[es] the amount … a consumer will hand over *in exchange for* [*wholesale*] *power*").  Thus, even accepting the complaint's allegations, all the Commission has done here is regulate

generating facilities and set retail rates within West Virginia's jurisdiction.

**B.    Any Indirect Effect on Wholesale Prices Does Not Give Rise to Preemption.**

To the extent Plaintiffs allege that the "69% Directive" is preempted because it conflicts or interferes with FERC's ability to ensure just and reasonable wholesale prices, that allegation likewise fails to state a preemption claim.  When Congress gave states control over generation facilities, it knew that such state regulation would inevitably affect wholesale rates—and it chose to accommodate that interplay.  It would be an "extravagant interpretation of the scope of federal power" to find such state action preempted merely because of its indirect effects on the wholesale market.  *Nw. Cent.*, 489 U.S. at 512; *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 479 (4th Cir. 2014) (noting it is "[o]bvious[]" that "not every state regulation that incidentally affects federal markets is preempted"), *aff'd sub nom. Hughes*, 578 U.S. 150.  Thus, the relevant line is "between state laws whose effect depends on a utility's participation in an interstate auction (forbidden) and state laws that do not so depend but that may affect auctions (allowed)."  *Star*, 904 F.3d at 523.

Given these precedents, any incidental effect of the alleged "69% Directive" on wholesale prices does not give rise to a conflict preemption claim.  The "69% Directive" does not compel the Companies to make wholesale sales.  True, the "69% Directive" as alleged may yield a "larger supply of electricity" and thus a  "lower market-clearing price, holding demand constant," but "because states retain authority over power generation, a state policy that affects price only by increasing the quantity of power available for sale is not preempted by federal law."  *Id.* at 524.  Thus, in *Zibelman* and *Star*, the Second and Seventh Circuits upheld state programs that subsidized the production of nuclear energy, notwithstanding Plaintiffs' allegations that the inevitable and intended consequence was that the additional energy generated would be sold on the wholesale market.  State policies of this kind are not preempted if they do not adjust any wholesale rate.  *Id.*

at 523; *Coalition for Competitive Elec. v. Zibelman*, 906 F.3d 41, 51-52 (2d Cir. 2018) (state policy not preempted because it does not "compel generators to make wholesale sales" and does not "tether" funds on "participation in the wholesale markets").[8] Nor is a state preempted just because it accounts for a rate-regulated generator's wholesale sales when setting retail rates. *See Rochester Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 754 F.2d 99, 104 (1985) (state policy not preempted because "in regulating jurisdictional activity, nonjurisdictional activity may have to be accounted for"). Plaintiffs have therefore failed to state a preemption claim as a matter of law.

## V.    FERC HAS PRIMARY JURISDICTION OVER ANY CLAIM THAT WEST VIRGINIA HAS THWARTED JUST AND REASONABLE RATES.

Finally, the complaint's allegations that the alleged "69% Directive" results in unjust and unreasonable wholesale rates or thwarts FERC's ability to ensure just and reasonable wholesale rates must be brought to FERC in the first instance, under the doctrine of primary jurisdiction. Compl. ¶¶ 31, 113, 128-131; *see generally Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Comm'n*, 341 U.S. 246, 250-51 & n.6 (1951) (what constitutes a "just and reasonable" rate is a range left to the federal agency, not the courts). "Primary jurisdiction applies to claims 'properly cognizable in court that contain some issue within the special competence of an administrative agency,'" and enables the court to make a "'referral to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling.'" *In re Bulldog Trucking, Inc.*, 66 F.3d 1390, 1399 (4th Cir. 1995). The doctrine is generally "designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion." *Env't Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996);

---

[8] *Cf. Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 99-100 (2d Cir. 2017) (rejecting preemption theory where the complaint did not plausibly allege a compelled wholesale transaction but leaving open whether a compelled wholesale transaction would be preempted).

*Stevens v. Boston Sci. Corp.*, 152 F. Supp. 3d 527, 531 (S.D. W. Va. 2016).

Here, the doctrine of primary jurisdiction applies. *See Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993). Plaintiffs claim that the "69% Directive" interferes with FERC's ability to set just and reasonable wholesale rates. The appropriate forum for that complaint is FERC. Congress established a comprehensive administrative scheme for complainants to enforce the Federal Power Act. FERC has many tools to ensure just and reasonable rates. Indeed, FERC could directly address preemption if it wished to do so. *See, e.g.*, *Cal. Pub. Utils. Comm'n*, 132 FERC ¶ 61,047, at PP 1-2 (2010) (finding that "CPUC's decision is not preempted by the FPA"). FERC could also revise its market rules to address any impact of the alleged 69% Directive on wholesale rates. Just as in *Stevens*, "[i]mposing the severe equitable relief that the plaintiff seeks would prevent the [agency] from taking the first action in an area in which that agency clearly has expertise and an interest in the uniform application of its regulatory framework." *Stevens*, 152 F. Supp. 3d at 537. Given FERC's clear competence to resolve Plaintiffs' grievance, the Court should dismiss or stay the case pending FERC's consideration of Plaintiffs' allegations.

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed.

Dated:  November 4, 2024                    Respectfully submitted,

/s/ Devon J. Stewart                        /s/ Matthew E. Price

Kurt L. Krieger (W. Va. Bar No. 4927)       Matthew E. Price (PHV No. 56226)
Devon J. Stewart (W. Va. Bar No. 11712)     JENNER & BLOCK LLP
S. Caleb Davis (W. Va. Bar No. 13833)       1099 New York Ave. N.W. Suite 900
STEPTOE & JOHNSON PLLC                       Washington, DC  20001-4412
707 Virginia Street East, 17th Floor         (202) 639-6000 (Telephone)
Charleston, WV 25301                        mprice@jenner.com
(304) 353-8000 (Telephone)
kurt.krieger@steptoe-johnson.com

*Counsel for Appalachian Power Company and Wheeling Power Company*

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2024, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Matthew E. Price*