UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

BRUCE PERRONE, ROSANNA LONG,
and SIERRA CLUB,

       Plaintiffs,

v.                                                              CIVIL ACTION No. 2:24-cv-00434

CHAIRMAN CHARLOTTE R. LANE,
COMMISSIONER RENEE A. LARRICK,
and COMMISSIONER WILLIAM B. RANEY,
*in their official capacities*,

       Defendants.

## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO APCO and WPCO'S MOTION TO DISMISS

APCo and WPCo are between a rock and a hard place. They would prefer there were no 69% Directive forcing them to uneconomically dispatch their power into the wholesale market. But if the Directive exists, they want to recover the costs of complying with it. Indeed, West Virginia ratepayers will bear the costs of the unlawful policy precisely because the 69% Directive ensures recovery of the excessive costs of uneconomic commitment. And consumers are on the hook for such compelled inefficiency at a time when their rates have already skyrocketed to record-high levels. Because Plaintiffs have pled more than enough facts to show that the Commissioners' 69% Directive intrudes into FERC's exclusive jurisdiction and is therefore preempted, the Court should deny APCo and WPCo's Motion to Dismiss.

## REGULATORY BACKGROUND

This case involves two regulatory bodies—the Federal Energy Regulatory Commission ("FERC") and West Virginia's Public Service Commission (the "Commission" or "PSC")—and the scope of their respective authorities. Pursuant to the Federal Power Act ("FPA"), FERC

exclusively regulates interstate transmission of electricity and the wholesale of electricity in interstate commerce, while States retain jurisdiction over retail electricity rates, generation, and the transmission and distribution of electricity in intrastate commerce. *See* 16 U.S.C. § 824(b)(1).

The PJM Interconnection ("PJM") is a wholesale electricity market that falls under FERC's exclusive jurisdiction. ECF No. 1 ¶ 30. As relevant here, PJM operates an Energy Market, which requires PJM to forecast the next day's anticipated electricity demands and secure enough bids to fulfill that demand (known as the "Day-Ahead Market"). *Id.* ¶¶ 32, 40. Through an auction process, the cheapest resource will "clear" the market first, followed by the next cheapest option, and so forth until demand is met. *Id.* ¶ 42. When supply matches demand, the market is "cleared," and the price of the last resource to offer in is the "market-clearing price"—the wholesale price of power for all the generators whose bids were accepted in the auction. *Id.* ¶¶ 42–44. If an operator does not receive a market-clearing price greater than or equal to its costs to produce and sell electricity, its dispatch will be uneconomic and it will lose money on the sale. But because the market-clearing price is based on the last offer that clears the market, uneconomic dispatch will occur only if a unit clears the market with an artificially low bid. *Id.* ¶ 48.

Appalachian Power Company ("APCo") and Wheeling Power Company ("WPCo") (collectively, the "Companies") are public utilities that supply electricity to West Virginia consumers. *Id.* ¶ 59. To do so, they rely upon their portfolio of owned generation (which they must sell into the PJM Energy Market) and power purchase agreements from the PJM Energy Market. *Id.* ¶¶ 38, 50–52. Because APCo and WPCo operate in West Virginia, they are regulated by the Commission. *Id.* ¶ 61. Among other things, the Commission sets the retail rate that they can charge retail customers for electricity. *Id.* One component of retail rates is the cost of fuel (and related expenses) and purchased power used to serve customers, which is collectively known as the

Expanded Net Energy Cost ("ENEC"). *Id.* ¶ 63. The ENEC is typically set in an annual proceeding, in which the Commissioners determine whether APCo and WPCo's costs for the fuel, purchased power, and other costs were prudently incurred in the given year. *Id.* ¶ 67. The Commissioners must find that costs were prudently incurred in order for the Companies to pass their costs on to consumers in retail rates. *Id.* ¶¶ 86–87.

Plaintiffs' challenge arises out of the Commissioners' actions in ENEC proceedings over the past four years, compelling APCo and WPCo to operate their coal-fired power plants at a 69% threshold (hereinafter, the "69% Directive"), rather than making operational decisions based on the market-clearing price in PJM. Plaintiffs seek declaratory relief from this Directive under *Ex parte Young* and federal preemption principles, arguing that the Commissioners intruded on FERC's exclusive jurisdiction of wholesale markets. Plaintiffs believe they—and all other ACPo and WPCo ratepayers in West Virginia—have been and will continue to subsidize the Companies' compliance with the 69% Directive until it is enjoined.

## ARGUMENT

### I.    Plaintiffs' Well-Pled Facts Satisfy Article III Standing.

APCo and WPCo's attack on Plaintiffs' standing is a factual challenge inappropriate for a Rule 12(b)(6) motion to dismiss. It is well established that, "[w]hen ruling on a motion to dismiss, courts must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017); *see also Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 505 (4th Cir. 1998) (explaining that federal "pleading standards require the complaint be read liberally in favor of the plaintiff"). As addressed in more detail below, Plaintiffs have plausibly pled a 69% Directive that is responsible for Plaintiffs' rising electricity rates and contrary

3

to Sierra Club's mission of replacing fossil fuels with cheaper, cleaner energy sources. Further, the zone of interest test is inapplicable to Supremacy Clause challenges. Thus, the Companies' Rule 12(b)(1) motion to dismiss for lack of jurisdiction should be denied.

### A. Plaintiffs Have Pled the Existence of a 69% Directive.

APCo and WPCo argue that there is no 69% Directive. ECF No. 37 at 1–2 ("The Commission has not, as a matter of law, required APCo and WPCo to run their plants at a 69% capacity factor. . . . Because Plaintiffs have claimed injury arising from a requirement that does not exist, the Court should dismiss the suit for lack of subject-matter jurisdiction."). This is unsurprising—it is in their best interests if there were no Directive. ECF No. 1 ¶ 95. However, Plaintiffs have pled facts showing that the Commissioners issued the 69% Directive in 2021, doubled down on that Directive multiple times since 2021, and ultimately denied APCo and WPCo cost recovery in 2024 for failing to follow the Directive.

In fact, APCo and WPCo's position is belied by a review of the Orders themselves, some of which the Companies have attached to their Motion,[1] and is contradicted by the recent findings of the West Virginia Supreme Court in *Appalachian Power Company v. Public Service Commission of West Virginia*, No. 24-75 (W. Va. Nov. 13, 2024). As alleged in the Complaint, beginning in 2021 with APCo and WPCo's 2021 ENEC proceeding, the Commissioners

---

[1] Taking judicial notice of these Orders does not convert this motion into one for summary judgment. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) ("[C]ourts are permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment."). Further, while the Court may take judicial notice of these Orders, it cannot take judicial notice of the truth of the factual matters within those documents and must make all inferences in favor of Plaintiffs. *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 558 (4th Cir. 2013) (finding that "the district court improperly considered contents of a public record as an established fact and as evidence contradicting the complaint"). Thus, even if the Orders have information contradictory to Plaintiffs' allegations—which Plaintiffs deny—this only introduces a factual ambiguity that cannot be resolved against the Plaintiffs at this stage in the litigation. *See St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002) ("While there may be a dispute as to whether the alleged facts are the actual facts, in reviewing the grant of a motion to dismiss, we are required to accept the allegations in the complaint as true.").

questioned whether APCo and WPCo were firing their coal-fired power plants enough. Specifically, the Commissioners were dissatisfied with APCo and WPCo's "capacity factor projections"—the percentage of energy produced by a generating unit for one year compared to the energy that theoretically could have been produced at continuous full power operation during the same period—and found that they were "too low." ECF No. 1 ¶ 84(a). The Commissioners determined that petitioners should be using a capacity factor of 69% "at a minimum," adjusted projected costs to reflect less purchased power and more self-generation, and approved ENEC rates based upon a capacity factor of 69%. ECF No. 1 ¶ 84(a); *see also* ECF No. 36-1 at 42; *App. Power Co.*, slip op. at 7.

Since 2021, the Commissioners have used the 69% Directive to evaluate the utilities' cost recovery requests. In 2022, the Commission decided to reopen the 2021 ENEC docket, in part because "capacity factors have not approached [the 69%] level in September, October, and November 2021," and set the matter for a hearing to determine why the companies were "severely curtailing their own generation." *App. Power Co.*, slip op. at 7; *see also* ECF No. 36-1 at 69; ECF No. 1 ¶ 84(b). In a May 13, 2022 order, the Commissioners directed their Staff to conduct a prudence review for expenses incurred from 2020 to 2022 because of "the large under-recovery balance and the Commission's direction . . . to run their coal-fired generation plants at 69 percent capacity, which has not yet been achieved." ECF No. 1 ¶ 84(d); *see also App. Power Co.*, slip op. at 9–10. However, that prudence review—the "CTC Report"—used a 69% capacity factor as the standard to judge whether the Companies' operations were prudent and specifically recommended that the Commission deny cost recovery in proportion to the companies' failure to operate at a 69% capacity threshold. ECF No. 1 ¶ 88.

In February 2023, the Commissioners reiterated their Directive, explaining that the utilities' power plants "should be capable of operating at a minimum 69% capacity factor," and established a rebuttable presumption based on that threshold. *Id.* at 11–12; *see also* ECF No. 36-1 at 42; ECF No. 1 ¶ 86. Specifically, the Commissioners stated that the "first step" in evaluating the Companies' costs would be a determination of whether they operated their plants at a 69% capacity factor. ECF No. 36-1 at 45. They explained that "it would be easier for the Companies to meet their burden of proof regarding reasonableness of costs and prudence of their management of ENEC costs if they achieve the 69-percent annual capacity factor." *Id.* But if that threshold is *not* met, the Companies' submissions would be evaluated on a detailed four-factor test to determine reasonableness and prudence. *Id.* In other words, the Commissioners mandated that if APCo and WPCo met the 69% capacity threshold, their costs would be presumed to be reasonable. On the other hand, if the threshold was not met, the Companies' operations would be subject to the careful scrutiny of a fine-grained review.

Despite a footnote positing that the 69% Directive was not binding, the Commissioners nevertheless continued to rely on that threshold in their January 2024 Order. *See* ECF No. 36-1 at 9–10 & n.10. That Order did nothing to replace the previously established presumption; instead, it based its finding on an assumption that "there was no question that self-generation would have been economic for most of the period March, 2021 through February 28, 2023 if the Companies had adequate coal supplied." *Id.* at 10 n.10. Indeed, in that same Order, the Commissioners noted the CTC Report's finding that "the Companies did not appear to take seriously the Commission decision in the 2021 and 2022 ENEC [dockets]" and did not tell the employee responsible for coal procurement "of the 69 percent capacity factor target set forth in the September 2, 2021 Commission Order." *Id.* at 9–10; *App. Power Co.*, slip op. at 14–15. The cost-recovery denied in

the January 2024 Order ($231 million) was similar to the amount of disallowance recommended in the CTC Report ($202 million), and the CTC Report was based directly the Companies' failure to operate at a 69% capacity factor. ECF No. 1 ¶ 88–89. The justification in the Commissioner's Order was that the Companies had not procured enough coal to operate at that capacity threshold or higher. *Id.* ¶¶ 88–89, 96; *see also App. Power Co.*, slip op. at 15 ("[T]he Commission determined that the evidence showed that [the utilities] failed to procure enough coal to generate at a 69% annual capacity factor.").

APCo and WPCo's position in their Motion is also inconsistent with their own conduct and interactions with the Commissioners throughout the 2021, 2022, and 2023 ENEC dockets:

- At a March 23, 2022 hearing, Chairman Lane asked APCo's director of coal transportation and procurement, Jeffrey Dial, whether it was true that "you didn't take our 69-percent capacity seriously. That you thought we didn't really mean it, that maybe it was sort of a target that you should look at." *Id.* ¶ 84(c).

- At the same hearing, APCo's vice president for regulatory services and finance, John J. Scalzo, asked the Commissioners whether the Companies were "supposed to hit 69 percent, regardless of economic dispatch?" *Id.* ¶ 102(b).

- Mr. Scalzo then provided written testimony on April 19, 2022, that the "Commission's directive that the Companies should be targeting a 69% capacity factor at their coal-fired plants would appear at odds with the flexible, least-cost approach of economic dispatch." *Id.* ¶ 102(c).

- At a subsequent hearing on October 4, 2022, Chairman Lane asked APCo's director of regulatory services for West Virginia, Randall Short, "[w]hat is it going to take to get your attention that we really mean 69 percent?," *id.* ¶ 84(e), before asking Mr. Dial to identify "who is in charge of seeing that the plants are running at 69 percent," *id.* ¶ 84(f).

- Later in the October 2022 hearing, the Companies' consultant Ruben Moreno testified that "mandating a 69 percent capacity factor has unintended consequences that eventually will impact the cost. We just need to be upfront in terms of saying, how are we going to handle those?" *Id.* ¶ 102(e).

- Finally, during a September 5, 2023 hearing, a third-party consultant for APCo and WPCo, Jeff Plewes, testified that "[l]ooking at whether or not they were aiming for a 69 capacity factor target is not what I think should be the focus of a prudency review.

. . . [I]f you aim and put all your efforts into meeting a 69 percent targeted capacity factor and you successfully achieve your 69 percent target capacity factor in 2023, you have cost your customers a lot of money." *Id.* ¶ 102(h).

All of these allegations show that APCo and WPCo were on notice of both the 69% Directive and, importantly, the prospect that the Commissioner's would deny their cost recovery if it was not met. And while the Companies sought every opportunity to "seek clarification" or get the Commissioners to renege on the Directive, the Commissioners never did. *See generally* ECF No. 1. Further, Plaintiffs' allegations regarding APCo and WPCo's uneconomic dispatch to comply with the Directive remain unchallenged. After APCo and WPCo failed to convince the Commissioners to back down from the Directive, the Companies began dispatching uneconomically. *Id.* ¶¶ 103, 117–25. In doing so, they broke from the practice described in their testimony before the Commissioners of normally following the principles of economic dispatch. *See, e.g.*, *id.* ¶ 102.

Thus, viewing the allegations in the light most favorable to Plaintiffs, the Complaint sufficiently alleges the existence of a 69% Directive. Notably, with the exception addressed below of Sierra Club's associational standing, the Companies have not challenged Plaintiffs' Article III standing if the Directive exists. Rather, they have only argued those injuries do not exist because the 69% Directive does not exist. ECF No. 37 at 6–11. Thus, because Plaintiffs have plausibly pled the existence of the 69% Directive, Plaintiffs have plausibly pled a concrete and particularized injury, in the form of higher retail rates, that will be redressed if the Directive is enjoined, as more fully explained in Plaintiffs' Response to the Commissioners' Motion to Dismiss. *See* ECF No. 29 at 7–10.

**B. Sierra Club Has Associational Standing.**

The Companies also argue that Sierra Club lacks associational standing. ECF No. 37 at 11–12. "An association has standing to bring suit on behalf of its members when its members would

otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The Companies' main argument is that the Complaint fails to adequately allege how retail rates are germane to Sierra Club's mission. ECF No. 37 at 11. To assess germaneness, the question is "'whether an association's lawsuit would, if successful, reasonably tend to further the general interests that individual members sought to vindicate in joining the association and whether the lawsuit bears a reasonable connection to the association's knowledge and experience.'" *W. Va. Coalition Against Domestic Violence, Inc. v. Morrisey*, No. 19-cv-00434, 2020 WL 6948093, at *7 (S.D. W. Va. Nov. 25, 2020) (quoting *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006)).

While Plaintiffs' main injury is higher retail rates, Plaintiffs have also alleged that they are injured by the uneconomic dispatch *of coal* that results from the 69% Directive. ECF No. 1 ¶¶ 21–25. The Complaint specifically alleges that Sierra Club "will have to subsidize . . . a greater reliance on coal generation," *id.* ¶ 24, that Sierra Club has a "mission to replace fossil fuel generation with cleaner energy sources" and to "minimize the emission of environmental pollutants," *id.* ¶ 26, and that its injuries will be redressed, in part, because an injunction of the Directive will "decreas[e] the amount of coal burned for baseload power generation," *id.* ¶ 28. Under the "undemanding" test for germaneness, success in this challenge to the Commission's Directive that utilities sell a certain amount of electricity generated through coal-combustion in the PJM market "would further the interests" of the Plaintiffs in replacing fossil fuel generation with cleaner energy sources, which are also typically cheaper than fossil fuels and help reduce member's electricity rates. *See Morrisey*, 2020 WL 6948093, at *7. That in turn would satisfy the interest "that individual

members sought to vindicate in joining" the Sierra Club by ensuring West Virginia ratepayers do not subsidize the otherwise uneconomic operation of coal-fired power plants. *See id.* Thus, Sierra Club has associational standing and should not be dismissed from the case.

### C. Plaintiffs Do Not Have to Show Prudential Standing in Supremacy Clause Challenges.

Finally, APCo and WPCo argue that Plaintiffs' interests in retail rates falls outside the FPA's "zone of interest." ECF No. 37 at 12–13. While litigants must always satisfy the standing requirements of Article III of the Constitution—injury in fact, causation, and redressability—the additional requirement of "prudential standing" applies only in certain cases. Prudential standing requirements are "judicially self-imposed limits on the exercise of federal jurisdiction." *Allen v. Wright,* 468 U.S. 737, 751 (1984). Whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question" is one such prudential standing requirement that courts employ in certain instances. *Bennett v. Spear*, 520 U.S. 154, 163 (1997). While the Companies frame this issue as whether Plaintiffs have a cause of action, it is synonymous with a prudential zone of interest standing inquiry. *See* ECF No. 37 at 2 ("Plaintiffs lack a cause of action (or, alternatively, prudential standing) because their alleged injury—paying higher retail rates—lies outside the FPA's zone of interests.").

In this case, the prudential zone of interest test is inapplicable. Plaintiffs' only claim is a Supremacy Clause preemption challenge brought under *Ex parte Young*. ECF No. 1 ¶ 8. Under binding Fourth Circuit precedent, Plaintiffs do "not have to meet the additional standing requirement involving the zone of interests test with respect to . . . Supremacy Clause claim[s]." *Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 481 (4th Cir. 2003) (applying zone of interest test to APA claim but rejecting zone of interest test for Supremacy Clause preemption

challenge under two federal statutes). Other Circuits have held the same. *See Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001); *St. Thomas–St. John Hotel & Tourism Ass'n v. Gov't of the U.S. V.I.*, 218 F.3d 232, 241 (3d Cir. 2000).

This is so because the zone of interest test applies to "statutorily created causes of action," where "Congress is presumed to legislate against the background of the zone-of-interests limitation, which applies unless it is expressly negated." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (internal citations and quotation marks omitted). However, as explained below and in more detail in Plaintiffs' response to the Commissioners' Motion to Dismiss (ECF No. 29 at 11–15), the FPA does not need to create a cause of action for Plaintiffs' claim to proceed; rather, Plaintiffs' claim arises out of *Ex parte Young* directly. The cases the Companies cite are inapposite because they were analyzed as statutory FPA claims. *See Nw. Requirements Utils. v. FERC*, 798 F.3d 796, 807 (9th Cir. 2015) ("APA 'aggrievement' requires that 'the interest sought to be protected by the complainant be arguably within the zone of interests to be protected or regulated by the statute in question,'—in this case, § 211A of the FPA. A similar standard applies to substantive challenges brought directly under the FPA." (cleaned up)); *Vill. of Old Mill Creek v. Star*, No. 17-CV-1163, 2017 WL 3008289 (N.D. Ill. July 14, 2017) (analyzing whether the FPA *created* a cause of action).

Thus, Plaintiffs have more than met their burden of establishing Article III standing.

## II.    Plaintiffs Have a Cause of Action under *Ex parte Young*.

In arguing that Plaintiffs do not meet the *Ex parte Young* conditions*,* APCo and WPCo implicitly admit that the doctrine provides a cause of action in cases seeking to vindicate the supremacy of federal law. ECF No. 37 at 13–14; *see Ass'n of Am. R.Rs. v. Hudson*, No. 1:23cv815, 2024 WL 1626105, at *31 (E.D. Va. Apr. 12, 2024) ("[P]arties seeking 'declaratory and injunctive

relief against [a defendant] in his official capacity . . . do not need a statutory cause of action,' because the *Young* exception 'permits courts of equity to enjoin enforcement of state statutes that violate the Constitution or conflict with other federal laws.' . . . Federal courts' ability to provide this relief lies 'beyond dispute.'" (citing *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983))).

Because APCo and WPCo do not dispute that Plaintiffs can *have* a cause of action under *Ex parte Young* without an independent statutory cause of action, they instead try to limit the scope of such an action to exclude Plaintiffs' claim. But the limits they assert have no basis in Supreme Court precedent, as interpreted several times by the Fourth Circuit Court of Appeals. To meet the requirements of *Ex parte Young*, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Indus. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 163 (4th Cir. 2023) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)); *accord D.T.M. ex rel. McCartney v. Cansler,* 382 F. App'x 334, 337 (4th Cir. 2010); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 496 (4th Cir. 2005).

The Complaint easily satisfies this "straightforward inquiry" test. *See* ECF No. 1 ¶¶ 134, 139. First, Plaintiffs' complaint contains numerous allegations that the violation of federal law is ongoing. *See supra* Section I.A. Specifically, the Commissioners have reinforced and reiterated the 69% Directive by evaluating the reasonableness and prudence of the Companies' cost recovery submissions under the express assumption that each power station's operation at or above a 69% capacity factor is reasonable. *Id.* By compelling the Companies to bid and sell into the PJM market at uneconomic levels, the Commissioners' Directive is a violation of federal law. ECF No. 1 ¶ 134. Second, Plaintiffs seek only prospective relief. While the Complaint does cite past actions of the

Commissioners, the only substantive relief sought is (1) a declaration that the 69% Directive violates the Supremacy Clause of the United States Constitution," and (2) an injunction against "Defendants from executing or otherwise putting into effect the 69% Directive." *Id.* at 36. That sort of purely prospective relief is within the scope of *Ex parte Young.*

The Fourth Circuit cases cited by APCo and WPCo are not to the contrary. In *Antrican v. Odom*, the court allowed a Supremacy Clause challenge based upon the federal Medicaid Act to proceed, rejecting the argument that the claims did not fall within the scope of *Ex parte Young*. *See* 290 F.3d 178, 184–91 (4th Cir. 2002). It also predated the enunciation of the "straightforward inquiry" test announced by the Supreme Court in *Verizon* the same year. *See generally id.* The case of *Bragg v. West Virginia Coal Association*, which also predated *Verizon*, stands simply for the propositions that (1) *Ex parte Young* does not permit a federal court to order a state to "remedy past violations by paying funds out of the State treasury," and (2) that a federal court cannot order state officials to "conform their conduct to *state law*." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 293 (4th Cir. 2001) (emphasis added). Neither situation is applicable here, where no state funds are at issue (only reimbursement of costs to a utility) and Plaintiffs' claim arises under federal law.

In making their arguments on the inapplicability of *Ex parte Young* to Plaintiffs' claims, APCo and WPCo also mischaracterize Plaintiffs as bystanders unaffected by the Commissioner's violation of federal law established in the FPA. Plaintiffs, however, are ratepayers who are and will be subject to higher rates designed to subsidize the uneconomic operation of coal plants within the Companies' operating territory. ECF No. 1 ¶ 125. Protecting consumers from "excessive rates" was a "primary purpose" in the enactment of the FPA. *Cities of Anaheim v. FERC*, 723 F.2d 656, 663 (9th Cir. 1984) (citing *Power Comm'n v. Sierra Pac. Power Co.* 350 U.S. 368, 372 (1956); *Mun. Light Bds. v. Fed. Power Comm'n,* 450 F.2d 1341, 1348 (D.C. Cir. 1971); *Towns of*

13

*Alexandria Minnesota v. Fed. Power Comm'n*, 555 F.2d 1020, 1028 (D.C. Cir. 1977)); *see also Atl. Refining Co. v. Pub. Serv. Comm'n,* 360 U.S. 378, 388 (1959).

Indeed, Plaintiffs here are in much the same position as those in *CSX Transportation, Inc. v. Board of Public Works of the State of West Virginia*, who sued state officials to prevent the implementation of taxes they alleged were illegal under the federal Railroad Revitalization and Regulatory Reform Act. *See* 138 F.3d 537 (4th Cir. 1998). The Fourth Circuit in that case relied heavily on *CSX* to hold that *Ex parte Young* does not require any ongoing or imminent enforcement proceedings to invoke its protections. *See Indus. Servs. Grp.*, 68 F.4th at 165 ("On appeal, however, we rejected the district court's conclusion because it would foreclose any injunction 'pursuant to *Ex parte Young* if the action to be enjoined had already been decided upon by a state official.'" (quoting *CSX*, 138 F.3d at 542)).

Notably, this Court itself has rejected the theory asserted by APCo and WPCo that there must be some direct threat of enforcement action for a case to proceed under *Ex parte Young. See Air Evac EMS v. Cheatem*, 260 F. Supp. 3d 628, 639 (S.D. W. Va. 2017) (Johnston, J.).[2] In reaching its decision in *Cheatem*, this Court explained,

> [t]hough there had been no threatened or actual proceeding to enforce the state laws against the plaintiffs, the Fourth Circuit focused on the relief sought in the plaintiff's pleading. The plaintiffs sought injunctive relief against state officials, at least some of whom bore direct enforcement responsibility for the challenged statutes. This

---

[2] Even if Plaintiffs did have to show a threat of enforcement, they do not have to show that this enforcement will be *against the Plaintiffs*. *See Cheatem*, 260 F. Supp. 3d at 639–40 ("It was sufficient that the State constrained Air Evac's ability to collect more than the established reimbursement rate under the Texas workers' compensation scheme, even if indirectly."); *see generally* ECF No. 1 (alleging that Plaintiffs' rates are increasing due to the Commissioners' uneconomic 69% Directive). Showing a threat of enforcement is just another way to prove the relief being sought is actually prospective. *Cheatem*, 260 F. Supp. 3d at 639. Further, courts have said that "Plaintiffs need only show a 'scintilla of enforcement,'" *Book People, Inc. v. Wong*, 91 F.4th 318, 335 (5th Cir. 2024), which Plaintiffs easily show here because they have alleged that the Commissioners continue to apply the 69% Directive and denied cost recovery in January 2024 for the Companies' failure to follow it, *supra* Section I.A. Further, "Article III standing analysis and *Ex parte Young* analysis significantly overlap, such that a finding of standing tends toward a finding that a plaintiff may sue the official under the *Ex parte Young* exception." *Wong*, 91 F.4th at 335 (cleaned up). As explained above in Section I, Plaintiffs have Article III standing.

was sufficient for the Fourth Circuit to find, "The case before us is precisely the
type of case to which the *Ex parte Young* doctrine applies."

*Id.* at 639 (quoting *Holdings, Inc. v. Gilmore,* 252 F.3d 316, 330 (4th Cir. 2001)). Thus, because

Plaintiffs do not need to face a threat of enforcement, are ratepayers economically affected by the

69% Directive, and plainly meet the standards of the straightforward inquiry test, they have a valid

cause of action under *Ex parte Young*.

### III.    There Is No Justification for Dismissing this Action Pursuant to the Primary Jurisdiction Doctrine.

APCo and WPCo ignore important precedent on the primary jurisdiction doctrine. First, a

court has no jurisdiction to dismiss a case *with* prejudice under the doctrine; rather, it can only stay

a case or dismiss *without prejudice.*[3] *Reiter v. Cooper*, 507 U.S. 258, 268 (1993); *see also Smith*

*v. Clark/Smoot/Russell*, 796 F.3d 424, 431 (4th Cir. 2021). Second, courts in this Circuit examine

four specific factors under the doctrine: (1) whether the question at issue is within the conventional

experience of judges or whether it involves technical or policy considerations within the agency's

particular field of expertise; (2) whether the question at issue is particularly within the agency's

discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a

prior application has been made to the agency. *See, e.g.*, *In re Gerber Prods. Co. Heavy Metals*

*Baby Food Litig.*, No. 1:21-cv-269, 2022 WL 10197651, at *11 (E.D. Va. Oct. 17, 2022). Here,

none of the four factors are met.

As to the first factor, the primary questions involved in this action are those of statutory

preemption and constitutional questions. As the Supreme Court noted in *Loper Bright Enterprises*

*v. Raimondo*, legal questions of that nature are historically and squarely within the experience of

---

[3] To be fair, APCo and WPCo do not specify that they seek dismissal with prejudice; but neither
do they make clear that dismissal without prejudice or a stay are the only appropriate actions for the Court
under the primary jurisdiction doctrine.

the courts, not administrative agencies. 144 S. Ct. 2244 (2024). The precedents of *Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150 (2016) and *Electric Power Supply Association v. Star*, 904 F.3d 518, 523 (7th Cir. 2018), discussed below, also demonstrate that federal courts are well equipped to answer the questions presented in this case. *See also Nantahala Power & Light Co. v. Thornbug*, 476 U.S. 953 (1986); *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354 (1988). Second, the issue is not within the discretion of FERC. As an administrative agency, FERC does not have discretion to simply allow an unconstitutional directive by a state administrative agency or to allow states to infringe on its authority as specifically delegated to it by the FPA. Any such action would be overturned on appeal. Third, there is little risk of inconsistent rulings. No party has brought to the Court's attention any other challenge to the 69% Directive, nor are Plaintiffs aware of any. Finally, and relatedly, there is no petition or application to FERC upon which the agency might ground a different decision. For these reasons, the Court should decline the Commissioners' invitation to rely on the primary jurisdiction doctrine to refer this issue FERC. *See, e.g.*, *Entergy Nuclear Fitzpatrick, LLC v. Zibelman*, No. 5:15-CV-230, 2016 WL 958605, at *9 (N.D.N.Y. Mar. 7, 2016) (rejecting primary jurisdiction argument in FPA preemption case).

### IV.    The 69% Directive Is Field Preempted.

Finally, Plaintiffs have plausibly pled a field preemption claim under binding case law.[4] "A state law is preempted where 'Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law' . . . ." *Hughes*, 578 U.S. at 163 (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989)). FERC has exclusive jurisdiction over the wholesale market, while States have exclusive authority over the retail market. *Id.* at 154.

---

[4] Plaintiffs are not pursuing a conflict preemption argument and thus will only address the Companies' arguments as to field preemption.

APCo and WPCo incorrectly argue that there is no field preemption because the Commissioners are properly exercising their authority over in-state generation. ECF No. 37 at 16. But "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates," and "States interfere with FERC's authority by disregarding interstate wholesale rates FERC has deemed just and reasonable, *even when States exercise their traditional authority over . . . in-state generation*." *Hughes*, 578 U.S. at 165 (emphasis added). In fact, *Hughes* involved a state regulatory program that, on its face, only regulated in-state generation, yet the Supreme Court still enjoined the program under field preemption because of its interference with the wholesale market. *Id.* at 166. The state program in *Hughes* is directly analogous to the 69% Directive.

As the Companies explain in their brief, "Maryland offered subsidy payments to new gas-fired generators but 'condition[ed] receipt of those subsidies on the new generator selling capacity into a FERC-regulated wholesale auction,'" and the "generator 'receive[d] no [subsidy]' at all 'if its capacity fail[ed] to clear the auction.'" ECF No. 37 at 16 (quoting *Hughes*, 578 U.S. at 153, 159). In finding that Maryland's scheme was field-preempted, the Supreme Court characterized the program as "[d]oubting FERC's judgment" by requiring power generators "to participate in the PJM capacity auction, but guarantee[ing] a rate distinct from the clearing price for its interstate sales of capacity to PJM." *Hughes*, 578 U.S. at 163. "[B]ecause the payments are conditioned on [the generator's] capacity clearing the auction—and, accordingly, on [the generator] selling that capacity to PJM"—"the payments are certainly 'received . . . in connection with' interstate wholesale sales to PJM." *Id.* at 163 n.9 (quoting 16 U.S.C. § 824d(a)).

APCo and WPCo argue that the 69% Directive is different from this Maryland program because it does not "adjust any wholesale rate" but rather ensures the Companies "will receive

whatever price FERC's energy market will pay them—and they will not receive any additional revenue or subsidy for that sale from the state." ECF No. 37 at 17. That is simply not true. Plaintiffs have alleged the 69% Directive requires uneconomic dispatch into PJM, ECF No. 1 ¶ 97, and that the Commissioners have given APCo and WPCo a rebuttal presumption in favor of cost recovery if the 69% Directive is met, *id.* ¶ 86. Thus, the Companies will not receive just the PJM market price; they will also be reimbursed for what they expend *over* the clearing price, as in *Hughes. Id.* ¶¶ 117–25. APCo and WPCo acutely understood this throughout their 2021, 2022, and 2023 ENEC dockets and sought express assurance of recovery in their relevant ENEC testimony. *See, e.g.*, *id.* ¶ 102(a) (On March 14, 2022, Mr. Scalzo submitted pre-filed testimony stating that the "Companies need clarification from the Commission that they are being ordered to 'selfschedule' units to run when they otherwise would not be dispatched by PJM" and "need assurance from the Commission that any cost premiums incurred as a result of self-scheduling can be recovered fully from West Virginia ratepayers"); *id.* ¶ 102(e) (reciting testimony of APCo consultant that, "Given a case where we are driving to a 69 percent capacity factor and the market price is below the cost of generation, the unintended consequence is that the utility will be selling at a loss. And obviously in a model cost of service, that would be passed on to the consumer. So 69 percent as a concept itself does have a consequence, because of this idea that sometimes the prices are lower and that the utility or the generator may not be cost effective to generate.").

The Courts of Appeal decisions on zero emission credits ("ZECs"), which the Companies point to, are not factually analogous. For instance, *Coalition for Competitive Electricity v. Zibelman* involved ZECs that were set at a specific price and awarded to nuclear generators when they generated electricity. *See* 906 F.3d 41, 45–48 (2d Cir. 2018). Unlike in *Hughes*, where generators received "'the difference between . . . the clearing price,'" the ZEC price was "fixed"

and "capped based on an independent variable." *See id.* at 52*; see also id.* at 57 ("ZECs do not guarantee a certain wholesale price that displaces the NYISO auction price."). The plaintiffs challenged the ZEC program under the Supremacy Clause and *Hughes*, but the court determined the ZEC program was not preempted because, unlike in *Hughes*, the ZECs were not "insulat[ing] generators from fluctuations in wholesale prices" and generators were still "exposed to market risk." *Id.* at 51. The 69% Directive is more analogous to the Maryland program in *Hughes* than the ZEC program in *Zibelman* because the Directive removes any market risk and substitutes its own price (through the ENEC procedure) for the energy sold in that market by requiring ratepayers to pay APCo's and WPCo's costs, as determined by the Commission, without regard to the price received in the PJM energy market. *See* ECF No. 1 ¶ 86.

Further, the ZEC cases put an important, additional gloss on *Hughes*—that state actions "compelling wholesale market participation" are also preempted. *Zibelman*, 906 F.3d at 52; *see also* ECF No. 37 at 18–19 (citing *Star*, 904 F.3d at 523 ("[*Hughes*] draws a line between state laws whose effect depends on a utility's participation in an interstate auction (forbidden) and state laws that do not so depend but that may affect auctions (allowed)."); *Zibelman*, 906 F.3d at 52 (state policy not preempted because it does not "compel generators to make wholesale sales" and does not "tether" funds on "participation in the wholesale markets"); *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 99–100 (2d Cir. 2017) (rejecting preemption theory where the complaint did not plausibly allege a compelled wholesale transaction but leaving open whether a compelled wholesale transaction would be preempted)). Specifically, "the tether in *Hughes* is tied to 'wholesale market *participation*,' not prices; the Maryland program was unlawful because it conditioned payment on auction sales." *Zibelman*, 906 F.3d at 51 (internal citation omitted).

19

In the ZEC cases, the courts determined that the ZEC programs did not compel wholesale sales, but rather only incentivized them by providing a subsidy on top of the wholesale price. *Id.* at 52. The courts explained that, to receive a ZEC, "a firm must *generate* power, but how it sells that power is up to it. It can sell the power in an interstate auction but need not do so. It may choose instead to sell power through bilateral contracts with users (such as industrial plants) or local distribution companies that transmit the power to residences." *Star*, 904 F.3d at 523. However, that is not true for APCo or WPCo in following the 69% Directive—APCo and WPCo must bid and sell all of the electricity they produce at their coal-fired power plants into PJM. ECF No. 1 ¶¶ 50-51, 115. The fact that PJM's FERC approved tariff requires them to sell into PJM actually distinguishes this case from the ZEC cases. Further, under the Commissioners' rebuttable presumption, if the Companies do not reach a 69% capacity factor, the only other way to get cost recovery is to demonstrate, along with three other factors, that they "effectively bid[] to clear the PJM energy market." *Id.* ¶ 86. In other words, to get cost recovery, the Companies must reach a 69% capacity factor, which requires dispatching into PJM, or they must demonstrate that they effectively bid and cleared the PJM energy market. Because either option requires wholesale market participation, and the Companies have no other way to recover their costs, such a scheme undoubtedly compels wholesale sales. Thus, even if the 69% Directive does not adjust the wholesale rate the Companies receive, like in *Hughes*, it is still field preempted because it forces participation in a wholesale market, which also infringes on FERC's exclusive jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court should deny APCo and WPCo's Motion to Dismiss in its entirety.

Dated: December 9, 2024

Respectfully submitted,

/s Amanda Demmerle

Amanda Demmerle (WVSB No. 13930)
J. Michael Becher (WVSB No. 10588)
APPALACHIAN MOUNTAIN ADVOCATES
PO Box 11571
Charleston, WV 25339
(757) 650-2774
ademmerle@appalmad.org
(304) 382-4798
mbecher@appalmad.org

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

BRUCE PERRONE, ROSANNA LONG,
and SIERRA CLUB,

       Plaintiffs,

v.                                              CIVIL ACTION No. 2:24-cv-00434

CHAIRMAN CHARLOTTE R. LANE,
COMMISSIONER RENEE A. LARRICK,
and COMMISSIONER WILLIAM B. RANEY,
*in their official capacities*,

       Defendants.

### <u>CERTIFICATE OF SERVICE</u>

      I, Amanda Demmerle, certify that on December 9, 2024, **PLAINTIFFS' RESPONSE IN OPPOSITION TO APCO AND WPCO's MOTION TO DISMISS** was filed with the Clerk of Court using the CM/ECF System.


Dated:       December 9, 2024               Respectfully submitted,

                                            <u>/s Amanda Demmerle</u>

                                            Amanda Demmerle (WVSB No. 13930)