**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

BRUCE PERRONE,
ROSANNA LONG, and
SIERRA CLUB,

*Plaintiffs*,

Civil Action No. 2:24-cv-00434

v.

CHAIRMAN CHARLOTTE R. LANE, in her official capacity; COMMISSIONER RENEE A. LARRICK, in her official capacity, and COMMISSIONER WILLIAM B. RANEY, in his official capacity,

*Defendants*.

**REPLY IN SUPPORT OF MOTION TO DISMISS OF APPALACHIAN POWER COMPANY AND WHEELING POWER COMPANY**

The Court should grant the motion to dismiss of Intervenor-Defendants Appalachian Power Company ("APCo") and Wheeling Power Company ("WPCo"; collectively, the "Companies"). ECF No. 37 ("Mem."). Although the complaint should be dismissed for many reasons, Plaintiffs' Response underscores that two grounds are particularly clear and straightforward.

First, Plaintiffs base their suit on a premise—the "69% Directive"—that is false as a matter of law. Plaintiffs assert that the Public Service Commission of West Virginia ("Commission" or "PSC") issued "a series of ... orders" requiring the Companies to "fire their coal-fired power plants at a 69% capacity factor," come what may and even if doing so is uneconomic and costs customers more. ECF No. 1 ("Compl.") ¶ 1. But as the Companies explained, the orders say no such thing.

Mem. 6-11. Both the regulator who issued those orders (the PSC) and the regulated entities subject to those orders (the Companies) *agree* no such directive exists. And in their Response, Plaintiffs repeatedly concede that the purported "69% Directive" is at best a "presumption": The PSC assessed that "self-generation" via coal "would have been economic" for the relevant period "if the Companies had adequate coal supplied," ECF No. 41 ("Resp.") at 6 (quoting ECF No. 36-1 at 10 n.10), and it gave the Companies a "presumption" that the Companies could run at a 69% capacity factor, *id.* at 18—but a presumption the Companies could "rebut[]" by making certain showings, *id.* at 20 (quoting Compl. ¶ 86). Because Plaintiffs base their case on a legal mandate that does not exist, the suit must be dismissed based on lack of any injury-in-fact (and as unripe and for failure to state a claim, Mem. 2).

Second, Plaintiffs' Response makes clear that even if the "69% Directive" existed, Plaintiffs have not stated a preemption claim. Plaintiffs build their case entirely on *Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150 (2016). As Plaintiffs concede, *Hughes* condemns only programs where "a State [has] condition[ed] payment" on clearing FERC's wholesale auctions. *Id.* at 166. Thus, per Plaintiffs, "the Maryland program was unlawful because it conditioned payment on auction sales." Resp. 19 (quoting *Coal. for Competitive Elec. v. Zibelman*, 906 F.3d 41, 51 (2d Cir. 2018)). Here, the PSC has not done that—and Plaintiffs do not genuinely contend otherwise. They say that "PJM's FERC approved tariff requires [the Companies' plants] to sell into PJM." Resp. 20. But a requirement imposed by a FERC-approved tariff is not a state mandate. And if Plaintiffs were correct that *Hughes* condemns state regulation of generation and retail rates based on FERC requirements to sell into wholesale auctions, myriad state regulations within the core of their police power would fall. *Hughes* carefully guarded against this untenable result, and Plaintiffs' preemption claim thus fails as a matter of law.

The suit should be dismissed for additional reasons too. Sierra Club should be dismissed as a plaintiff because its asserted interest in lower retail rates is not germane to its alleged mission to replace fossil fuel generation with cleaner energy sources. Plaintiffs also lack a cause of action because *Ex parte Young* does not permit suit by bystanders like Plaintiffs and because their alleged interest in lower retail rates falls outside the zone of interests of the Federal Power Act ("FPA"). Finally, at minimum, the suit should be dismissed under the primary jurisdiction doctrine.

## ARGUMENT

### I. PLAINTIFFS LACK ARTICLE III STANDING.

#### A. Plaintiffs' Alleged Injury Is Not Fairly Traceable to the "69% Directive" Because There Is No "69% Directive" as a Matter of Law.

Plaintiffs lack Article III standing because their entire complaint is based on a premise that is false as a matter of law—that the PSC issued a "series of … orders ... directing [the Companies] to fire their coal-fired power plants at a 69% capacity factor." Compl. ¶ 1. The complaint grounds its single preemption count on the claim that this supposed directive "compels" the Companies "to achieve … a 69% capacity factor" regardless of "principles of Economic Dispatch" and thereby "compel[s]" the Companies to "bid[] into and clear[] the PJM energy market." Compl. ¶ 134. But as set forth in the Companies' motion to dismiss, *none* of the orders the PSC issued in the 2021, 2022, and 2023 ENEC proceedings imposed such a mandate. Mem. 6-11.

Most important, Plaintiffs' Response makes clear that they have no persuasive response to the January 2024 Order—the PSC's final word that resolved all three of the ENEC proceedings at issue in this case. That Order was crystal clear in expressly disclaiming any kind of 69% mandate, and it merits excerpting at some length. The Commission recounted that it had "explained several times that we arrived at the 69% capacity factor as a minimum target to strive for, based on the evidence before us in the 2021 ENEC *that self generation was more economical*." January 2024

Order at 8 n.10 (emphasis added). The Order emphasized that "[t]here should be no misunderstanding about maximizing self-generation and striving for a minimum target capacity utilization level *when self-generation was the most economical power supply choice*." *Id.* at 9 n.10 (emphasis added). And the Order reiterated that the "issue in this case is *not* whether the Companies achieved a 69 percent capacity factor, or any specific capacity factor." *Id.* According to the Order, "[i]f the projections regarding the economic benefit of self-generation had been incorrect, the Companies could have planned their daily generation accordingly and explained why that resulted in not meeting the target capacity utilization level." *Id.* That is the very opposite of the mandate on which Plaintiffs base their case. While the Companies disagree with aspects of how the Commission undertook its analysis—and so challenged the Commission's decision in the West Virginia Supreme Court—the January 2024 Order unequivocally demonstrates that the Commission did not base its decisions on a come-what-may "69% Directive."

Although Plaintiffs try to shrug off the January 2024 Order's dispositive provisions, Plaintiffs ultimately concede that the PSC based its decision on its assessment that "self-generation would have been economic" for the relevant period "if the Companies had adequate coal supplied" and that the Companies should reasonably have had enough coal to do so. Resp. 6-7. Plaintiffs also invoke the CTC Report, *id.*—but there, too, Plaintiffs concede that the January 2024 Order did not even adopt the CTC Report's suggested methodology that would have calculated the Companies' disallowance based on a 69% capacity factor. January 2024 Order at 26-30, 36. Plaintiffs have nothing else to say—and there is nothing else to say about this dispositive order. The PSC did not, either in terms or in substance, adopt a "69% Directive" in its final resolution of the Companies' 2021, 2022, and 2023 ENEC proceedings.

Plaintiffs therefore err when they assert that their "allegations regarding APCo and WPCo's uneconomic dispatch to comply with the Directive remain unchallenged" and that the "Companies sought every opportunity to 'seek clarification' or get the Commissioners to renege on the Directive [but] the Commissioners never did." Resp. 8. Indeed, in September 2023, after all the Commission's other orders, the Companies' witness entered pre-filed testimony as follows: "Given their overarching responsibility to control costs and the Commission's long-standing adherence to safeguarding the interests of public utility customers as one of the several factors it is statutorily required to consider, the Companies have chosen to assume that economic dispatch is still a controlling concept, unless and until the Commission expressly instructs them to the contrary." Compl. ¶ 102(d). And in the wake of that statement, the PSC issued the January 2024 Order with the unambiguous provisions just described. The Companies thus made unequivocally clear that they did not understand the PSC to have imposed a "69% Directive" or operate based on such a directive—and in the final January 2024 Order, the Commission confirmed the Companies were right.

None of the other orders help Plaintiffs either. To the contrary, Plaintiffs now all but concede that the PSC, at most, established a "presumption" that the Companies should operate at a 69% capacity factor. For example, as to the February 2023 Order, Plaintiffs repeatedly concede that the Commission created only a "rebuttable presumption" of cost recovery based on the 69% threshold. Resp. 6; *see id.* (suggesting that the January 2024 Order "did nothing to replace the previously established *presumption*" (emphasis added)). Indeed, the complaint itself quotes from the February 2023 Order that "[r]eaching that [69%] goal would not, by itself, be dispositive of the question of reasonableness of net ENEC costs if the costs were challenged by competent evidence." Compl. ¶ 86 (quoting February 2023 Order at 6). A rebuttable presumption that costs

could be recovered if the Companies operated at a particular level is not a directive. Such a presumption does not direct the Companies to operate at a 69% capacity factor. Neither does it even guarantee the Companies cost recovery if they *did* operate at a 69% capacity factor. *See id.* (stating that "[r]eaching that [69%] goal would not, by itself, be dispositive of the question of reasonableness of net ENEC costs"). Nor, conversely, does it rule out cost recovery if the Companies *did not* operate at a 69% capacity factor. *Id.* (explaining how cost recovery was still possible even "if [the Companies] do not achieve the 69 percent capacity factor" if certain considerations were satisfied).

The other orders similarly do not impose a "69% Directive." As to the original September 2021 Order, *see* Compl. ¶ 84(a), Plaintiffs now agree that the 69% capacity factor referenced in that order reflected the Commission's capacity *projections*—not a directive to operate at that level. *See* Resp. 5 (conceding that the "Commissioners were dissatisfied with [the Companies] 'capacity factor projections'" and "adjusted projected costs" on this basis). Nor do Plaintiffs dispute that the September 2021 Order expressly provided that these projected costs would be "subject to a true up in a future ENC proceeding," with the Companies permitted to demonstrate that their "actual costs are reasonable, prudently incurred and not contrary to the public interest in West Virginia." September 2021 Order at 6; *see* Mem. 8 (explaining that the "69% figure is an estimated target subject to further revision"). Similarly, as to the March 2022 Order, Compl. ¶ 84(b), Plaintiffs do not contest that the PSC characterized the 69% capacity factor as simply "an alternate projection" that was "subject to true-up," again making clear that the "Companies will have the opportunity to recover the actual costs if they can demonstrate that the costs are reasonable and prudently incurred." March 2022 Order at 3. A non-binding projection that the Companies were not ordered to follow, set forth in an order expressly stating that the Companies could be found to

act prudently if they did not achieve that level, is not a mandate. Finally, Plaintiffs do not dispute that the May 2022 Order at most set a target of 69% for the Companies to strive for, but did not direct the Companies to achieve that capacity factor. *See* Resp. 5; Mem. 9.

Plaintiffs at points wrongly suggest that the question of whether the PSC issued a "69% Directive" is subject to plausibility pleading standards. *See, e.g.*, Resp. 1, 3, 4 & n.1, 8. That error does not matter—because for the reasons just explained, Plaintiffs' claims about the PSC's orders are not plausible. But plausibility pleading is for factual questions, not legal questions. *E.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that the court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quotation marks omitted)). And whether or not the Commission has issued legally binding orders requiring the Companies to operate at a 69% capacity factor is a legal question. Just as this Court would not ask whether a plaintiff has plausibly pled the meaning of a Supreme Court decision or a federal statute, it does not ask whether Plaintiffs have plausibly characterized the PSC's orders. The Court determines what the PSC ordered. Indeed, Plaintiffs elsewhere acknowledge that the Court can resolve this question by reviewing the orders and that doing so would not convert the motions to dismiss to motions for summary judgment. *See* Resp. 4 & n.1 (stating that whether the "69% Directive" exists requires only a "review of the Orders themselves").

Plaintiffs also cannot make up for the lack of support for a "69% Directive" in the PSC's orders by pointing to isolated questions and statements made during the ENEC proceedings. Resp. 7-8. As the Commission itself has said, the "Commission speaks only through its orders." ECF No. 34, at 2. Thus, the Commission cannot and does not issue legally binding directives through

the statements or questions of individual Commissioners. *Cf., e.g.*, *Rangel v. United States*, 155 F. Supp. 2d 949, 954 (N.D. Ill. 2001) ("[T]he views of a justice at oral argument are not law" because "'[c]ourt decisions are made on the record ... and in accordance with the applicable law'" and "[t]he questions and statements that justices and other judges make at oral argument on appeal are made to satisfy their concerns about the arguments raised by the parties" (quoting *United States v. Grace*, 461 U.S. 171, 183 (1983) (ellipsis in original)). And the existence of a legal mandate certainly cannot be established by statements made by *Company* witnesses before the Commission.

Moreover, none of the quoted statements, even on its own terms, establishes a "69% Directive." At most, those statements reflect a back-and-forth about what import to place on the non-binding 69% target the PSC encouraged the Companies to achieve—a back-and-forth conclusively resolved by the Companies' September 2023 statement that they did not understand the PSC to have imposed a "69% Directive" and the PSC's confirmation in its final January 2024 Order that it had not done so. Plaintiffs also reference the West Virginia Supreme Court's recent decision on direct review of the January 2024 Order, but they have identified nothing in that decision supporting a "69% Directive" either. The West Virginia Supreme Court's passing references to a 69% capacity factor only confirm the Companies and PSC's position that this output level was simply a target and that prudence could still be demonstrated short of that level. *See, e.g.*, *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, No. 24-75, slip op. at 11 (W. Va. Nov. 13, 2024). Indeed, the most notable aspect of that state judicial proceeding is that, though the Companies and the PSC disagree about many aspects of the January 2024 Order, both agree that no "69% Directive" ever issued. Because no "69% Directive" exists as a matter of law, the suit should be dismissed for lack of Article III standing (and as unripe and for failure to state a

claim, Mem. 2). Plaintiffs have not established any injury-in-fact that would permit the suit to proceed.[1]

**B. Sierra Club Lacks Associational Standing.**

Sierra Club should be dismissed from the case for lack of Article III standing. An association has standing when at least one member "would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *Lane v. Holder*, 703 F.3d 668, 674 n.6 (4th Cir. 2012). Here, Sierra Club's suit does not "reasonably tend to further the general interests that individual members sought to vindicate in joining the association." *W. Va. Coal. Against Domestic Violence, Inc. v. Morrisey*, No. 19-cv-00434, 2020 WL 6948093, at *7 (S.D. W. Va. Nov. 25, 2020).

Plaintiffs concede that their "main injury is higher retail rates," Resp. 9, yet they seek to establish associational standing for Sierra Club based on its mission to "replace fossil fuel generation with cleaner energy sources," Compl. ¶ 26. The complaint nowhere explains how retail rates are germane to that purpose. Plaintiffs respond that Sierra Club's interest in lower retail rates is "germane" to its mission to replace fossil fuel generation because the complaint alleges that Plaintiffs "are injured by the uneconomic dispatch *of coal* that results from the 69% Directive." Resp. 9 (citing Compl. ¶¶ 21-25). But that reference to "coal" says nothing about the connection between retail rates and the replacement of fossil fuels. Plaintiffs attempt to close this disconnect in their Response, asserting that "success in this challenge ... 'would further the interests' of the

---

[1] Plaintiffs insinuate that it is in the Companies' "best interests if there were no Directive." Resp. 4. But Plaintiffs do not explain why that would be so. The Companies reject Plaintiffs' claims about a "69% Directive" because the PSC never issued such a directive.

Plaintiffs in replacing fossil fuel generation with cleaner energy sources, *which are also typically cheaper than fossil fuels and help reduce member[s'] electricity rates*." Resp. 9 (emphasis added). But the italicized language appears nowhere in the complaint.[2] And even if it did, this language all but concedes that the comparative costs of fossil fuel generation and cleaner energy sources are at best incidental to Sierra Club's mission. As the word "typically" suggests, Sierra Club promotes cleaner energy even when it is more expensive.

## II. PLAINTIFFS FAIL TO STATE A PREEMPTION CLAIM AS A MATTER OF LAW.

Even if the PSC had imposed a "69% Directive," Plaintiffs' field preemption claim would fail as a matter of law (and Plaintiffs have now disavowed any conflict preemption claim, Resp. 16 n.4). As the Companies explained, the supposed Directive is an exercise of West Virginia's dual jurisdiction over generation and retail rates, allegedly requiring the Companies to run their coal-fired power plants at a particular frequency, which would correspondingly entitle the Companies to recover from retail ratepayers their prudently incurred costs in doing so. Mem. 17. Moreover, the supposed Directive steers far clear of the problem the Supreme Court found in *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016)—the decision on which Plaintiffs stake their case. Resp. 16-20. As the Companies explained, the *Hughes* Court could not have been clearer: "So long as a State does not condition payment of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable." 578 U.S. at 166. And "[n]othing in [*Hughes*] should be read to foreclose Maryland

---

[2] In Plaintiffs' Proposed Surreply to the PSC's Motion to Dismiss, Plaintiffs cite ¶ 28 of the complaint in support of the proposition that "cleaner energy sources ... are also typically cheaper than fossil fuels and help reduce member's [sic] electricity rates." ECF No. 40-1 at 1. But that paragraph of the complaint does not support that proposition, and Plaintiffs correctly did not include that reference in support of that proposition in their subsequently filed response to the Companies' motion to dismiss. *See* Resp. 8.

and other States from [taking] measures 'untethered to a generator's wholesale market participation.'" *Id.* (quoting Brief for Respondents 40); *see id.* at 163 n.9. The PSC has not, even accepting Plaintiffs' allegations, conditioned payments on auction clearance or tethered them to wholesale market participation. So Plaintiffs' preemption claim fails.

Plaintiffs' Response, read with care, all but concedes their case. Plaintiffs' lead argument is that the alleged "69% Directive" resembles the pricing mechanism of the "contract for differences" in *Hughes*—because if the Companies comply with the Directive, they will also receive (in addition to their wholesale market revenues) the balance of "what they expend" in order to operate their plants at a 69% capacity factor. Resp. 18. But to begin, Plaintiffs on the very next page correctly concede that if a state has not "compell[ed] wholesale market participation," the financial mechanism is irrelevant. Resp. 19 (quotation marks omitted). Per Plaintiffs, and per the Second Circuit, "[s]pecifically, 'the tether in *Hughes* is tied to 'wholesale market *participation*,' not prices; the Maryland program was unlawful because it conditioned payment on auction sales.'" *Id.* (quoting *Zibelman*, 906 F.3d at 51 (internal citation omitted)).

As the Companies have explained, the PSC has not compelled wholesale market participation or conditioned payments on auction sales. Mem. 17. And again, Plaintiffs all but concede as much. They say "PJM's FERC approved tariff requires [the Companies' plants] to sell into PJM." Resp. 20; *see* Compl. ¶ 50. But as Plaintiffs do not dispute, that mandate comes from FERC (via PJM's tariff), not West Virginia. And *Hughes* is express that it condemns only State-imposed bid-and-clear requirements—*i.e.*, that "[s]o long as *a State* does not" take the impermissible steps, the law lacks the "fatal defect" the *Hughes* Court found. 578 U.S. at 166 (emphasis added). By the terms of the PSC's "69% Directive," the Companies could equally contract bilaterally for their production or sell their output directly to retail customers.

Nor would the PSC's actions be preempted simply because its orders recognize that the Companies' plants must sell into the wholesale auctions under PJM's market rules. Acknowledging reality does not intrude on the federal field. Indeed, Plaintiffs' argument—which invokes a *federal* mandate to make up for the lack of the state directive *Hughes* required—re-runs an argument rejected in the Zero Emission Credit litigation. There, too, the challengers claimed that a federal law, the Public Utility Holding Act, "require[d] the generators to sell entirely into the auction." *Coal. for Competitive Elec. v. Zibelman*, 272 F. Supp. 3d 554, 571 (S.D.N.Y. 2017), *aff'd*, 906 F.3d 41 (2d Cir. 2018). But as the district court explained, that was "irrelevant"—because "the critical point is that *New York* has not required the generators to participate in the auction." *Id.*

Nor does it matter under *Hughes* whether the Companies' coal-fired plants as a practical matter do, or even must, participate in PJM's wholesale auctions. *See Vill. of Old Mill Creek v. Star*, No. 17 CV 1163, 2017 WL 3008289, at *13 (N.D. Ill. July 14, 2017) (finding the Zero Emission Credit program not preempted because it "does not *mandate* auction clearing ... and the state, while taking advantage of [the] attributes [of the plants at issue] to confer a benefit on nuclear power, is not imposing a condition directly on wholesale transactions"), *aff'd sub nom. Elec. Power Supply Ass'n v. Star*, 904 F.3d 518 (7th Cir. 2018). If instead the FPA preempted states from regulating based on the practical necessity of selling into FERC's wholesale auctions, a wide variety of state programs would fall—because many generators face such a necessity. Avoiding that untenable result is exactly why *Hughes* kept its holding "limited" and emphasized that it did not touch "the permissibility of various other measures States might employ" to encourage particular types of generation that will ultimately participate in wholesale markets, "including tax

incentives, land grants, direct subsidies, construction of state-owned generation facilities, or re-regulation of the energy sector." 578 U.S. at 166.

Although those points suffice to require dismissal, Plaintiffs are also wrong that the pricing mechanism of the "69% Directive" is no different than the *Hughes* contract for differences. Resp. 18. In *Hughes*, Maryland set a contract price for each unit of capacity the generators sold and paid generators the difference between that price and the auction price, "adjusting [the] interstate wholesale rate" by "guarantee[ing]" generators a specific "rate distinct from the clearing price." 578 U.S. at 163. Here, if the PSC had indeed imposed a "69% Directive," that directive would not have guaranteed the Companies a particular per-unit price for their energy; rather, the PSC would simply have had to permit the Companies to recover their prudently incurred costs to meet the directive. *E.g.*, Compl. ¶¶ 63, 67-69. That is very different—and the difference is important because the "69% Directive" operates the same way that cost recovery in vertically integrated utilities generally does. If, for example, West Virginia had directed the Companies to build a wind farm, a solar array, or a new coal plant to serve retail customers, then the Companies would be entitled to recover from retail ratepayers the costs left over after accounting for the sales in FERC's markets and elsewhere. *E.g.*, Compl. ¶ 69. Indeed, the Second Circuit in *Zibelman* rejected a similar "price-tethering theory" precisely because that theory, if accepted, would invalidate the vertically integrated model, 906 F.3d at 51—relying on a prior decision, *Rochester Gas & Electric Corp. v. Public Service Commission of New York*, 754 F.2d 99 (2d Cir. 1985), affirming that the FPA does not do so.

In this case as well, *Rochester Gas* further underscores why Plaintiffs' arguments fail. Before FERC created auction markets, a New York vertically integrated utility principally made retail sales to its retail customers, but also made some "sales of electricity for resale, also called

wholesale or incidental sales." 754 F.2d at 100. When the state utility commission calculated how much the utility needed to recover from retail customers to recoup its costs, the commission subtracted "an estimate of incidental sales." *Id.* at 101. The utility claimed that approach was "preempted by the" FPA because it amounted to a regulation of the wholesale sales. *Id.* The Second Circuit, however, disagreed: "[T]here is a distinction between, on the one hand, regulating incidental sales, and on the other, reflecting the profits from a reasonable estimate of those sales in jurisdictional rates." *Id.* at 105. The Second Circuit thus held the state "may impute revenue from a reasonable estimate of [wholesale] sales" in determining what costs a vertically integrated utility may recover from retail customers. *Id.*; *accord Zibelman*, 906 F.3d at 51-52 (reaffirming *Rochester Gas*). That well-established distinction is fatal to Plaintiffs' preemption argument.

Indeed, another concession dooms yet further Plaintiffs' attempt to analogize to the *Hughes* contract for differences: The PSC, as alleged, established a "rebuttable presumption" only, and even "if the Companies do not reach a 69% capacity factor," they may "get cost recovery" by "demonstrat[ing] that they effectively bid and cleared the PJM energy market." Resp. 20; *see* Compl. ¶ 86. A rebuttable presumption is a far cry from the guaranteed payment the *Hughes* generators received. And this rebuttable presumption just does exactly what *Rochester Gas* held long ago state utility commissions *could* do: It is a way of "imput[ing] revenue from a reasonable estimate of [wholesale] sales," which state commissions may do because state retail ratepayers must pay the residual. 754 F.2d at 105; *see* Compl. ¶ 68.

## III. PLAINTIFFS LACK A CAUSE OF ACTION.

The complaint also must be dismissed because Plaintiffs lack of cause of action. *Ex parte Young* does not authorize their suit, and regardless, their claimed harms fall outside of the zone of interests of the statute they invoke—the FPA.

### A. Plaintiffs Lack a Cause of Action Under *Ex Parte Young*.

Plaintiffs lack a cause of action under *Ex parte Young*. Plaintiffs take the extreme position that *Ex parte Young* provides an equitable cause of action for any preemption plaintiff with Article III standing. *See, e.g.*, Resp. 14 n.2. As the Companies have explained, however, this theory has no support in history or case law, and the Tenth Circuit properly rejected it in *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017). Mem. 13-15. *Ex parte Young* does not permit bystanders who are not the subject of potential state enforcement proceedings to sue state official for injunctive relief. Mem. 13-15. And because the alleged "69% Directive" cannot be enforced against Plaintiffs, they cannot rely on *Ex parte Young*. *See Safe Sts.*, 859 F.3d at 895-96.

Plaintiffs' response—which relies heavily on *Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 645 (2002)—is unpersuasive. Resp. 12. *Ex parte Young* reached two separate holdings. First, the Court held that the Eleventh Amendment did not bar the suit because the Minnesota Attorney General, having acted unlawfully, was not immune from a suit for injunctive relief. *Ex parte Young*, 209 U.S. 123, 159-60 (1908). Second, the Court concluded that courts possessed equitable authority to issue an injunction to prevent a potential enforcement action against a regulated party. *Id.* at 165. Plaintiffs' reference to *Verizon*'s "straightforward inquiry" goes only to the first, Eleventh Amendment holding. As the Supreme Court has explained, this test is used only to "determin[e] whether the doctrine of *Ex parte Young*

avoids an Eleventh Amendment bar to suit." *Va. Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted).

It is not enough, however, for Plaintiffs to "avoid[] an Eleventh Amendment bar." *Id.* They must also show that equity gives them a cause of action in the present circumstances. *See, e.g.*, *Ind. Prot. & Advocacy Servs. v. Ind. Fam. & Soc. Servs. Admin*, 603 F.3d 365, 370-82 (7th Cir. 2010) (en banc) (analyzing these two issues separately). It does not. All the *Ex parte Young* cause of action authorizes is an anti-suit injunction—a suit that "pre-emptive[ly] assert[s] in equity ... a defense that would otherwise have been available in the State's enforcement proceedings at law." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 983 (7th Cir. 2012) (quotation marks omitted). Plaintiffs have not brought such a suit here. No enforcement action is impending against them, and none could ever be.

Plaintiffs otherwise offer no substantive response to the central thrust of the Companies' argument that Plaintiffs are bystanders, not themselves the potential target of any state enforcement, who cannot invoke *Ex parte Young*. Plaintiffs state that the Companies "mischaracterize Plaintiffs as bystanders *unaffected by* the Commissioner[s'] violation of federal law established in the FPA," when in fact Plaintiffs "are ratepayers who are and will be subject to higher rates." Resp. 13 (emphasis added). The question under *Ex parte Young*, however, is not whether Plaintiffs are "affected." It is whether they are potential subjects of state enforcement.

Plaintiffs cite two additional cases, neither of which offers them genuine support. The first, *CSX Transportation Inc. v. Board of Public Works of West Virginia*, 138 F.3d 537 (4th Cir. 1998), establishes only—in Plaintiffs' own words—that "*Ex parte Young* does not require any ongoing or imminent enforcement proceedings to invoke its protections." Resp. 14. That conclusion addresses only *imminence* and not whether *Ex parte Young* provides a cause of action to

individuals like Plaintiffs who can never face enforcement. Second, Plaintiffs cite a decision from this Court that they claim shows that there need not be a "direct threat" of enforcement for a case to proceed under *Ex parte Young*. *See* Resp. 14 (citing *Air Evac EMS, Inc. v. Cheatham*, 260 F. Supp. 3d 628, 639 (S.D. W. Va. 2017) (Johnston, J.)). But that case likewise focused on imminence, concluding that Plaintiffs could invoke *Ex parte Young* even if enforcement were merely threatened rather than imminent. *Air Evac EMS*, 260 F. Supp. 3d at 639. More than that, the Court held that "enforcement can be shown through a state-law scheme that imposes a 'compulsion or constraint' in contravention of federal law." *Id.* at 639-40 (citation omitted). That is nearly the opposite of Plaintiffs' position, which asserts that it is entirely irrelevant under *Ex parte Young* whether they could ever face "enforcement." *Id.* at 639.

### B. Plaintiffs Lack a Cause of Action Because Their Interest in Retail Rates Falls Outside the FPA's Zone of Interests.

Plaintiffs' suit should also be dismissed because Plaintiffs' alleged injury—higher retail rates—falls outside the zone of interests protected by the FPA. Plaintiffs do not appear to dispute that their asserted interest in lower retail rates falls outside the FPA's zone of interests. *See generally* 16 U.S.C. § 824(b).[3] Rather, Plaintiffs argue that the "prudential zone of interest test is inapplicable here" because they have proceeded under *Ex parte Young*, arguing that the PSC's orders violate the Supremacy Clause. Resp. 10. But even if Plaintiffs could proceed under *Ex Parte Young*, the Companies have cited closely analogous cases in which other district courts held that retail customers could not bring a preemption claim premised on the FPA based on an injury

---

[3] Plaintiffs cite several cases in their discussion of *Ex parte Young* that they describe as establishing that "[p]rotecting consumers from 'excessive rates' was a 'primary purpose' in the enactment of the FPA." Resp. 13 (quoting *Cities of Anaheim v. FERC*, 723 F.2d 656, 663 (9th Cir. 1984) (Reinhardt, C.J., concurring)). But Plaintiffs do not argue that those cases establish that Plaintiffs therefore fall within the FPA's zone of interests; as noted, they make no attempt to defend that proposition.

related to retail rates. *See Village of Old Mill Creek*, 2017 WL 3008289, at *6 (concluding that the "consumer plaintiffs' claim is expressly excluded from [the FPA's] interests because the states have the power to regulate retail sales of electricity and impose retail charges that are subject to state regulation"); *see also Nw. Requirements Utils. v. FERC*, 798 F.3d 796, 809 (9th Cir. 2015) (similar).

In response, Plaintiffs refer to a handful of cases that do not establish the general proposition that a zone-of-interests inquiry is inapplicable to preemption claims like those Plaintiffs press here. The only in-circuit case that Plaintiffs reference states that conclusion in dicta in a footnote at the end of the opinion, citing no precedent for that conclusion. *See Taubman Realty Grp. Ltd P'ship v. Mineta*, 320 F.3d 475, 481 n.3 (4th Cir. 2003). Moreover, *Taubman* premised its statement on the unexamined assumption that challengers can bring a freestanding "Supremacy Clause claim." *Id.* at 478-79, 481 n.3. The Supreme Court, however, has since clarified that "the Supremacy Clause does not confer a right of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). Now that the Supreme Court has confirmed that Plaintiffs need a cause of action and cannot simply rely on the Supremacy Clause, *Taubman* cannot support Plaintiffs' position that the FPA's zone of interests is irrelevant to whether they can pursue relief under *Ex parte Young*. If courts were to permit mere bystanders to invoke *Ex parte Young*, which the Companies maintain they should not, courts must at least ensure that those bystanders seek to vindicate interests that the FPA protects. It simply cannot be that plaintiffs who rely on express statutory causes of action must generally show that they are among the class that Congress intended to sue, but bystanders who invoke the "judge-made remedy" of *Ex parte Young* need not do so. *Armstrong*, 575 U.S. at 327.

## IV. FERC HAS PRIMARY JURISDICTION OVER ANY CLAIM THAT WEST VIRGINIA HAS THWARTED JUST AND REASONABLE RATES.

Finally, the Court should at minimum dismiss Plaintiffs' suit without prejudice because FERC has primary jurisdiction over their allegations that the alleged "69% Directive" has thwarted FERC's ability to ensure just and reasonable wholesale rates. *Reiter v. Cooper*, 507 U.S. 258, 268 (1993); *see* Compl. ¶ 113 (alleging that the Directive "interferes with PJM's operations and its objective to set just and reasonable rates"). As the Companies explained, this doctrine is "designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise," particularly with respect to "issues of fact not within the conventional experience of judges." *Env't Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996). Here, FERC is best positioned to hear Plaintiffs' grievance as to whether the PSC's alleged "69% Directive" undermines FERC's ability to ensure just and reasonable wholesale rates, and Congress has set forth a comprehensive administrative scheme that would permit Plaintiffs to seek FERC's resolution of that question.

In response, Plaintiffs identify four factors that guide the Court's primary jurisdiction inquiry. *See* Resp. 15; *but see In re Gerber Prods. Co. Heavy Metels Baby Food Litig.*, No. 21 CV 269, 2022 WL 10197651, at *11 (E.D. Va. Oct. 17, 2022) (acknowledging that the "applicable factors and weight given to those factors varies by circuit," and that the "Fourth Circuit has no fixed formula for determining when the doctrine applies"). Even assuming Plaintiffs' specific factors should guide this Court's analysis, those factors on balance support applying the primary jurisdiction doctrine. As to the first two factors, while preemption questions as a general category are generally within judges' competence, Plaintiffs' allegations concerning how the alleged 69% Directive impacts "PJM's operations and its objective to set just and reasonable rates," Compl. ¶ 113, is firmly within PJM's expertise. Moreover, as the Companies have explained, FERC can

decide preemption questions. Mem. 20 (citing *Cal. Pub. Utils. Comm'n*, 132 FERC ¶ 61,047, at PP 1-2 (2010)).

As for the third consideration, Plaintiffs' claim creates a risk of inconsistent rulings. For example, if a court accepted Plaintiffs' theory that considering wholesale market behavior in setting cost recovery via retail rates prevents FERC from establishing just and reasonable wholesale rates, it would create an inconsistency across FERC's markets—which are full of vertically integrated utilities whose state commissions, relying on the principle set forth in *Rochester Gas* decades ago, take account of wholesale market behavior in setting retail rates. If FERC in fact believed that doing so interfered with its wholesale markets (which is hard to conceive), the proper course would be for FERC to consider revising its market rules to establish a uniform approach. *Cf.* Mem. 20 (discussing this possibility). Finally, as to whether there has been a previous application to the agency, Plaintiffs' own case recognizes that this factor is not dispositive when other considerations are to the contrary. *See Gerber*, 2022 WL 10197651, at *15.

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed.

Dated: December 16, 2024

Respectfully submitted,

*/s/ Devon J. Stewart*

Kurt L. Krieger (W. Va. Bar No. 4927)
Devon J. Stewart (W. Va. Bar No. 11712)
S. Caleb Davis (W. Va. Bar No. 13833)
STEPTOE & JOHNSON PLLC
707 Virginia Street East, 17th Floor
Charleston, WV 25301
(304) 353-8000 (Telephone)
(304) 353-8100 (Fax)
devon.stewart@steptoe-johnson.com

*/s/ Zachary C. Schauf*

Zachary C. Schauf (PHV No. 56226)
JENNER & BLOCK LLP
1099 New York Ave. N.W. Suite 900
Washington, DC 20001-4412
(202) 639-6000 (Telephone)
(202) 639-6066 (Fax)
zschauf@jenner.com

*Counsel for Appalachian Power Company and Wheeling Power Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2024, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: December 16, 2024

*/s/ Devon J. Stewart*